IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  15-cr-00149-RM-06

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CRISTINA PORTILLOS,

    Defendant.

---

## GOVERNMENT'S SENTENCING STATEMENT

The United States of America, by and through Assistant United States Attorneys Martha A. Paluch, and Bryan D. Fields, files the following sentencing statement as required by D.C.COLO.LCrR 32.1(a)(1):

### STATUTORY PENALTIES

**Conspiracy to File False Claims for Refund:**  The defendant was convicted of Conspiracy to File False Claims for Refund as charged in Count 1, in violation of Title 18, United States Code, Section 286.  The maximum statutory penalties for this conviction are ten years of imprisonment, a fine of $250,000, or both, three years of supervised release, and a $100 special assessment fee.

**Aiding and Abetting the Filing of False Claims for Refund**:  The defendant was convicted of aiding and abetting in the filing of false claims for refund as charged in Counts 10, 12, 14-17, and 30.  The defendant asserted during trial that these claims were barred by the statute of limitations.  The Court took the matter under advisement as to Counts 10, 12, 14-16, and ordered the government to file a brief on this issue by

1

May 27, 2016. On this date, May 20, 2016, the United States filed a motion to dismiss Counts 10, 12, 14-16. If granted, the defendant will be sentenced solely on her convictions for Counts 1, 17, and 30. The maximum statutory penalties for each of Counts 17 and 30 are five years of imprisonment, a fine of $250,000, or both, three years of supervised release, and a $100 special assessment fee.

## FACTS RELEVANT TO SENTENCING

The tax fraud conspiracy of which the defendant was convicted operated in the following manner: Co-defendant Raul Caraveo obtained identifying information (names, dates of birth, social security numbers) from Colorado Department of Corrections (DOC) inmates with whom he was incarcerated and, in some instances, the inmates' family members. The identifying information was used by Raul Caraveo and co-defendant Eugene Chavez and other inmates to generate false Forms 1040A. All returns requested a tax refund that was generated by the Earned Income Tax Credit (EITC). Returns were filed for the tax years 2005 through 2013 and contained similar wages, deductions, Earned Income Tax Credits, and refund amounts for each respective year. The only differing information per year was the primary and dependent's identifying information and the amount requested.

Raul Caraveo, Eugene Chavez, and other inmates working with them mailed tax returns to co- defendants Sabrina Caraveo, Pamila Lucero, and Carolina Aragon. These defendants provided addresses to add to the returns for the receipt of the refund checks, or allowed their address to be used for receipt of the refund checks. The defendant Cristina Portillos was paid for allowing her address to be listed on the false tax returns and for receipt of the refund checks. The defendant provided the refund

checks sent to her home to Pam Lucero who cashed the checks and distributed the money among the members of the conspiracy.  Caraveo's cellmate and co-defendant Conrad Archuleta convinced his wife and co-defendant Nancy Guzman to receive refund checks at her address.  During the course of the conspiracy 259 false returns were submitted to the IRS seeking approximately $688,000 in refunds.  The IRS paid out approximately $370,000 in refunds on these false claims.

Recorded calls between Raul Caraveo and Pamila Lucero revealed that the defendant allowed her Baltic Street address to be used on 36 false tax returns submitted to the IRS.  These returns listed the names of DOC inmates and alleged that these inmates lived at the defendant's Baltic Street address when they did not.

Specifically, 14 refunds were issued on the false returns listing the defendant's address.[1]  All refund checks sent to the defendant's address were soon after cashed by the defendant's friend Pam Lucero.  Timelines were admitted at trial which established the phone calls that occurred between the defendant and Pam Lucero around the time the refund checks were issued by the IRS and mailed to the defendant's address.  *See* Govt. Exs. 255-256 and 259-262.

### Defendant's Knowledge of the Objective of the Conspiracy

Recorded calls admitted at trial established that the defendant conspired with Raul Caraveo and Pam Lucero to achieve the objective of the conspiracy – to make money from the IRS by filing false claims for refund.  Such calls include the following:

---

[1] Nine refunds were in the form of refund checks and five other refunds were applied to a non-IRS debt owed by the inmate, such as child support.

| Government Exhibit | Description / Quotation |
|---|---|
| 165S | Caraveo tells Lucero to pay Cristine "7."[2] |
| 168E | Lucero tells Caraveo that Cristine is asking whether she will be paid. |
| 172E | Caraveo tells Lucero that "Cristine is 8." |
| 173E | Lucero tells Caraveo Cristy wants her payday before she goes on vacation. |
| 180E | At Caraveo's direction, Lucero tells the defendant that Caraveo intends to pay her a bonus for being a good worker. Portillos is heard in the background as saying "Oh, I like bonuses." |

**Defendant's Knowing and Voluntary Participation in the Conspiracy**

At trial, the defendant testified that it was her voice talking either directly to Raul Caraveo or talking in the background while Pam Lucero was talking to Raul Caraveo (*i.e.,* Govt. Exhibit 180E "Oh, I like bonuses"). Each one of the recorded calls set forth in the previous section established the defendant's knowing and voluntary participation in this conspiracy.

In addition, in a recorded call marked Govt. Ex. 182E, the defendant spoke directly to Raul Caraveo. Caraveo says to the defendant, "Finally get to say what's up to one of the mother fucking integral parts of the M-O-B. You feel me?" The defendant responds, "Yes." Trial testimony from Sabrina Caraveo established that, while there was some confusion as to what the letters "M-O-B" stood for, there was no confusion over what Caraveo meant when he used this acronym: it was a reference to the conspiracy to file false claims.

In this same call, Caraveo says to the defendant, "Yeah, you know what to do hita. Hey thanks a lot for everything, all right?" The defendant responds, "Oh, no, yeah,

---

[2] Testimony at trial showed that shorthand references to something like "7," meant $700.

I agree." Caraveo then states, "Yeah, you know what's up," and the defendant responds, "Yes." The defendant *did* know what was up; she was fully aware of and involved in this conspiracy.

Recorded calls admitted at trial also established that the defendant did more than provide her address to be listed on the false tax returns and for receipt of the refund checks. Specifically, in a recorded call marked Govt. Ex. 200E, Lucero and Caraveo discuss their efforts to submit a false tax return in the name of a prisoner named "Steele." In that call, Lucero tells Caraveo that "Cristina" filled out a form and pulled up a form up at work. Sabrina Caraveo testified that she reviewed the tax returns filed in this case and recognized Raul Caraveo's handwriting on the majority of them, and identified her handwriting on others. However, she testified that the handwriting on the Steele return, Govt. Ex. 59, was unfamiliar. A reasonable inference from this testimony, coupled with the Steele phone call referenced above, is that it was the defendant's handwriting on this return. In addition, in yet another call, Govt. Ex. 201E, Lucero tells Caraveo that "Cristina" provided her with a form.

Accordingly, the recorded calls established that the defendant allowed her address to be used on false returns, received refund checks at her address, provided those refund checks to Pam Lucero, pulled up at least one tax form at work, provided at least one tax form to Lucero for use in the conspiracy, and was paid for her participation.

**In addition to her involvement in the conspiracy, the defendant aided and abetted in the submission of the false claims charged in Counts 17 and 30 of the indictment.**

Count 17 charged a false return in the name of Ermenejildo "Gilbert" Diaz which

5

listed the defendant's Baltic Street address. In a recorded call marked as Govt. Ex. 172E, Caraveo and Lucero discuss payment to the defendant of "8," or $800, for the Diaz return. Pam Lucero cashed this check.

Count 30 charged a false return in the name of Epifanio Aragon which listed the defendant's Baltic Street address. In a recorded call marked as Govt. Ex. 182E, Caraveo asked Lucero if anything else had arrived at "Cristy's." Lucero responded, "Yes we got letters for uh that crazy name." Caraveo asked, "Epafine?" And Lucero responds, "Yup." Pam Lucero also cashed this check.

The evidence at trial established that the defendant aided and abetted in the submission of these false claims for refund by allowing her address to be used on these returns and by notifying Lucero when these refund checks arrived at her home.

### Intended Loss Attributed to the Defendant

The first return listing the defendant's address was received by the IRS on December 14, 2009. The last return listing the defendant's address was received by the IRS on March 1, 2012. During this time frame, 193 of the 259 false returns were submitted to the IRS seeking $524,963 in refunds. *See United States v. Gassaway,* 81 F.3d 920, 922 (10th Cir. 1996) ("tax loss calculation [is] dependent upon intended rather than actual loss"). Pamila Lucero's phone records, Govt. Ex. 240, the recorded DOC calls, Govt. Exs. 149-209, and the defendant's own testimony established that the defendant was in almost constant contact with Pamila Lucero, and had multiple conversations with Raul Caraveo, during this time period. During these calls the tax fraud conspiracy was discussed by all three individuals.

The full amount of the intended loss during the scope of the defendant's

involvement is attributable to her because relevant conduct includes all reasonably foreseeable acts and omissions of co-defendants in furtherance of the jointly undertaken criminal activity and was within the scope of that activity.  § 1B1.3(a)(1)(B). *See United States v. Thompson,* 518 F.3d 832, 867 (10th Cir. 2008) ("[t]ax loss is determined from the reasonably foreseeable conduct of all co-actors, not just the defendant's own conduct"); *United States v. Allen,* 533 F. App'x 406, 411 (5th Cir. 2013) ("the point of § 1B1.3 is to hold a defendant responsible for the conduct of '*others.*'") (emphasis in original); *United States v. De La Cruz Suarez,* 601 F.3d 1202, 1221 (11th Cir. 2010) ("[i]f a defendant is aware of the scope of a conspiracy outside of [her] individual actions, [she] may be held accountable for actions by co-conspirators even though [she] was not personally involved").

The evidence admitted at trial established the scope of the jointly undertaken criminal activity – the filing of false tax returns.  The use of the defendant's and others' addresses was in furtherance of that criminal activity and reasonably foreseeable and in fact known to this defendant.[3]

**Obstruction Enhancement for Defendant's Obstruction of Justice**

Section 3C1.1 of the sentencing guidelines provides for a two-level enhancement if the defendant willfully obstructed the administration of justice "with respect to the investigation, prosecution, or sentencing" of the instant offense of conviction.  The Supreme Court explained that in the context of § 3C1.1, perjury takes place when "[a] witness testifying under oath or affirmation . . . gives false testimony concerning a

---

[3] This calculation of intended loss – the amount of refunds requested during the time the defendant was involved in the conspiracy – is the intended loss calculation the Court applied to Raul Caraveo and Eugene Chavez, and is the intended loss calculation agreed to by the parties with respect to Sabrina Caraveo and Carolina Aragon.  It is also the calculation the government will argue should be applied to Pamila Lucero.

material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan,* 507 U.S. 87, 94 (1993). The defendant cannot contend "that increasing her sentence because of her perjury interferes with her right to testify, for [the Court has] held on a number of occasions that a defendant's right to testify does not include a right to commit perjury." *Id.* at 96.

The Tenth Circuit requires the district court to identify the perjurious statement, "at least in substance" so that the Tenth Circuit need not "speculate on what the district court might have believed was the perjurious testimony." *United States v. Hawthorne,* 316 F.3d 1140, 1146 (10th Cir. 2003). For the enhancement, this Court must find the following elements: "(1) a false statement under oath, (2) concerning a material matter, (3) with the willful intent to provide false testimony." *Id.* (citing *Dunnigan,* 507 U.S. at 94).

Here, the defendant willfully obstructed the administration of justice with respect to the investigation and prosecution of this case in four ways: (1) she intentionally lied to the jury about her involvement in the scheme, (2) she intentionally lied to the jury about her receipt of IRS mail at her home, (3) she intentionally lied to the jury about her knowledge of Raul Caraveo, and (4) she intentionally obstructed the investigation by agreeing with her co-conspirators to lie to interviewing agents.

### Defendant's False Statements Regarding her Involvement in the Scheme

The guilt of this defendant hinged on whether the jury believed she was knowingly involved in this conspiracy, by allowing her address to be used on false tax returns and receiving refund checks at her address, and then providing those checks to

Lucero. On this, the most material aspect of the case, the defendant denied in both her interview with Agent Romero and on the stand any knowledge of this scheme.[4]

Specifically, when interviewed by Agent Romero, the defendant was adamant that no one had ever asked her to receive mail at her address and then give it to them. Defendant's Interview, attached to ECF No. 201, at Ex. C (INT_00001349). When asked directly if Pam Lucero asked her to receive mail for others, the defendant responded, "No." *Id.* at INT_00001378. At trial, the defendant denied all knowledge of the scheme and denied discussing the scheme with Pam Lucero.

However, the recorded calls and Lucero's phone records, Govt. Ex. 240, refuted the defendant's testimony that she had no contact with Pam Lucero about this scheme. This evidence included the following:

| Exhibit | Description / Quotation |
|---|---|
| Govt. 186E | In a recorded call, Lucero tells Caraveo she "just got off the phone with Cristina there's nothing there today either she's like Oh, Man!" Lucero's phone records show a call between Lucero and Portillos moments before this recorded call, confirming Lucero's statement that she had just spoken to "Cristina." |
| Govt. Ex. 192E<br>Govt. Exs. 52-54 | In a recorded call, Lucero tells Caraveo, "So anyway I called Cristina to confirm it is what I said it was. The Willhite or whatever." The corresponding tax returns in the name of inmate Richard Willhite all list Portillos's address. |
| Govt. Ex. 195E<br>Govt. Ex.. 117 | In a recorded call, Lucero tells Caraveo that "Cristina got another one of those watcha call it for that same other one." Caraveo asks, "for Will?" Lucero responds, "Yeah the fucking . . Yeah for the fucking . . . they're taking that for C-S . . . the whole thing." The corresponding tax transcript confirmed the information related from Portillos to Lucero to Caraveo: the refund was applied to a non-IRS obligation. |
| Govt. Ex. 182E<br>Govt. Ex. 100 | In a recorded call, Lucero tells Caraveo that for "8," they received a refund check for 6 bucks for "Epafine." The 2008 Epifanio Aragon refund check was in the amount of $600. Portillos, who gets on the phone later in the call, says something inaudible in the background. Lucero then reports "Cristina goes we spent it, thanks." |

---

[4] The defendant repeated these denials in an email she sent to Agent Romero after her December 7, 2012 interview, marked as Govt. Ex. 267.

| Exhibit | Description / Quotation |
|---|---|
| Govt. Ex. 188E<br>Govt. Exs. 50-51 | In a recorded call, Caraveo asks Lucero if Portillos "knows what's up" with respect to a return filed in the name of "Kevin." Lucero responds, "I've been telling her." Corresponding tax returns in the name of Kevin Woodard list Portillos's address. |
| Govt. Ex. 203E | In a recorded call, Caraveo asks the defendant directly if Lucero has been "hollering at you about what's cracking and shit, right?" The defendant responds, "Uh-huh." Caraveo then states, "Yeah, we all good though little nig . . . don't trip." |
| Govt. Ex. 160E | In a recorded call with Caraveo, Lucero confirms that the defendant is with her while discussing the scheme. Lucero tells Caraveo, "Cause one was going to Cristina's . . and she's here." |
| Govt. Ex. 205E | In a recorded call, Caraveo asks what's up with "Cristine." Lucero responds, "I don't know." Caraveo says, "Oh she's scared to death right now." Lucero's response is, "Probably . . you know she had all those ones." |

Given the volume of calls establishing the defendant's knowledge of and participation in this conspiracy, her testimony denying the same cannot be construed as the "result of confusion, mistake, or faulty memory." *Dunnigan,* 507 U.S. at 94.

**Defendant's False Statements about Receipt of IRS Mail**

In her interview, the defendant admitted to receiving IRS refund checks at her address, but told Agent Romero she returned them to sender. When asked whether she "returned all the IRS checks," she responded, "Anything that I get I return." INT_000001350. *See also* INT_00001362 ("I mean, I – I get more than just random IRS *checks*"). While in her statement to Agent Romero the defendant clearly referred to multiple checks, at trial she testified that she received *only one* IRS refund check and that she placed it in her mail box marked return to sender. Her testimony, and the implication from other defense witnesses she called to testify on her behalf, was that because the defendant was away from home often, someone could have stolen mail from her mailbox. Agent Romero, however, testified that no refund checks mailed to the defendant's address were ever returned to sender and that all nine checks were cashed

by the defendant's close friend Pam Lucero.

All nine refund checks were mailed to the defendant's house in 2010. During her interview, the defendant told Agent Romero that Pam Lucero watched her house in November of 2012. When asked if Lucero ever watched her house in 2010, the defendant responded, "No, more recently." INT_00001351. She also testified at trial that Pam Lucero did not live in Colorado Springs in 2010. The defendant's own statement and testimony undercut the false impression she attempted to convey to the jury regarding the possibility that Lucero stole the refund checks from her mailbox in 2010.

Moreover, on May 16, 2016, the Court received a letter written by Pam Lucero in which Lucero states that the defendant "only did as I asked, which was to use her address to receive mail." ECF No. 454. There was nothing in Pam Lucero's plea agreement that prevented her from coming to court and testifying on the defendant's behalf. Instead of facing cross-examination, Lucero now attempts to exculpate the defendant by stating the defendant only did as she (Lucero) asked. However, Lucero's statement *inculpates* the defendant, by directly contradicting the defendant's testimony that Lucero never asked to use her address, and confirms what the jury found: the defendant *did* agree that Lucero could "use her address to receive mail."

**Defendant's False Statements Regarding Knowledge of Raul Caraveo**

During her interview, the defendant was specifically asked if she knew anyone in prison in 2010 and she responded, "No, my kid's dad is the only one I've ever known in prison and he's out." INT_00001352. Later, when asked if Pam Lucero ever mentioned the names Raul Caraveo or Eugene Chavez, she answered, "Eugene Chavez sounds

11

familiar. I think she dated a Eugene." INT_00001375. The defendant never mentioned knowing Raul Caraveo.

At trial, the defendant admitted that it was her voice talking with Raul Caraveo. She testified she "assumed" the person she was talking to was "in jail," but claimed did not know who she was talking to. The personal nature of the defendant's calls with Caraveo directly refutes her testimony. In one such call, Govt. Ex. 206S, Caraveo asks the defendant for pictures of her naked breasts and states that Lucero has told him that "them motherfuckers is big nigger." The defendant responds, "I know cause she's heard me talking about them today." Caraveo goes on to inquire about the defendant's health issues. He then tells the defendant he "said some prayers" for her, and tells her "It's family first and you are my fam," and that when he gets out "the MOB going to take care of all their loved ones . . . just don't trip."

In Govt. Ex. 180E, Caraveo tells Lucero to tell the defendant she is going to receive a bonus for being a good worker. When Lucero does so, the defendant responds, "Oh, I like bonuses." When asked about this call during cross-examination, the defendant admitted that it is her voice saying "Oh, I like bonuses." When asked what work she had done that warranted a bonus, the defendant claimed she believed it was for accompanying Lucero on a trip to Delta for a supervised visit with Lucero's son, but maintained she did not know who it was that was saying she would receive a bonus.

In sum, the defendant's testimony at trial that she did not know Raul Caraveo defies credulity.

**Defendant's Obstruction of the Investigation**

Govt. Ex. 208E is a recorded call between Caraveo and Lucero that

occurred on November 9, 2012, approximately one month prior to the defendant's December 12, 2012 interview with Agent Romero. In this call, Lucero and Caraveo discuss the current investigation into the conspiracy and the interviews that are occurring of the people involved. Lucero tells Caraveo, "Well that's the only thing I'm saying is if anything with any link I just said . . . don't denying knowing me . . . but anything else nothing . . . I mean like I told Cristina . . . I said if anything . . . I was like told everyone else I said nothing . . . If anything they say something about gatos I just said well just say something was up with your mail or something."

In another recorded call, Govt. Ex. 207S, Lucero and Caraveo again discuss the investigation. In this call, Lucero tells Caraveo, "Um I don't know . . . they're asking if they knew anyone that was in prison . . . they haven't talked anything they just left a card. Cristina hasn't gotten back but Jen and Ton met up with them on Wednesday. They're asking if they know anyone up in prison and all this other shit and I was just like . . . and Jen's like 'no just my cousin.' So they're trying to find a weak link somewhere." Caraveo then tells Lucero to "just make sure that them niggers aint on no . . . You know what I mean?" Lucero responds, "I know. I already fucking let them know . . . I said no say nada nada nada."

This is exactly what the defendant did. She told Agent Romero she was having problems with her mail for some time, had been receiving mail that was not hers, and had complained to the Post Office about this. Nineteen times in her interview the defendant claimed she returned IRS mail to sender. She also said "nada" when asked any questions that could have implicated Pam Lucero or Raul Caraveo in this scheme. The defendant followed Lucero's instructions to lie to Agent Romero and say something

13

was up with her mail and she repeated this lie under oath at trial. Her testimony on this issue is a "(1) a false statement under oath, (2) concerning a material matter, (3) with the willful intent to provide false testimony." *Hawthorne,* 316 F.3d at 1146.

Agent Romero testified at trial that prior to interviewing the defendant, he left a business card at the defendant's Baltic Street address asking that she call him. Despite the phone call listed above in which Lucero tells Caraveo that "they just left a card. Cristina hasn't gotten back," the defendant testified under oath that she never received a card from Agent Romero. When pressed in cross-examination on how Pam Lucero would know that an agent's card had been left at her home if she (the defendant) did not tell Lucero, the defendant testified she did not know. While this false statement may not concern a material matter, it is certainly evidence the Court may consider in fashioning an appropriate sentence in this case. Indeed, "the evolutionary history of sentencing . . . demonstrates that it is proper – indeed, even necessary for the rational exercise of discretion – to consider the defendant's whole person and personality, as manifested by [her] conduct at trial and [her] testimony under oath, for whatever light those may shed on the sentencing decision." *United States v. Grayson,* 438 U.S. 41, 53 (1978), *superseded on other grounds by Barber v. Thomas*, 560 U.S. 474, 482 (2010).

In sum, there are a number of material false statements made by the defendant in both her interview and trial testimony that warrant application of a two-level enhancement pursuant to § 3C1.1.

## SENTENCING GUIDELINE COMPUTATIONS[5]

The defendant's convictions related to the conspiracy to file false claims for refund and aiding and abetting in the filing of false claims for refund group because the

---

[5] The November 1, 2015 Sentencing Guidelines Manual applies.

offense level is determined "largely on the basis of the total amount of harm or loss," U.S.S.G. § 3D1.2(d), and involve "substantially the same harm." *Id.* at § 3D1.2. The defendant's offense level is thus calculated as follows:

| | | |
|---|---|---:|
| Base Offense Level | (U.S.S.G. § 2B1.1(a)(2)) | 6 |
| Intended Loss of $524,963 | (U.S.S.G. § 2B1.1(b)(1)(G)) | +12 |
| Obstruction Enhancement | (U.S.S.G. § 3C1.1) | +2 |
| **TOTAL** | | 20 |

The defendant has never admitted that she committed any crime. Additionally, because she put the government to its burden of proof at trial by denying the essential factual elements of guilt, the adjustment for acceptance of responsibility does not apply to this defendant. § 3E1.1, App. N. 2.

The defendant does not appear to have any criminal history, which would place her in Criminal History Category I. Cross-referencing this Criminal History Category with an offense level of 20 yields an advisory range of 33-41 months' imprisonment, *id.* Chap. 5, Pt. A, an advisory fine range of $15,000 to $150,000, *id.* § 5E1.2(c)(3), and an advisory supervised release range of at least one but not more than three years, *id.* § 5D1.2(a)(2).

Respectfully submitted this 20th day of May, 2016.

                                            JOHN F. WALSH
                                            United States Attorney

                                            *s/ Martha A. Paluch*
                                            MARTHA A. PALUCH
                                            BRYAN D. FIELDS
                                            Assistant U.S. Attorneys
                                            1225 17th Street Suite 700
                                            Denver, CO  80202
                                            Telephone 303-454-0100
                                            Email: Martha.paluch@usdoj.gov
                                            Bryan.fields3@usdoj.gov

## CERTIFICATE OF SERVICE

  I hereby certify that on this 20th day of May, 2016, I electronically filed the foregoing GOVERNMENT'S SENTENCING STATEMENT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Mr. John Mosby
Counsel for Cristina Portillos
john_mosby@msn.com

Mr. John Schlie
Counsel for Pamila Lucero
johnhenry@schlielawfirm.com

Mr. Thomas Ward
Counsel for Eugene Chavez
tward@wardlawdenver.com

Mr. David Owen
Counsel for Conrad Archuleta
davidowen@lodopc.com

Mr. Martin Stuart
Counsel for Raul Caraveo
mstuart@portmanstuart.com

Ms. Marci Gilligan LaBranche
Counsel for Sabrina Caraveo
labranche@ridleylaw.com

Mr. Robert Pepin
Counsel for Carolina Aragon
Robert_Pepin@fd.org

Mr. John Sullivan
Counsel for Nancy Guzman
jfslaw1@aol.com


              *s/ Mariah Tracy*
              Mariah Tracy
              Legal Assistant
              U.S. Attorney's Office
              1225 17th Street, Suite 700
              Denver, CO 80202
              Telephone: (303) 454-0100
              FAX: (303) 454-0401
              Email: Mariah.Tracy@usdoj.gov