**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 15-cr-00149-RM-6

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**6.  CRISTINA PORTILLOS,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Motions Hearing)**
_____

        Proceedings before the HONORABLE RAYMOND P. MOORE,
Judge, United States District Court, for the District of
Colorado, commencing at 9:01 a.m. on the 16th day of
February, 2016, Alfred A. Arraj United States Courthouse,
Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MARTHA A. PALUCH, Office of the United States Attorney,
1225 17th Street, Suite 700, Denver, CO 80202

**FOR THE DEFENDANT:**
JOHN E. MOSBY, Attorney at Law, 621 17th St., Suite 1035,
Denver, CO 80293

1                            **FEBRUARY 16, 2016**

2               (Proceedings commence at 9:01 a.m.)

3               THE COURT:  Please be seated.  15-cr-149 United

4      States versus Cristina Portillos.

5               I will take appearances.

6               MS. PALUCH:  Good morning, Your Honor, Martha

7      Paluch appearing on behalf of the United States.  With me

8      at counsel table is Special Agent Tony Romero.

9               THE COURT:  Good morning, both of you.

10              MR. MOSBY:  Good morning, John Mosby appearing on

11     behalf of Cristina Portillos, who is also present.  And

12     also with me is Elisa Moran, assisting me.

13              THE COURT:  All right.  And good morning to all of

14     you.

15              I want to apologize at the outset for something

16     that may or may not happen.  At the very least, I want to

17     alert you to this.  Judge Daniel is out of town this

18     morning.  Why should you care?  You shouldn't.  But, he

19     has a jury that went out last week, and they did not

20     return a verdict on Friday.  So, over the weekend, he and

21     I talked, and if something comes up; they return the

22     verdict, I am going to have to break here, go upstairs and

23     deal with that, and then come back.

24              I'm hopeful that won't happen during the course of

25     our hearing, but you never know.  They may come in this

1    morning and decide to reach some quick verdict, although I

2    suspect that the fact that they couldn't do it at the end

3    of a Friday before a 3-day weekend is a signal.  Sadly,

4    judges, as much as lawyers, try to read jurors, and do it

5    as badly as lawyers.  I am taking it as a signal that

6    there are many things remaining to be discussed.

7            So, in any event, if I need to break, I wanted to

8    at least let you know why, and apologize for that in

9    advance.

10           Now, where we are is that we're here today on

11   several motions filed by Ms. Portillos.  And I think that

12   I have them correctly.  There is a motion for a James

13   hearing, 268.

14           A motion for disclosure of Jencks, 274.

15           A motion for severance, 275.

16           A motion for -- well, to dismiss based on selective

17   and vindictive prosecution, which is 201.  That motion is

18   restricted at level 1.  I don't think I am going to

19   restrict the argument here today, unless there is some

20   great need for that.  I understand why it was restricted;

21   there were materials that needed to be provided to me that

22   related to grand jury proceedings.  But I think the motion

23   today is on a more elevated level, if you would, than the

24   nuts and bolts of who said what on whom.

25           And, lastly, a motion for discovery, No. 288.

1          Have I missed anything, Mr. Mosby?  I don't think

2    so, but I want to make sure I didn't.

3          MR. MOSBY:  No, Your Honor, you have not.

4          THE COURT:  Okay.  Thank you.

5          Let's start with the easy one.  And what I mean by

6    that is 275, the motion for severance.  I am going to deny

7    it as moot.  There are no other defendants remaining in

8    the case.  My understanding is that Pamela Lucero filed a

9    notice of disposition, I have got 12/12, but I think

10   February 12th.

11         MS. PALUCH:  It is February 12, Your Honor.

12         THE COURT:  Okay.  And that means that

13   Ms. Portillos is the last remaining defendant in the case,

14   or the sole remaining defendant in the case.

15         MS. PALUCH:  That's correct, Your Honor.

16         THE COURT:  So there is nothing to sever her case

17   from.  As a result of that, 275 is denied as moot.

18         There was a motion -- I want to make sure that I

19   cover this.  There was a motion to supplement the motion

20   for severance, which was 301, to supplement it with some

21   additional material.  I believe I granted it.  If I

22   haven't, I will grant it now, but it doesn't change

23   anything.

24         MR. MOSBY:  Thank you.

25         THE COURT:  I take it I had granted it.

1          MR. MOSBY:  You did, Your Honor.

2          THE COURT:  So, let's talk about the other motions;

3     the James hearing.  Let's start with that one.  Let me --

4     I understand the defendant's position, like many

5     defendants, they want -- she wants a James hearing.  The

6     Government's position is we don't need a James hearing, we

7     can do it on proffer; is that right?

8          MS. PALUCH:  That's correct, Your Honor.

9          THE COURT:  You want to make any argument,

10    Mr. Mosby, with regard to this?  I will tell you, my

11    practice, to the extent that one develops a practice in

12    less than 3 years, is to deal with this by written proffer

13    and James log.  I think that is permitted by the Circuit

14    authority, and it is simpler in many respects than having

15    a full blown James hearing.

16          I understand that most defendants would prefer the

17    full blown James hearing.  And there are reasons for that

18    preference.  I am not suggesting there is anything

19    inappropriate about that.  But, you get a live witness,

20    you get to ask questions, it is a better mix, if you

21    would, for the defendant.

22          But I will permit you to argue, and I just want to

23    give you an insight into what I generally do.

24          MR. MOSBY:  I have no objection to going with the

25    Court's normal procedure.  I have no problem with that.

1        THE COURT:  So, the question is, how shall we do

2    this?  And what I think is -- when I say a "written

3    proffer," what I mean is a written proffer as to both

4    parts; to the existence of the conspiracy, and then a

5    James log attached to the proffer specifying the statement

6    that you wish to introduce, and the support for that

7    statement; how it is in furtherance of the conspiracy, and

8    any other items you need.

9        MS. PALUCH:  That's correct, Your Honor.  That is

10   my understanding.

11       THE COURT:  All right.  So 14 days.

12       MS. PALUCH:  Your Honor, I can file it tomorrow.

13       THE COURT:  All right.  Let's not be all powerful

14   about this.  I take there is not a ton of statements you

15   are looking to introduce, or are you just that ready?

16       MS. PALUCH:  No.  There are 24 pages, single-spaced

17   statements, we intend to introduce.

18       THE COURT:  Let's do this.  Let me give you at

19   least a week so you can look it over.

20       MS. PALUCH:  Certainly.

21       THE COURT:  Mr. Mosby, what would you like in

22   response?  Because what will happen is once she has filed

23   it, then I will give you a certain period of time within

24   which to review it and file any objection to the proffer,

25   as well as the James log.  You may or may not have such

1    objections, but I want to give you adequate time to do so.

2    And she has indicated -- Ms. Paluch has indicated there is

3    a considerable number of statements.

4         MR. MOSBY:  If this is, as normal documents -- if

5    she has 24 pages, normally on each page, there may be any

6    place from 5 to 10 statements, or is she talking about 24

7    statements?  If she is talking about 200 statements, Your

8    Honor, I will need at least 30 days.

9         THE COURT:  What are we talking about, Ms. Paluch?

10   I take it the statements have been produced by now.

11        MS. PALUCH:  Certainly, Your Honor, they have all

12   been.

13        MR. MOSBY:  Absolutely.

14        THE COURT:  So simply the identification of them

15   and then whether or not they are in furtherance of the

16   conspiracy, assuming the existence of a conspiracy.

17        MR. MOSBY:  In this case there are three separate

18   conspiracies at issue, so that will take awhile.

19        MS. PALUCH:  We dispute that.  There is one

20   conspiracy, Your Honor.  One conspiracy charged.  As to

21   the log, itself, I haven't counted up the actual number of

22   statements.  Some pages contain three, some pages contain

23   five excerpts from calls.  So I can't tell you.

24        There are substantial number of excerpts and phone

25   calls setting forth the conspiracy, as well as we believe

1    implicating the defendant in the conspiracy.

2          THE COURT:  All right.  How about a grand

3    compromise.  I will give you 3 weeks.  If you need more,

4    file something.

5          MR. MOSBY:  Thank you.

6          THE COURT:  Right.  Now we are shooting blind.  You

7    don't know what she is going to give you.  I don't know

8    what she is going to give you.  It may be material that is

9    well known to you.  It may be material that you are

10   surprised to see designated.  I can't get inside her head

11   or your head.  So let's say I will give you 21 days.  If

12   you need be an extra week, you can file a motion for that.

13         Cathy, I will look to you.  I suppose, let's make

14   it simple.  The 23rd for the Government's filing.  The

15   15th of March for Mr. Mosby's objections/response, if any.

16   And then when I have those materials, I will rule.

17         And, for current purposes, you should say that 268,

18   the motion, is still pending, but addressed.  It is not

19   taken under advisement yet, but to be taken under

20   advisement on submission of additional materials.

21         All right.  Now we have 274, the motion for Jencks.

22   Mr. Mosby, I will hear from you with regard to that.

23         MR. MOSBY:  Your Honor, basically, what we are

24   seeking with respect to this motion -- and this is also

25   related to the motion for more discovery -- is that we saw

1    the special agent's report.  I think in response to that,

2    we indicated that they could produce it, and they did, but

3    it was greatly blacked out, and really of no material

4    assistance.

5         I think, in their response that they filed to this

6    motion, that the Government indicated that they would be

7    willing to submit the entire report to the Court so the

8    Court could review it to see if there were additional

9    materials in it.

10        One of the things -- you really can't tell anything

11   by what is blacked out, how it relates.  But we think that

12   since, unquestionably, Agent Romero is going to testify,

13   that we're entitled to that entire special agent report.

14   And that is what was the subject of the Jencks motion.

15        THE COURT:  Okay.  There were some other parts of

16   it that I don't think are addressed by your comments, but

17   I am not sure there is really much to talk about with

18   regard to it.

19        As I saw the Jencks motion, there were four topics,

20   parts, whatever you want to call it.  There was a request

21   for production of witness statements.  My understanding is

22   that is done.  Is there any continuing argument with

23   respect to witness statements?

24        MR. MOSBY:  Well, the last --

25        THE COURT:  Apart from the extent to which the

1    special agent report constitutes a witness statements?

2         MR. MOSBY:  There is, because the Government had

3    been giving us the debriefings they were doing for all

4    individuals who have given notice of disposition.

5         THE COURT:  Right.

6         MR. MOSBY:  However, we do not have the debriefing

7    for Mr. Caraveo or, as I presume now, Ms. Lucero.  So we

8    would need their debriefings also.

9         THE COURT:  All right.

10         MS. PALUCH:  Your Honor, neither of those

11    defendants were debriefed.  We entered into a plea

12    agreement.  They pled guilty.  They're not cooperating

13    with the Government.  There is no debriefing.

14         THE COURT:  All right.

15         MR. MOSBY:  With that, I believe I have -- there

16    are hundreds of statements of people in this case.  I have

17    gone through all of them.  So I think that is resolved,

18    then, if there are no debriefings and they're not

19    cooperating with the Government.

20         THE COURT:  Okay.  So 274, to the extent that it

21    references or seeks witness statements, that is denied as

22    moot, because there are no statements that have not been

23    provided.  All right.

24         Let me skip over the special agent aspect of 274.

25    There was also a request for the agent's notes.  Well,

1    there is actually a request for two different forms of

2    notes.  There is the agent's notes, then there is

3    Government counsel's notes that are also referenced in the

4    motion.  Do you want to speak to those?

5        MR. MOSBY:  We definitely, at least -- I know that

6    when Agent Romero interviewed Pamela Lucero the first

7    time, he prepared a statement from his notes.  Many of the

8    other statements were also recorded at the same time.

9    And, basically, we do want the notes, for example, of --

10   he interviewed an individual by the name of Ms. Steinhaus

11   in December of 2014.  He interviewed her on,

12   hypothetically, on the 29th.  He took notes, and then he

13   recorded the interview on the next day over the phone.

14       And in the interview over the phone, he says, well,

15   yesterday you told me this, or yesterday you told me that.

16       THE COURT:  Right.

17       MR. MOSBY:  And we do want those notes involving

18   Ms. Steinhaus.  There are also, we believe, some notes

19   involving Sabrina Caraveo that we want also.  We also,

20   when he interviewed -- and we will get into that a little

21   more when we get into the last motion, but when he

22   interviewed Jennifer Leff and Tanya Barrett, he called

23   them up on the phone about a week before he had the actual

24   interview, and he talked to them about certain things,

25   because he also references his notes in that.  So we want

1    his note from that also because that is not part of their

2    taped conversation.

3         So we want the notes from Michelle Steinhaus, when

4    he called her up and interviewed her.  We also want the

5    notes from Tanya Barrett, and we want the notes from

6    Jennifer Leff also.

7         THE COURT:  All right.

8         MR. MOSBY:  We mentioned Pamela Lucero.

9         THE COURT:  What about the basis for the claim that

10   you want Government counsel's notes?

11        MR. MOSBY:  Well, I am going to withdraw that claim

12   for the Government counsel's notes, Your Honor, because,

13   you know, under Rule 16, you know --

14        THE COURT:  I don't disagree with you.  Okay.

15        MR. MOSBY:  Okay.

16        THE COURT:  274, to the extent it seeks

17   Government's counsel's notes, is withdrawn.

18        Let me hear from Ms. Paluch with regard to the

19   agent's notes, and only the agent's notes, not the special

20   agent report at this junction juncture.

21        MS. PALUCH:  Certainly, Your Honor.  As stated in

22   our response to this motion, it actually is the practice

23   of our office that if there are any handwritten notes of a

24   defendant, those are turned over.  As to agent's notes for

25   any other witness interview, the law is clear that Jencks,

1   by its terms, only applies to writings which are signed or

2   adopted by a witness and to accounts which are

3   substantially verbatim, recital of a witness' oral

4   statements.

5        Rough notes of an agent are not subject to <u>Jencks</u>

6   so, therefore, we do not provide rough notes.  And, as the

7   Court is aware, in this case, virtually every interview

8   conducted -- almost every single interview was of the main

9   individuals involved -- was recorded by a tape recorder.

10  And those recordings, and where they had been transcribed,

11  those have been turned over.

12       But, <u>Jencks</u> does not require production of an

13  agent's rough notes of interviews unless those are adopted

14  by a witness.  And <u>Jencks</u> simply doesn't apply in this

15  case.

16       THE COURT:  All right.  With respect to the agent's

17  notes, although I understand counsel's desire for the

18  notes, I do believe that Government counsel is correct;

19  that rough notes, which are neither shown to or adopted by

20  a witness, are not subject to <u>Jencks</u> materials.

21       Nonetheless, I do order that the notes of the

22  agent, to the extent they continue to exist, be

23  maintained, because who knows, we get into trial, there is

24  some reference to something, I simply want whatever notes

25  that were made, that they be maintained.  But I am not

1    ordering they be produced.

2           MS. PALUCH:  Understood, Your Honor.

3           THE COURT:  That leaves us with the special agent

4    report.  And I don't think there is really any dispute

5    about this.  The law is it can be submitted to me in

6    camera.  The Government has offered to do so.  Mr. Mosby

7    obviously wants an additional eye to look at the document.

8           I don't know if there is anything else to talk

9    about here, other than the timing of things.  And I think

10   what I want to have submitted to me is -- and I don't mean

11   filed, I mean brought to chambers.

12          MS. PALUCH:  Certainly.

13          THE COURT:  And what I am looking for are basically

14   three things.  First, the report, unredacted.  Second, and

15   I know this is fairly obvious, I think, by reviewing the

16   documents, but I don't want to do the hunting and pecking,

17   I would rather you peck and hunt for me.  Just a brief

18   indication on a separate sheet of paper as to which

19   portion of the special agent report was provided to

20   Mr. Mosby.

21          Now, I believe that that is largely attached to his

22   motion.  I can see it in redacted form, but I would like

23   it in one packet, then give me the redacted version you

24   gave to him, so when I sit down with it, I have it all

25   together in one place, rather than kind of chasing through

1    the record to find the three things.

2           So it is simply give me the report, an indication

3    as to what sections were provided to him, and then a copy

4    of those sections as provided to him; meaning redacted,

5    and that way I can compare -- that way I can compare the

6    redacted version with the original.

7           MS. PALUCH:  Certainly.

8           THE COURT:  Or unredacted version.  Ten days.

9           MS. PALUCH:  Certainly, Your Honor.  That is fine.

10          THE COURT:  So the 26th, next Friday, have that

11   brought up to chambers.  And I will review it, and then

12   issue a decision with regard to that after my review.

13          MS. PALUCH:  Your Honor, one point of

14   clarification.  Counsel has submitted to the Court the

15   redacted version.  So what I will give you is the complete

16   unredacted version.  I will give you this copy, which is

17   the redacted version, and then I will provide a sheet

18   explaining what was redacted.  Do I have that correct?

19          THE COURT:  Yeah.

20          MS. PALUCH:  Okay.  Thank you.

21          THE COURT:  That takes care of 274 and 288, which

22   288 is additional discovery, but it relates back to the

23   special agent report.  So, as I have indicated, 274 is

24   denied, except -- well, is withdrawn, except noted, to the

25   extent it deals with the special agent report.  It, as

1   well as 288, are addressed by my requirement that the

2   Government submit the materials that we have been

3   discussing, to me by the end of next week, 10 days from

4   now.

5            Then I will look at it, and the matters will be

6   taken under advisement at that time, and I will make a

7   decision thereafter.

8            That, I believe, brings us down to 201, which is

9   the motion for selective -- to dismiss on the basis of

10  selective and vindictive prosecution.  And I'm looking for

11  it.  Give me a moment.  All right.  I have that now in

12  front of me.  And I think that is the last motion to

13  address at this juncture.

14           Just to tee this up a little bit, what we have is a

15  motion asking for -- it is not truly a motion to dismiss,

16  it is a motion asking for a further-developed hearing and

17  discovery with respect to these issues.  So this motion,

18  this hearing, if you would, is somewhat preliminary.  At

19  least, it is going to be the basis upon which to decide

20  whether there is discovery and a yet further hearing with

21  regard to the issue of selective and vindictive

22  prosecution.

23           If there is, of course, selective and/or vindictive

24  prosecution, then what I assume I would be asked is to

25  dismiss on the basis of those matters.  But that's not

1    exactly where we are now.  Where we are now is a request

2    for a further developmental and evidentiary record; fair?

3            MR. MOSBY:  Yes, Your Honor.

4            THE COURT:  All right.  Then let me hear from you,

5    Mr. Mosby, about this matter.

6            MR. MOSBY:  And the Court is absolutely correct,

7    the motion is to decide whether or not there is discovery,

8    and then a further hearing would be appropriate.  With

9    respect to the two claims; selective prosecution and

10   vindictive prosecution, I must admit that upon reviewing

11   this, it was undiscovered concrete for me.

12           But, then getting into it, Your Honor, clearly the

13   law, and starting with Armstrong, I think, is a similar

14   case that people refer back to.  And the case in this

15   circuit comes down to DeBerry.  But the question here is

16   whether or not the plaintiff can produce some evidence or

17   threshold evidence of discriminatory effect and

18   discriminatory purpose.

19           Your Honor, there is absolutely no doubt that the

20   documents that we've submitted in this case demonstrate

21   that there were in this case white females who could have

22   been prosecuted by the Government but were not.

23           And, beyond a doubt, we can also show that those

24   individuals are similarly situated with defendant

25   Portillos.

1          To jump ahead of myself a little bit, I notice that

2    in the response, the Government bases its response upon a

3    false premise.  That false premise generated a response

4    from the Government using and citing to DeBerry that, take

5    our word for it, Your Honor, there was no discrimination

6    in this case.

7          The false premise upon which that is based is that

8    the selective prosecution, as well as the vindictive

9    prosecution, which I will discuss in a minute, is directed

10   to the U.S. Attorney.  It is not.  The case law -- and the

11   last one I submitted, was U.S. v. Jones, and that's the

12   case I referred to as, "see you, wouldn't want to be you

13   case," where they put the script.  That was directed

14   towards the police officer.

15         And there is also at least one case that I have

16   come across that have been directed to IRS agents, and

17   that is U.S. v. Coughlin, C-O-U-G-H-L-I-N, at 26 F.3d 656.

18   And a selective prosecution motion is directed to the

19   Government.

20         In this case, for example, at one of the seminal

21   cases that just jumps off the page at you, is this

22   incident involving Ms. Steinhaus.  It is alleged here that

23   my client received at her address six IRS checks.

24   Ms. Steinhaus received 11.

25         It is also clear that when you look at the other

1    individuals involved, for example, Ms. Steinhaus, although

2    she received 11 checks, they were all cashed, Agent

3    Romero, an IRS -- and there is no doubt that this is who

4    my motion is directed to; the IRS and the Government at

5    the investigative level.  No disrespect.

6        THE COURT:  Let me just stop for you a minute just

7    to make sure I clearly understand.  And let me just say

8    this, it doesn't need to be said, we are all adults and we

9    are proceeding as adults.  This is a valid motion, and the

10   nature of it, obviously, is somewhat accusatory.  That is

11   the nature of the beast.  And I note that both sides have

12   been professional in dealing with this and addressing this

13   and hopefully that will continue.

14       But, am I to understand that what you are saying to

15   me is that the allegation of selective prosecution is

16   being directed to the IRS and its investigative efforts

17   and not to the U.S. Attorney's Office, or --

18       MR. MOSBY:  It is not solely to the U.S. Attorney's

19   Office, all right.  Not solely.  I mean, of course, in

20   discovery I would seek to find out whether or not the IRS

21   has ever recommended, all right, prosecution that has been

22   rejected or whether it is automatic.

23       But what we are talking about -- and, you know, I

24   don't know the relationship or the relief between the U.S.

25   Attorney, but I also know that as part of the entire

1   prosecution, all right, that the IRS -- and if you read

2   their regulations, is involved.  The regulation even

3   requires that once the recommendation is sent to the

4   Government, the special agent has to also participate in

5   that prosecution.  All right.

6           So it is directed towards the Government.  And this

7   is why you need discovery, because I am standing here

8   telling the Court many things I can glean, I can infer,

9   but until I actually get some discovery, I can't really

10  make the motion to dismiss.

11          That is why you file this motion.  That is why the

12  Supreme Court says -- they talk about a threshold level of

13  evidence.  They talk about presenting some evidence just

14  to get discovery.  Because, at this point, it is, as I

15  said, it is undiscovered concrete until you get discovery.

16  Once you get discovery, there may be no basis for a

17  hearing, or it may amplify the basis for a hearing.

18          But, basically, what it says is, if I have evidence

19  of discriminatory effect and discriminatory purpose.

20  Discriminatory effect can be shown by showing that there

21  were similarly-situated individuals.  And unquestionably

22  it cannot be denied here; that there are

23  similarly-situated individuals.

24          Now, the Government argues, but she was the only

25  one that spoke to Caraveo.  There are four conversations.

1      Four.  The first conversation was on August 6, 2010.  The

2      second conversation was on January 5, 2012.  The next

3      conversation was April 9, 2012.  And the last conversation

4      was July 26, 2012.  The last three conversations had

5      absolutely nothing to do with any scheme or anything else.

6              In each one of those conversations, Caraveo is

7      asking the plaintiff for a picture -- and, excuse me, Your

8      Honor, of her tits.  That's it.

9              Now, the first conversation that they wanted to

10     distinguish these other women by, the first conversation,

11     Ms. Portillos, who was contacted for the first time for

12     help, she has known Pam Lucero for years.  She is a family

13     friend.  But she was contacted in 2010 when Pam Lucero

14     decided to get a divorce and move to Colorado Springs.

15             Ms. Portillos was contacted because Lucero's

16     husband got a restraining order that she could not see her

17     son unless it was in the presence of a third person.  She

18     contacted Cristina Portillos.  Cristina Portillos

19     submitted all her information to a court in Delta,

20     Colorado, so she could be approved as a monitor.

21             She's driving from Colorado Springs to Delta, in a

22     car, and she's driving.  Her daughter is in the back seat

23     of the car.  Pam Lucero gets a phone call.  And the person

24     on the phone call says, put that "hita" on the phone.  Let

25     me talk to her.

1          She gets on the phone, and excuse the language, "I

2     finally get to talk to this mother fucker who is an

3     integral part of the MOB."  What does she say, "oh, no."

4     I mean, she is driving a car down the highway.  That's the

5     conversation.  That is the only distinction that is made

6     between Portillos and the other three white females.

7          The Government is alleging she got paid.  The only

8     evidence they have that there was any payment to any of

9     Pam Lucero's friends, is a conversation where Caraveo

10    asked Lucero, "how much you paying your girls?"  She says,

11    "I give them all 3- or $400 a check."  She never says she

12    has given her any money.

13         There is no distinction.  We have shown that

14    similarly-situated individuals were treated differently.

15    Even more so, it is even more -- and you are right, it is

16    accusatory, but it is done in a professional manner.  This

17    is not personal.  This is, if I didn't do it, I get a

18    motion against me.

19         THE COURT:  Absolutely.

20         MR. MOSBY:  All right.  In this case, in this case,

21    Agent Romero, he wants to talk to Tanya Barrett and

22    Jennifer Leff, two of the white females.  What does he do?

23    He calls them up a week ahead of time, I need to make an

24    appointment with you to sit down, to ask you some

25    questions about Pam Lucero.

1    He needs to talk to Michelle Steinhaus.  What does

2  he do?  He calls her up ahead of time, I need a good time

3  to call you to talk to you.  I got some questions about

4  Pam Lucero.

5    What does he do when it comes to Portillos?  Shows

6  up at her job, unannounced.  Scares the hell out of her,

7  all right, and, basically, ambushed her.  She doesn't know

8  what it is about.  Her managers comes to her; these two

9  officers are here to see you.  What did I do?  She does

10  what any reasonable person -- I mean, what is this about?

11  Has somebody been hurt in my family?  Are my kids all

12  right.  I'll talk to them.  He doesn't give her a chance.

13    With respect to one white female, who got the most

14  checks, 11 checks, he doesn't even go down to Delta to

15  talk to her.  He just calls her on the phone and says, you

16  know what, listen, you didn't do anything wrong, I just

17  want to talk to you.  And even though he catches her in

18  lies, she lies to him about her contact with another

19  co-conspirator, Sabrina Caraveo, he still doesn't indict

20  her.

21    Herein lies the rub.  Herein lies the rub.  There

22  is another individual in Delta, her name is Mary Gallegos.

23  She is the mother of Gina Gallegos.  Same distance from

24  Denver, same 5-hour drive that he couldn't make to talk to

25  Michelle Steinhaus.  What does he do?  He sends two agents

1    down to talk to Ms. Gallegos.

2          Now, I admitted in my motion, I don't know her

3    race.  But it shows -- let's just assume hypothetically

4    for this argument that she is Hispanic.  You send two

5    agents down to Delta to talk to her, and the person who

6    receives the most checks in this case, you just call them

7    on the phone and talk to them and tell her no problem.

8          Agent Romero tells every individual in this case,

9    including Ms. Portillos, Pam is very manipulative.  She

10   used you.  All right.  You didn't do anything wrong.  Had

11   you done anything wrong, I would have read you your

12   rights.  He read no one their rights.

13         But, then, we look around, and they indict after

14   telling her she has done nothing wrong, after she

15   explained to him her relationship with Pam.  She has known

16   her since high school.  But, on the other hand, Tanya

17   Barrett has known her even longer; since high school.  You

18   know, there is simply no measurable difference between

19   these three white individuals and Cristina Portillos.  You

20   just can't find one.

21         And the same for the Government to say, well, she

22   talked on the phone to Caraveo, without putting that in

23   any context.  Talking on the phone.  Can I have a picture

24   of your tits?  Can you send me a picture?  Three times.

25   And the one time he said this outrageous language, "I

1     finally get to talk to the mother fucker who is an

2     integral part of the MOB."  And she is saying "What?  Oh,

3     no."  Okay.  That is what she says.

4           I agree, because she is going to say she is driving

5     a car with her child in the back seat, all she wants to do

6     is get this fool off the phone.  There is just no

7     difference, and there is no logic, there is no reason.

8     And the Government can't find one as to why this woman,

9     this Mexican-American woman, this sister of mine, there is

10    no reason that she was indicted and these three white

11    females were not.

12          She told them, I didn't know why mail was coming to

13    my house.  I went to the post office to complain about it.

14    Does he follow up and go to the post office to see?  No.

15    Do we?  Yes.  But we can't find -- the woman who was

16    working there is now gone.

17          But, you know, when I read Armstrong, when I read

18    Jones, when I read Meyer -- and Meyer is important.  Meyer

19    is very important.  U.S. v. Meyer.  That is the Park

20    Police case in Washington, D.C.  Because, one day the

21    Government says that -- and this will get into vindictive

22    prosecution, a pretrial setting, so I will hold off on

23    that for a minute until I talk about vindictive

24    prosecution, because they are really two separate things.

25          But, basically, Your Honor, I think that I have

1    shown this Court what the Tenth Circuit and what the

2    Supreme Court says that I have to produce to show

3    discriminatory effect.

4        Now, with respect to discriminatory purpose, and it

5    can be shown by the totality of the facts and the

6    circumstances, I am really amazed at how the cases for

7    selective prosecution really follow in many ways the cases

8    that the Supreme Court has decided in discrimination law.

9        And one case that comes to mind is Burdine v. Texas

10   Department of Social Services, where, in Footnote 9, it

11   clearly says, once I show -- once I show this Court

12   evidence of disparate treatment, you can't come forth with

13   argument.  You can't just say, well, we will not produce

14   any affidavits.  We will not respond to any of this.  I am

15   just going to tell the Court, we did nothing wrong.

16       Your Honor, I think we are entitled at this point

17   to discovery.  I think on our selective prosecution claim,

18   I believe that we have met all of the requirements of both

19   the Supreme Court and the Tenth Circuit.

20       Now, on the vindictive prosecution claim, separate

21   claim, and that is the case of U.S. v. Meyer.  And why is

22   that case important?  Because in response to that, the

23   Government argues that it can't exist in a pretrial

24   setting.  But, if you look at the Tenth Circuit case of

25   U.S. v. Raymer, they cite to U.S. v. Meyer.  And the case

 1    says, at page 1040, the case says that after Meyer, we no

 2    longer believe that you can't have vindictive prosecution

 3    in a pretrial setting.

 4         Your Honor, what happened in this case,

 5    Ms. Portillos belatedly so, asserted a constitutional

 6    right.  She said, I don't want to call Pam Lucero up on

 7    the phone and take any chance that I might be incriminated

 8    by what she says.

 9         Agent Romero, at her job, even though you can tell

10    from the tape when you listen to it, she is crying, I

11    don't want to call Pam.  Well, here is what he says.  I

12    talked to my superior, and in due respect to the U.S.

13    Attorney, I recognize what she said.  She said, I talked

14    to the U.S. Attorney, and here is what you have to do to

15    get out of the case.  He tells her, here is what you have

16    to do to prove you're innocent, and it will all be over.

17         Now, they're intertwined, the selective prosecution

18    and vindictive.  He didn't say that to any of the white

19    females.  He didn't tell them what they had to do.  She

20    says, this is my job.  I don't want to call Pam up on the

21    phone.  I don't want to ask her questions.  Romero says,

22    I'll give you the questions to ask, and we'll monitor the

23    whole thing.

24         Now, she says -- she's sweet -- I will do it

25    another day.  Come by my house.  She goes home, she picks

1    up the phone, and she talks to her mother and to her

2    father.  And they say, you got nothing to do with that.

3    Don't do it.  Don't get involved.

4         She then refuses to make the phone call.  Agent

5    Romero then sends her another e-mail back.  What does it

6    say?  Remember, I know where you work.  I know where you

7    work.  And the next thing she has been told by Agent

8    Romero, "I am going to tell you right now."  What he says

9    is "I am going to tell you right now, you haven't done

10   anything wrong."

11        Now, when he talked out at her job, on December 9,

12   2012, when he interviewed her, when he walked out of her

13   job, he left her with the thought, "you've done nothing

14   wrong."  Two years later she is indicted for conspiracy,

15   and six or seven other counts.

16        And, you know, we have raised a realistic

17   possibility, that is what we have to raise, because we

18   can't show actual malice.  But she can show that there is

19   a realistic possibility that because she did not make that

20   phone call, because she asserted her rights; she had a

21   right not to incriminate herself.  And when she did that,

22   the next thing you know, she is indicted.

23        And, once again, because the vindictive prosecution

24   is related to selective prosecution, you have to look at

25   what happened to these other white females.  Nothing.

1    They did no more nor less.  They were all, based on Agent

2    Romero's words, not mine, "manipulated" and used by Pam

3    Lucero; all of her five friends.

4        But, because one won't work the Government's wheel

5    in this vindictive prosecution claim and do what he tells

6    her to do, she gets indicted.  We are entitled, at least,

7    to discovery.  What evidence did you get when you walked

8    off her job, where you showed up unannounced, or you

9    intimidated her, what new evidence did you get between

10   December 9th and the day you indicted her?  What is the

11   new evidence?

12       THE COURT:  What are you looking for by way of

13   discovery?

14       MR. MOSBY:  You know, I'm looking at, to follow

15   suit on my argument in terms of now I do want -- I want

16   any notes he has relating to Steinhaus, relating to Tanya

17   Barrett, relating to Jennifer Leff, and possibly relating

18   to Ms. Gallegos, because I don't know what race she is.

19       And I want the Government to detail; you walked off

20   her job on December 9, 2012.  You told her -- not only did

21   he tell her, he told her manager, just tell her when you

22   go back there I need to talk to her, that she has done

23   nothing wrong.

24       So I want to know what evidence you got after

25   December 9th, that you didn't have before that date, that

 1     makes the Government and the prosecutor change their mind.

 2             THE COURT:  I am not necessarily deciding anything

 3     with regard to what he said or didn't say, but let's

 4     assume he said, "You didn't do anything wrong."  This

 5     sounds more cavalier than I mean it to be, but agents,

 6     police officers, they lie.  And they are permitted to lie.

 7             So, why am I taking this as, you know, rock solid

 8     affirmation of truth, and then using that rock solid

 9     affirmation to suggest that something else must have

10     happened?

11             MR. MOSBY:  Because in this case you are comparing

12     the conduct with that of other individuals.  I mean, sure,

13     I read the case of U.S. v.  -- I can't pronounce it --

14     Carce, C-A-R-C-E, the Supreme Court case involving the

15     IRS.  And they can say, that is a tactic.  I understand

16     that.  But I also understand that you cannot punish an

17     individual because she exercised a right.  A right.

18             She doesn't know -- and no disrespect, Pam Lucero,

19     even in the discovery, she suffers from bipolar disease,

20     and she has a lot of other problems.  And she did a few

21     years in the state mental hospital in 1998 and 1999.

22             And she is saying, I am not going to take a chance

23     with my life by calling someone up, not knowing what they

24     are going to say.  So just -- but what I am saying about

25     what he is saying -- and let him say that.  And

1    unfortunately, in my motion, the Government has said,

2    we're not going to respond.  We're not going to file the

3    affidavit.  We are not going to respond in any way.

4          And that is exactly what the Supreme Court said in

5    discrimination cases you can't do.  Argument of counsel is

6    not evidence.  The agent, if he just had given the

7    affidavit saying that, yeah, I said that, but that is just

8    a tactic, we say it all of the time.  He didn't say it.

9    They have no response.

10         But -- and let's say, when you told Jennifer

11   Leff -- he told her the same thing.  He said, listen, if I

12   thought you had done something, I would have read you your

13   rights.  Is that a tactic, or did he believe it when he

14   told her that?

15         He told Michelle Steinhaus, the only reason I am

16   talking to you is you are a friend of Pam's, and she

17   manipulated you.  Is that a tactic?  He told them all the

18   same thing.  And we are talking about the weight of the

19   evidence.  I understand tactics.  I understand police

20   officers.  They are doing their job, and they are doing a

21   valuable job, and they are doing a hard job.

22         But there is something about invoking something

23   called equal protection.  When you say it -- just when,

24   you know, you look at the Supreme Court, which says,

25   "Equal justice under the law."  And whenever we think

1    there is even a possibility that that is being strained

2    away from -- and we are here to lodge any defense.

3          But, you know, at least we're saying treat people

4    differently.  If you look at this case, every person who

5    was not -- who was not incarcerated -- there are three,

6    Archuletta, Caraveo, and Chavez.  But everyone who was not

7    incarcerated, they actually received a check and cashed a

8    check and took the money.  All of them except one person,

9    and she is sitting here today.  And all we are saying now

10   is, give us discovery.

11         The Court is going to get a chance to say,

12   Mr. Mosby, listen, I looked at it, and there is nothing

13   there.  What he did is within the realm of police work

14   investigation.  Because I am going to be arguing that it

15   is discriminatory and it is vindictive prosecution.  And

16   all I am asking is, did he treat her the way he treated

17   other similarly-situated individuals?

18         THE COURT:  And there is the rub.  At the end of

19   the day, as I look at both sides, you're saying to me that

20   she is similarly situated to these other individuals;

21   Steinhaus, Barrett, and Leff, who are white females.

22   Although, I think the gender doesn't mean a whole hell of

23   a lot in this case.  I mean she is a female, as well your

24   client.  But I suppose it adds to the similar situation.

25   All right.

1          So we have four women; three white ones and a

2     Latina.  And you're saying that what I should look at to

3     describe the outer boundaries of similarly situated is

4     what is it that they're accused of doing?  What I

5     understand the Government to be saying to me is, what you

6     should look at, to the extent you are talking about a

7     prosecutorial decision, is not only what is it they are

8     accused of doing but, what is the difference in the

9     quantum of evidence that we have for one as opposed to the

10    other?

11         At least that -- and it may be over simplifying it,

12    but that is the way I see it.  So the question becomes,

13    what is it that I should be looking at?

14         MR. MOSBY:  Let's talk about corner of evidence.

15    We are talking about Leff and Barrett.  They get two

16    checks.  We are talking about Steinhaus; she gets 11

17    checks.  We are talking about Portillos; she gets six.  I

18    think, at this point, and the Supreme Court addresses

19    that.  I think that is addressed in Armstrong, where they

20    talk about, "roughly," using the word in quotes, "roughly

21    similar."  There is never going to be an absolute exact

22    tool.  They are the same height they are the same weight.

23    That doesn't work, it is roughly equivalent.

24         In this case, in this case, there can be no

25    denying -- and whether Agent Romero was doing his job, and

1   with the exception of my client, I can tell you, he did a

2   good job.  But, I mean, I understand that he can ask

3   certain questions.  He can take certain actions.  He can

4   play the game.

5       And one things he did, and especially at her job --

6   and they talk about that in the case of U.S. v. Jones.

7   One of the elements they talked about when they had the

8   pictures of the people, is toying.  Toying with the

9   people.  He toyed with her.  He came in, and she is

10  saying, I don't want to do this.  But he kept pushing

11  forward.  I can't talk to you about this on the job.  He

12  kept pushing forward.

13      And then herein lies the rub.  You are ambushed on

14  one.  You come to their job.  They're in tears.  They're

15  telling you, like, I didn't do anything, but you don't let

16  up.  Then you turn around and say, I'm going to indict you

17  for what you told me on that day that I ambushed you at

18  your job.  I am going to indict you on that day that I

19  made you so uncomfortable that you were crying.  I am

20  going to use that against you now.

21      So, you know, I think what is similar to all of

22  these women is exactly what Agent Romero said.  You are

23  all friends of Pam Lucero.  And she used you all in the

24  same way.  That is what he told the grand jury.  She used

25  your addresses to get checks.

1        And so I think at this point, I think the question

2   of me is, have I complied with the law?  Have I

3   demonstrated discriminatory effect by showing similarly

4   situated?

5        Now, they are not all exactly the same.  But

6   they're similarly situated, in the context of <u>Armstrong</u>,

7   they're roughly similar.  Even with respect to the

8   vindictive prosecution, you know, we are all grown ups.

9   We know how it works out here in the real world.  All

10  right.  I mean, we know that the detective, going in, not

11  knowing people, he has techniques to use, and he uses

12  them.  And when it comes to fairness, it don't matter

13  until we get to you, and until we walk through those

14  doors.  That is when fairness kicks in.

15       Before that, everything is tactics.  It is rules.

16  It is the way we play the game.  But, you know, we have

17  shown what the law says we have to show.  They are

18  similarly situated.  The only thing the Government says

19  now, the only reason the Government gives for them not

20  being similarly situated is, she is the only one to talk

21  to Raul on the phone.  No, that is not enough.  That has

22  to be put in context.

23       Somebody hands you a phone.  These are prisoners in

24  a state institution.  They can't even call people unless

25  they are on the list.

1          THE COURT:  I am not suggesting that saying she is

2     the only one that talked to them in a distinguishing

3     feature.  Clearly, it is not.  But I don't hear them

4     saying, it is just she happened to talk to him on the

5     phone.  What I hear them saying, and I will hear in a

6     minute whether I am understanding this correctly, is that

7     during the course of that conversation, there were

8     statements made, or the conversation can be construed as

9     evidence of knowledge and involvement, and that creates a

10    quantum of evidence against her that is different than

11    against the other three women; Steinhaus, Barrett, and

12    Leff.

13         And that a prosecutor has to decide, on the basis

14    of evidence, who to prosecute and who not to.  So it is

15    not she talked to them, it is she talked to them, and that

16    conversation is incriminating.  And she lied about who she

17    knew in prison.  So, that's the way I'm hearing it.

18         Now, I am not saying that you necessarily hear it

19    the way I hear it.  But that is the way I am hearing it.

20    And if, in fact, we are talking about a prosecutorial

21    decision to go forward, what you're saying is the

22    interviews were similar, but you are not saying

23    necessarily -- you are not necessarily meeting this

24    allegation that the evidence is dissimilar so there is

25    really just -- they are basing their decision on the basis

1      of evidence not on the basis of race.

2              Let's look at Michelle Steinhaus.  Let's talk about

3      not the conspiracy, let's talk about the interdependency.

4      She gets a check.  She calls up another co-conspirator,

5      Sabrina Caraveo, and makes arrangements for her to get the

6      check.  But, yet, she tells Agent Romero she has never

7      talked to Sabrina Caraveo.  That is a prosecutorial

8      discretion.  And if you are going to use the fact that, as

9      they said in this case, she lied to the investigator,

10     because you ask her, do you know somebody?  You are at

11     somebody's job, and do you know this person, do you know

12     that person?

13             What happened -- and all of the friends say the

14     same thing.  Pam Lucero is just a live wire.  She talks

15     all of the time to everybody.  She talked to you on the

16     phone, Pam Lucero, in 2008.  She is married to Ernie

17     Romero.  Caraveo calls her up.  She gives him the phone to

18     talk to.  Pam Caraveo again asked her, well, do you think

19     Ernie's brother wants to get in on the scheme?

20             I mean, just the fact that she talked to someone,

21     it's the context.  And what does she say?  She says, "oh,

22     no."  Okay, I agree, that's it.  Then she gives the phone

23     back.

24             Now, they don't have any other phone calls.  Now,

25     what they have, they have Pam Lucero -- and they say it in

1    their motion, they say it in their response.  There was

2    evidence that could have incriminated all of the other

3    three.  In the special agent's report, Agent Romero writes

4    that Pam Lucero is telling Caraveo, let me check with

5    Tanya to see if I can use her address.  Let me get her

6    permission.  She is saying that.

7          She talks about all her girls.  Now, if all her

8    girls got between 3- and $400 a check, well, what makes

9    that believable when it comes to Cristina but not

10   believable when it comes to Steinhaus, since prosecutors

11   have to make a distinction.  That is the only evidence

12   they have that she derived any fruits from this alleged --

13   well, it was alleged, from this scheme.

14         So, I think at this point, we are talking

15   threshold.  We are talking some evidence.  We're not at

16   the point of asking the Judge, Your Honor, we are moving

17   that you throw this out and dismiss this based on

18   selective prosecution and vindictive prosecution.  We are

19   saying, at this point, have we reached that threshold to

20   ask the question, well, is there anything here, or is it

21   so devoid of any possibility or imagination that there

22   could be selective prosecution or vindictive prosecution

23   that we get no discovery and we get no chance, at least to

24   show, that that we have made a prima facie case.

25         And that is all we are trying to make now.  That is

1   all we can make, because we don't have any evidence.   That

2   is what discovery is for.   I don't know.   I don't know.

3   That is why I said, let me get some discovery.   Let me

4   then make an argument to the Court based on that, not

5   conjecture.

6        And, I think -- and for them to say this, we're not

7   going to even respond to these allegations -- and don't

8   get me wrong, I understand argument of counsel.   But, if

9   you accept what the Supreme Court says, when you got

10  discrimination, argument of counsel is not evidence.   We

11  are not going to put forth any evidence to counter.   And

12  we've put forth some evidence.   We have to be that strong

13  at this point, because we are fighting an uphill battle,

14  as it should be.   And that is the point that is made in

15  the response; that this is within the discretion of the

16  prosecutor; that you're infringing on their turf now, they

17  get to make this decision.

18       They do, unless there is allegations that equal

19  protection has been denied an individual.   And in this

20  case, there is one.   And in this case, there is some

21  evidence of it.   And it is the evidence we got.   That is

22  why they are saying you get discovery.

23       MS. PALUCH:   Thank you, Your Honor.   As the Court

24  is aware, in Armstrong the Supreme Court explained the

25  standard for discovery, to include an evidentiary hearing,

1      is rigorous.  To dispel the presumption that the

2      prosecutor has not violated the constitution of equal

3      protection, a defendant must present clear evidence to the

4      contrary.

5            The defendant must allege facts to show she has

6      been selectively prosecuted and that raise a reasonable

7      doubt that the propriety of the questioning -- the

8      propriety of the Government's charging decisions.  The

9      defendant cannot meet either of those burdens by

10     misstating -- astonishingly misstating the discovery in

11     this case.

12           This many months after the case has been filed and

13     the discovery that has been provided, to stand before the

14     Court and say that only six returns were mailed to this

15     defendant's address is a complete misstatement of the

16     evidence that the defendants have had since at least the

17     spring of last year.

18           This is not a case about numbers.  But, if we are

19     going to talk about numbers, let's do it correctly.

20     Thirty-six returns were received by the IRS that listed

21     the defendant's address, seeking close to $100,000 in

22     returns.  Of those, 14 refunds were issued.  Nine of those

23     were checks that were mailed to the defendant's house.

24     And five of them were refunds that offset other IRS debt

25     obligations that these inmates owed to the IRS.

1          That is over $38,000 that was actually paid out due

2     to this defendant's participation in this scheme.  To say

3     six, well, he is talking about at the time Agent Romero

4     interviewed this defendant, he understood that only six

5     checks had arrived to her house, and he was trying to get

6     to the bottom of it.

7          Defense counsel asked what changed?  Well, what

8     changed from the time the agent left that interview until

9     the time we charged this case, is we truly uncovered the

10    scope of this defendant's involvement.

11         At the time he interviewed the defendant, he didn't

12    know about the countless calls between Lucero and Caraveo

13    discussing this defendant's role in the scheme.  He didn't

14    know about the numerous calls in which this defendant is

15    on the phone with Caraveo and Lucero discussing her

16    integral part in the conspiracy, discussing the fact that

17    she is going to be paid a bonus because she is such a good

18    worker, to which she replies, "I like bonuses."

19         There is another call in which they discuss the

20    refund check arriving at her house, and Cristina tells

21    Lucero, "tell Caraveo we already spent it."

22         So to say we have very few calls, I think counsel

23    will be shocked when he receives the James log, because

24    apparently he hasn't listened to the calls or read the

25    transcripts, because there is ample evidence.

```
 1              THE COURT:  Let's keep it --
 2              MS. PALUCH:  I know, Your Honor, but to accuse the
 3    Government of charging this individual because of her
 4    race, if I don't take offense to that, then there is
 5    something wrong with how I do my job.
 6              THE COURT:  I don't think so.  Look, part of your
 7    job is you get accusations made against you.
 8              MS. PALUCH:  Absolutely.  I am entitled to respond.
 9              THE COURT:  Let's calm down and deal with the
10    accusation, because I understand where you are coming
11    from.  But I am not going to be moved by someone's
12    indignation.
13              MS. PALUCH:  I will try.
14              THE COURT:  I have indignation to my left.  I have
15    indignation to my right.  Everybody is indignant.
16              MS. PALUCH:  I will try to tone it down, Your
17    Honor.  But here is the thing.  To say we don't have
18    evidence implicating this defendant, that is different, to
19    a degree, than what we have from Steinhaus, Leff, and
20    Barrett, is completely a misstatement or not realizing
21    what the discovery in this case is.
22              Steinhaus admits to receiving mail for Lucero.  She
23    admits that she called her up and said, I have got mail
24    for you to pick up.  She admits that Lucero did the drive
25    to Delta to pick up this -- these checks.  How do I prove
```

1    criminal intent with that?

2         She admitted throughout the interview, I did this.

3    I was told that it was for family members or it was so

4    Ernie wouldn't intercept the mail.  I was told that she

5    had the authority to do this.  How do I disprove that?

6         I have nothing on a phone call implicating Michelle

7    Steinhaus, where she gets on the telephone and talks about

8    the scheme.  Sure, there is conversations in the phone

9    about a "Shelly," but what this defense counsel seems to

10   ignore is I have the burden of proof beyond a reasonable

11   doubt.

12        And I looked at every single individual even

13   remotely connected to this case.  And, as you can see,

14   Your Honor, by presiding over this case, we certainly were

15   not shy with who we charged.  We charged everyone we

16   believed we could make a case against.

17        And, believe me, Michelle Steinhaus, Tanya Barrett,

18   and Jennifer Leff, they received a lot of consideration by

19   the Government.  So, if we are going to talk numbers,

20   let's compare.  With Lucero we have up to a hundred

21   thousand dollars that was intended loss for 36 returns

22   mailed to her house.

23        Steinhaus 26 returns were received by the IRS, 13

24   refunds were issued, which was 12 checks, one debt

25   obligation.  Intended loss on Steinhaus was $70,000.

 1          Leff and Barrett --

 2          THE COURT:  Let's just not fall down the rat hole,

 3   because I think once we get down the rat hole, there is no

 4   getting out.  This is not about how many checks this one

 5   got and how many checks that one got, unless -- unless,

 6   there were something remarkable with regard to that.  For

 7   example, everyone else got -- the three white women got a

 8   hundred checks and this woman got one.

 9          Unless there is something remarkable in the

10   numbers, I am not going to sit down and say, you know, six

11   checks gets you prosecuted, 12 checks doesn't.

12          MS. PALUCH:  Right.  Here is where it is important,

13   Your Honor, is the defense started their argument with

14   Steinhaus got more checks and she didn't get charged.  My

15   client had fewer checks, and she got charged.

16          THE COURT:  I get that.

17          MS. PALUCH:  I am refuting that allegation.

18          THE COURT:  There is nothing remarkable presented

19   to me that suggests that I should make any kind of a

20   racial inference on the basis of number of checks.

21          MS. PALUCH:  Absolutely.

22          THE COURT:  So I am not really going down that

23   road.

24          MS. PALUCH:  Right.

25          THE COURT:  The road I am going down with you is, I

1    think as I said it to Mr. Mosby, my understanding of your

2    position is that the prosecutorial decision was one driven

3    by quantum of evidence.

4            MS. PALUCH:  That's correct, Your Honor.  That is

5    correct.

6            THE COURT:  And so talk to me about that.  And I

7    recognize that the number of checks fits within the broad

8    spectrum of quantum of evidence.  But you're focusing on

9    evidence of intent or knowledge or culpability.

10           MS. PALUCH:  Correct.

11           THE COURT:  And so talk to me about that.

12           MS. PALUCH:  The defendant has provided the Court

13   with a sworn affidavit saying she was the only person

14   allowed.  She also said that in her statement to the

15   agent.  She was the only person allowed to accompany Pam

16   Lucero in these drives to Delta to have visitation with

17   Pam Lucero's child.

18           During some of those visits, there are recorded

19   calls in which it is clear that the defendant is on the

20   phone.  They talk about the defendant's daughter's

21   birthday.  They talk about the defendant's birthday.

22   There can be no question that the defendant sitting at

23   this table is the individual in the car on the phone with

24   Raul Caraveo.

25           We don't have similar evidence to that effect on

1    Steinhaus, Leff, or Barrett.  We have pages and pages of

2    calls that have been culled out of 3,000 recorded prison

3    calls in which Lucero and Caraveo discuss at length the

4    defendant's involvement in this conspiracy.

5         We don't have prison calls in which Tanya's

6    knowledge and what Tanya said is all involved in this.  He

7    talks about, well, as far as friends and paying the

8    friends, that type of thing, how do we prove anyone else

9    got paid?  We can't prove anyone got paid, but what we can

10   prove is there is a call in which Caraveo says to pay her

11   a bonus, to which she says she likes bonuses.  They

12   discuss a figure of $200 or $250 being paid to this

13   defendant.

14        We don't have that information.  One of the telling

15   calls is Lucero tells Caraveo that she told her girls to

16   say, I'm having trouble with my mail.  When the IRS

17   interviews you, tell them you are having trouble with your

18   mail.  The only individual to say that repeatedly over and

19   over is this defendant.

20        Michelle Steinhaus readily admits that she received

21   mail from Lucero.  Leff and Barrett, they deny allowing

22   Lucero to -- actually, they say they received mail for

23   her, but deny all knowledge of IRS checks going to their

24   house.  They don't say, oh, my gosh I am having trouble

25   with my mail and I am receiving all this IRS mail and I

 1    don't know why it is.

 2         That is what this defendant says.  That

 3    distinguishes her.  She lies in her interview, and we can

 4    prove it.  She lies about knowing -- she is asked if she

 5    knows Caraveo or Chavez.  And her answer is, "I think I

 6    know a Chavez."  She leaves out Caraveo.

 7         The follow-up question is, do you know anyone in

 8    prison?  She says, the only person I have ever known in

 9    prison is my ex-husband.  We have calls that refute that.

10    So we are able to prove lies on this defendant that we

11    couldn't prove on the other women.

12         To say she was ambushed is a complete misstatement.

13    This agent left a card asking her to call him at her home.

14    He left the card at her home over a week before

15    approaching her at her place of business.  If she is not

16    going to respond to the agent, he has every right to

17    approach her and to discuss this matter with her.

18         And, again, at the time he interviewed her, that

19    was back in 2012.  The evidence -- the investigation was

20    still ongoing.  He was talking to people where he knew

21    refund checks were mailed to see what can they tell me.

22    Should he have told her, you did nothing wrong and you are

23    not in trouble?  Probably not, because at that point he

24    didn't have all of the evidence.  But that does not mean

25    that this is a case of selective prosecution.

1             The Constitution -- or the Supreme Court cases that

2       talk about the Constitution, they envision there is going

3       to be some selection in who is prosecuted.  And the

4       selection is based on our evidence.  Do we have the

5       evidence to prove that these people were involved?

6             And call after call after call, when the jury hears

7       all of the discussion about Cristina Portillos, and all of

8       the identifying factors of her and her Baltic Street

9       address, we have the evidence to convict this defendant.

10            Now let's talk about vindictive prosecution.  We

11      put forth in our response the case law that talks about --

12      that for the Government to charge someone who refuses to

13      cooperate, does not make a case a vindictive prosecution.

14      That is the pre-indictment setting.  It is standard for

15      defendants to either agree to cooperate or not to

16      cooperate.  That doesn't, per se, make this a vindictive

17      prosecution.

18            I take great offense to defense counsel asserting

19      that the transcript shows that the agent said the U.S.

20      Attorney told him to say this would take you out of the

21      case.  That is completely not what the transcript says,

22      and that is completely not true.

23            There is never a discussion between myself and this

24      agent that this would take the defendant out of the case.

25      And when given a chance to explain what he was thinking at

1    that time and if it is appropriate, the agent will do so

2    at that time.

3         I think, in his arguments, defense counsel is

4    trying to import civil standards into this criminal case.

5    And where are the affidavits, and where are the disputing

6    sworn statements?  What I provided in our response is

7    countervailing, concrete, legitimate reasons for the

8    distinction and the prosecution decisions made in this

9    case.

10        And that is what the case law says; that the

11   defendant has to meet both the effect and purpose prongs

12   of showing discrimination.  If the defendant meets those

13   prongs, which we submit the defendant has not, she is

14   entitled to an evidentiary hearing, unless the Government

15   puts forward adequate countervailing reasons to refute the

16   charge.  And here, the defendant has done just that.

17        We have explained to the Court why those three

18   women were not charged.  Believe me, if I could have

19   charged them, I would have.  So I have so many notes here,

20   Your Honor, of statements that were made by defense

21   counsel, that simply are not borne out by the discovery.

22        And let's go ahead and talk about discovery.  What

23   discovery?  Everything has been turned over.  Defense

24   counsel stands up and says, I would like to know what

25   discovery, what changed between her interview in December

1    and the time she was indicted.  I have explained, and he

2    has all of that.  He knows the number of the returns.

3         What changed is the agent making his way through

4    3,000 recorded calls and finding all of the references to

5    this individual, and explaining the evidence to our office

6    of what was implicating this defendant in this scheme.

7         So there is simply no merit to the claim that this

8    is selective prosecution.  Race never factors into any

9    charging decisions in this case.  I have explained to the

10   defense counsel very early on, at the beginning -- after

11   this case was charged, his client was on the phone, and we

12   have all of these phone calls implicating her.

13        THE COURT:  Let me interrupt you for a minute to do

14   something that I think is stupid, but I also think I

15   probably need to do.  The circuit probably knows you,

16   maybe they don't.  What is your race?

17        MS. PALUCH:  I am Caucasian.

18        THE COURT:  What is your agent's race?

19        MS. PALUCH:  He is Hispanic.

20        THE COURT:  I am not sure that anybody put that on

21   the record.  I am not sure it means anything, but I think

22   it is a question somebody might want to know, so I put

23   that there by asking you these questions.

24        MS. PALUCH:  Certainly.  You know, counsel points

25   out, we didn't know the race of Ms. Gallegos.  We didn't

1    respond to her in the motion, as the defendant pointed out

2    in his motion, Agent Romero didn't interview her.  But now

3    he is talking about Mary Gallegos.  So let's talk about

4    Mary Gallegos.  She was approached by Pam Lucero, who

5    asked her to receive mail, and Ms. Gallegos said, well,

6    why aren't the inmates' wives and family members receiving

7    this mail.

8         And Pam Lucero explained she had a power of

9    attorney.  There was nothing wrong.  There was nothing

10   illegal about doing this.  It is back to the evidence, and

11   how do we prove intent?  Leff and Barrett said we called

12   Lucero and said, what is going on?  I have done nothing

13   wrong.  You have done nothing wrong.  You haven't done

14   anything illegal.  I am sorry you got pulled into this.

15        You know, it just seems that defense counsel is

16   pointing out these people got checks, these people got

17   checks.  These people are white, these people are

18   Hispanic.  Why the difference?  The difference is the

19   evidence.  I can't prove intent on those people.

20        When Pam Lucero goes out and tells people, hey, I

21   just need a favor, I am going through a divorce, will you

22   receive mail on behalf of some friends of mine, they are

23   in prison, and they don't have anywhere for it to be sent.

24   I have a power of attorney, I can cash their checks.  You

25   are doing these people a favor.

1          And these people say, okay, you are my friend.  I

2     will trust you.  How do I prove that?  I don't know how I

3     could possibly charge any of those individuals.  The

4     women; Steinhaus, Leff, Barrett, we could not prove lies

5     in their statements.  We could prove this defendant lied.

6          So, I can go on and on, Your Honor.  I believe that

7     the standards that apply to a selective and vindictive

8     prosecution standard are so high, that I don't believe

9     this defendant can prove that he is entitled to any more

10    evidence or to an evidentiary hearing.  At this point, I

11    don't know what more we could possibly give.

12         What -- the running theme in his pleadings is, he

13    wants to know if Agent Romero recommended these women for

14    prosecution.  That clearly falls under work product.  It

15    clearly falls -- it is not Jencks material.  He wants to

16    know, what is his take on the statute of limitations.

17    What are the elements of the offense.  Those are some

18    things he put in his motion.  None of that is Jencks.

19         I stand firm on the belief that an agent's

20    recommendation for prosecution is not something for

21    discovery.  But, what I am going to state, for purposes of

22    this hearing never, never did this agent -- and it will be

23    borne out by the complete unredacted report that I provide

24    to you, he never recommended that these women be

25    prosecuted.  So you will have that.  And you will be able

1    to see that.

2           THE COURT:  I mean, now we are starting to cross

3    the stream, if you would.  I mean, look, he didn't

4    recommend they be prosecuted.  Why?  Because they are

5    white.  You know, you can twist or turn the pipe and look

6    down it one direction and say it is one thing, turn it

7    around and look down the other direction and say another.

8           I am not here to discuss the broader issue which

9    underlies all of this.  And the broader issue is, you

10   know, do you harbor some preference for white women as

11   opposed to Hispanic women?  Or does he harbor some

12   preference for white women over Hispanic women?  Those

13   issues aren't really anything that it is worth chasing.

14          What is worth talking about is are there

15   differences between these defendants?  Everybody be

16   adults, and everybody suck it up, and let's deal with what

17   is in front of us.  Are there differences between --

18   you're telling me there are differences in the evidence as

19   between charged and uncharged.

20          MS. PALUCH:  Absolutely.

21          THE COURT:  And I suppose I will come back to

22   Mr. Mosby and ask if there is any disagreement with that.

23   Because, what you've told me is that there is at least one

24   conversation, regardless of whether she is in a car or,

25   you know, wherever she is, there is at least one

1   conversation with Caraveo in which he's talking to her.

2   She says -- or he says to her, "Thanks a lot for

3   everything."  She says, "Yeah, I agree."  And there is

4   some other minor conversation.

5       Now, what the strength of that evidence is, that is

6   not for me to decide.  That is for a jury to decide.

7       MS. PALUCH:  Certainly.

8       THE COURT:  But there is a point of distinction.

9   There is conversation and communication directly between

10  her and somebody else, that is one of the people on the

11  inside, if you would, in the DOC.

12      Is there such evidence with respect to either

13  Steinhaus, Barrett, or Leff?

14      MS. PALUCH:  No, there is not, Your Honor.  There

15  is not.  And we looked.

16      THE COURT:  And is there any evidence of what you

17  consider to be -- I am not trying to resolve the question

18  of whether she lied or didn't lie.  Again, that is not for

19  me to decide.  But, if there is evidence from which you

20  can argue to a jury that she lied?  I understand that

21  there is, and I understand that that evidence is with

22  respect to what it means when she says, I don't know

23  anybody in prison, or I don't know -- again I may not have

24  it exactly the way you reported it in your response.

25      But the gist of it, when asked, do you know anybody

1    in prison?  Her answer is no, I don't know anybody except

2    some familial member or ex-familial member, but no

3    indication that she has ever communicated with or knows

4    anything about these other people.

5         Is there anything like that with respect to

6    Steinhaus, Barrett, or Leff?

7         MS. PALUCH:  Those women -- I believe Steinhaus

8    admits, and I could be wrong, it is either Leff or

9    Barrett, but they talk about knowing about Raul Caraveo.

10   They talk about knowing Chavez.  They don't deny --

11        THE COURT:  I am not interested in whether they

12   know or don't know them.  I am asking if there is a lie.

13        MS. PALUCH:  I can't prove a lie on those women.

14   Now, I need to back up.  There is one call, in preparing

15   the James log, that we found, where it appears that

16   someone named Tanya is talking to Caraveo.  There is no

17   discussion about the scheme, but they are discussing

18   Caraveo's concern about getting Lucero a job.

19        But there is nothing we can find in -- what we

20   state in our response is, we can't find calls on

21   Steinhaus, Leff, and Barrett, where it is similar to this

22   defendant, where they are talking to one of the

23   incarcerated defendants or through Pam Lucero, in which

24   there is discussion of the tax refund scheme.

25        So that was the distinction we went on, is forget

1 mail going to people's houses, because that, in and of

2 itself, if someone just agrees to receive mail for

3 someone, I don't know how the Government proves criminal

4 intent on agreeing to receive mail.

5   But, when you couple all of the returns, and then

6 you couple the phone calls, for example, what we list in

7 our response where they say Cristina -- the one with the

8 funny name has arrived at Cristina's house; Epifanio

9 Aragon.  That is one of the returns mailed to the

10 defendant's house.  There is a discussion about that one,

11 and we list it in our response.

12   So I hope I am answering your question, Your Honor.

13 But, what I am trying to say is that the body of evidence,

14 putting this defendant in this scheme, is absolutely

15 there, where I didn't have it with the other three

16 individuals.

17   THE COURT:  And I think you have answered this, but

18 I just want to be very precise.  Certainly, statements of

19 co-conspirators can be admitted against other

20 co-conspirators.  So if we have A, B, and C, if A and B

21 are talking about C, that evidence, assuming there is a

22 conspiracy and the statement is in furtherance of the

23 conspiracy, can be admitted against C.

24   What I'm understanding you to say is that beyond

25 that type of evidence, you look for something more that

1   gave an indication of at least personal acknowledgment, so
2   that it wouldn't be, at time of trial, well, Joey says she
3   is involved, so she must be involved; that there was
4   something above and beyond that.
5        Because, I think, if I understand from Mr. Mosby --
6   and the two of you go back and forth with regard to what
7   discovery says or doesn't say.  And my reaction to all of
8   that is that is really fascinating, but I have seen none
9   of it, so what am I to do with it?
10       MS. PALUCH:  Right.
11       THE COURT:  But what I understand you to say is
12   that that is not enough.
13       MS. PALUCH:  Right.
14       THE COURT:  From -- that wasn't enough in your
15   judgment.  You wanted something more.  And what you had by
16   way of more that exists for Ms. Portillos, and only for
17   her, when compared to Steinhaus, Barrett, and Leff is,
18   one, a lie.  And, two, some direct conversation that could
19   be interpreted as acknowledgment or knowledge or awareness
20   of the scheme.
21       MS. PALUCH:  That is exactly -- that is absolutely
22   correct, Your Honor.  That is what we have.  Now when we
23   talk about Lucero and Caraveo talking about Portillos,
24   that is a lot of what you will see in the James log that
25   we believe is admissible under 801(d)(2).

 1          There is a lot of that evidence.  Then we have the

 2     evidence with Cristina Portillos on the phone through

 3     Lucero talking about Caraveo talking about Lucero.  What

 4     we have, too, is we have Caraveo and Lucero talking about

 5     what we believe are these other women.

 6          But the only people who could put them in this

 7     conspiracy, who could come and testify and point the

 8     finger at them, would be Pam Lucero.  And even Raul

 9     Caraveo would be removed, because Caraveo didn't have --

10     he doesn't have direct contact.

11          The person who could have implicated those three

12     women is Pam Lucero, and Pam Lucero is not cooperating.

13     She never has, and she is not agreeing to cooperate.  Raul

14     Caraveo, that would have been even further removed for

15     Caraveo to come in and say, well, Pam Lucero says that

16     those women are involved.  Certainly 801(d)(2)(E), I think

17     I can get that in.  But is that strong enough to convict

18     someone, versus putting the defendant on the phone with

19     these people?

20          And to put it -- to just distill this down, what I

21     have said to defense counsel from the very beginning is

22     your client got on the phone and the other women didn't.

23     That was the distinction.  I had her on the phone.  I have

24     recorded calls of her.  I don't have that on the other

25     women.

1            Do I think those other women were involved?  I do.

2     I do.  But I can't prove it.  I can't prove it, and I

3     didn't have the evidence for it.  So what I'm saying is,

4     had she stayed off the phone -- we have a lie from her.

5     We have other evidence from her.  So what -- so I think we

6     are getting too far afield here when all of the evidence

7     goes to the jury.

8            But, if we come back to the Supreme Court, what it

9     says on selective and vindictive prosecution, the

10    defendant has a very, very high burden to receive an

11    evidentiary hearing or discovery on either of those

12    claims.  And if the Government comes forward with adequate

13    countervailing reasons to justify its prosecution

14    decisions, my understanding is it stops there.

15           I don't believe the defendant is entitled to any

16    more discovery.  And as I have said to the Court there is

17    nothing else I can give.  If the Court decides in its

18    judgment that the entire SAR is turned over, then that

19    would be the Court's call.  But the only thing that the

20    defense has not received is the SAR or any sort of notes

21    that are not Jencks material anyway.

22           So I don't know really where this can go any

23    further, when I have turned over all of the evidence.

24           THE COURT:  Well, in theory where it goes is an

25    evidentiary hearing.  He gets on the stand and he

1    cross-examines him and things of that nature.  So I'm a

2    little unclear as to exactly what else would be handed

3    over or done, but I do think that, you know, if I were to

4    rule in favor of the defendant, and there were an

5    evidentiary hearing, he could call the agent, and I could

6    then, you know, make a judgment based on credibility and

7    whether or not he would call you, and that is an

8    interesting story, and we can talk about that, as well.

9         And now I am drifting a little far afield, which is

10   to say there is stuff that could be at a stage two

11   proceeding.

12        MS. PALUCH:  You are correct.

13        THE COURT:  So I am not going to decide a stage one

14   issues by saying, no, there is nothing else.

15        MS. PALUCH:  I misspoke, Your Honor.  You are

16   absolutely correct.  The only relief I see here is if the

17   Court believes an evidentiary hearing is warranted.  Here

18   is something to contrast it.  Last week, or whenever it

19   was the defense provided to the Court the Jones case, and

20   the Jones case has egregious facts.  And on those

21   egregious facts, the relief they found warranted was an

22   evidentiary hearing.  And there, there was concrete

23   evidence of racial discrimination.

24        The officers had t-shirts made.  One of the

25   officers went so far as to send a derogatory post card to

1    the defendant.  If you read the facts of that case, it is

2    amazing the conduct of the officers in that case that was

3    such a racial overtone.

4         And that, the Court felt, was enough of

5    discriminatory purpose to get them to the next stage.  In

6    this case, if you contrast the facts of this case to

7    Jones, we have nothing of the sort.  Nothing of the sort.

8    What we have is the defense complaining that my client got

9    charged but those people didn't get charged.

10        There is nothing of racial purpose or racial intent

11   or anything in evidence of that nature in the discovery.

12   Nothing whatsoever.  So, in order to get to the

13   evidentiary hearing, even if you refer to the Jones

14   opinion, Your Honor, you will see -- and other case law,

15   as well, it has to be so concrete that race played a part

16   in the charging decision to even get to an evidentiary

17   hearing, which we believe would just be fishing or an

18   attempt to try to cross-examine the agent at a time that

19   is not appropriate.

20        The Supreme Court repeats that there is substantial

21   discretion afforded to the Government in deciding who gets

22   charged and who doesn't.  And there is selection that goes

23   into that process.  And that is inherent.  It is inherent

24   in the discretion of who to charge.  And we exercised that

25   discretion in a constitutional way and we exercised it by

1    selection based on the evidence that the Government had.

2         For these reasons, the Government is asking that

3    you deny the defendant's request for additional discovery

4    on these claims, and thank you for your time.

5         THE COURT:  All right.  Wait, wait, wait.  I

6    suppose I will ask this question, as well, because it is

7    not otherwise stated on the record as originally charged.

8    There are eight defendants; is that correct?

9         MS. PALUCH:  That's correct.

10        THE COURT:  Are they all of the same race or

11   national origin, ethnicity?

12        MS. PALUCH:  I would have to go through each.  I am

13   not certain of Raul Caraveo's ethnicity.  I believe he

14   might be African-American.  I don't know, to tell you the

15   truth.  Eugene Chavez, I believe he is Hispanic.  Pam

16   Lucero, Hispanic.  Melanie Palumbo, who is the

17   uncharged -- let me go in order.  Carolina Aragon is

18   Hispanic.  Nancy Guzman, Conrad Archuletta, Hispanic.

19   Melanie Palumbo is an unindicted co-conspirator.  She has

20   been charged.  She is Caucasian.

21        Have I answered the Court's questions?

22        THE COURT:  Yeah.  That is fine.

23        MS. PALUCH:  Thank you.

24        THE COURT:  All right.  Let's do this.  I am going

25   to give you a chance to respond, Mr. Mosby but I do need

1    to take 15 minutes to give my court reporter a break.  So

2    let's take a 15-minute recess.  We will come back at five

3    of.  I will hear from Mr. Mosby, then we will go from

4    there.

5              (A break is taken from 10:39 a.m. to 10:54 a.m.)

6              THE COURT:  Please be seated.

7              Mr. Mosby?

8              MR. MOSBY:  Okay.  First, Your Honor, let me

9    address -- I don't know if it is called a lie or not.  But

10   when you talk about the six checks and the 11 checks, that

11   is in the discovery.  That is in the transcripts that

12   we're talking about.  That is what Agent Romero told each

13   person.  That is what he told Portillos; you had six.  The

14   total number of checks, denying the 13, that is just in

15   discovery later on.

16             But, basically, why is the six and the 11

17   important?  They're important because now we hear, and the

18   Court is being told, well, we had two more years of

19   discovery before we found two more checks and more IRS

20   returns.

21             On the day that Agent Romero spoke to Tanya Barrett

22   and Jennifer Leff, he said, as far as I'm concerned,

23   you're out of it today.  He didn't wait to go through all

24   of the discovery to see if there were additional checks or

25   refunds.  On the day he that he talked to Steinhaus, he

1    told her that day, you may be called as a witness, but as

2    far as I'm concerned, you're out of it.

3          He only waited for one person to go for two more

4    years to look for information.  And, you are right, the

5    numbers really don't mean anything.  All right.  Like

6    counsel brings up, U.S. v, Jones, she says that is

7    egregious, okay, because that is a lot of discrimination,

8    and here we just got a little.  All right.  You know, that

9    is like having 16 votes as opposed to 1.

10          THE COURT:  You know, the top of her head is going

11    to hit the ceiling at some point.

12          MS. PALUCH:  It is already there.

13          THE COURT:  All right.

14          MR. MOSBY:  I'm trying to keep it real.  And I have

15    no disrespect --

16          THE COURT:  I recognize that.

17          MR. MOSBY:  I love everybody, all right.

18          THE COURT:  Mr. Mosby, over the course of my career

19    I have accused almost everybody of almost everything, so

20    it is okay.

21          MR. MOSBY:  But, you know, I'm still going to do my

22    job.  And, listen, I know -- I know there is a judge, an

23    honorable judge named Raymond Moore.  But if someone on

24    the street asked me yesterday, do you know Judge Moore?

25    No, I don't know him.  He's a judge.  We respect him.  But

1    I don't know him.

2          THE COURT:  You don't know how much that crushes

3    me.  I thought everybody knew me.

4          MR. MOSBY:  Let me get to the point.

5          THE COURT:  All right.  Fair enough.

6          MR. MOSBY:  If you ask somebody, do you know Raul?

7    No, she doesn't know Raul.  She doesn't know this man.

8    She doesn't know any of these people in prison.  She's

9    handed a phone.  She doesn't know who he is.  They are

10   saying she lied.  She didn't know these folks.  Only when

11   Pam Lucero hands her a phone, and when she hands it, she

12   is trying to get off of it.

13         They bring up something about a bonus.  That is

14   really interesting, because, see, they never give you the

15   context of these phone calls.  There are four phone calls.

16   Three of them, he wanted pictures of her titties.  She is

17   giggling and laughing.

18         But, on the bonus, the bonus is the same call.  It

19   is the same call, where he says, I finally get to talk to

20   the mother fucker.  She is like, what are you saying?  But

21   the bonus, the way it worked out, these are two criminals.

22   Raul doesn't trust Pam Lucero.  Pam Lucero is telling him

23   she's paying her girls money so she can get more.  So Raul

24   says, tells Cristina she has to get her bonus.  Pam says

25   nothing.

1        Raul -- I listened to the call.  Raul raises his

2    voice; tell her now.  Tell her.  Because he wants to

3    verify if Pam is really paying her girl.  That is the

4    bonus.  And Pam says, Raul says you are going to get a

5    bonus.  That's it.

6        And now you know, today, that Raul did talk to

7    another person.  He talked to Tanya.  Same conversation.

8    Because all these conversations -- let me put them in

9    context.  It is really unfair.  And most of them -- there

10   are one, two I found that have not been transcribed, but

11   most have.

12       But when you put them in context; hey, girl.  Hey,

13   home girl, when you going to send me a picture of your

14   tits?  Do a brother a favor, all right.  That is the type

15   of conversation.  The one conversation where someone is

16   driving down the hallway at 60 miles an hour and somebody

17   thrusts a phone call on them trying to get them to talk to

18   you.

19       And we need discovery, because we don't know.  I

20   can argue all day.  But I don't know the facts.  But I

21   know the difference between a fact and argument.  And now

22   we learn today, really -- and when you go through the

23   phone calls, there is one call.  One.  I told you about

24   the other three.  But they can get up and say I'm

25   overstating it, misstating it.  The other three have

1    nothing to do with the conspiracy.

2         The other one arguably says, all right, arguably,

3    "I finally get to talk to the mother fucker who is an

4    integral part of the MOB."  She doesn't know what MOB is.

5    And now you learn that, like I told you earlier, anybody

6    that was with Pam Lucero, if Pam's mother is there -- she

7    gives the phone to her husband, here, Raul wants to talk

8    to you.

9         Pam is with her new boyfriend.  She just had a new

10   child.  His name is Andrew.  Raul, let me talk to Andrew,

11   let me talk to him.  So, just saying that she talked on

12   the phone is meaningless unless you put this in context.

13        We need discovery.  And at this point we have made

14   a prima facie case.  Before we came in we may not have

15   been able to argue that Raul never talked to another one

16   of Pam Lucero's friends, but now that is on the table that

17   he did.  He talked to Tanya.

18        THE COURT:  Who is Tanya?

19        MR. MOSBY:  Tanya Barrett is one of the five

20   friends.

21        THE COURT:  What did he say to Tanya Barrett?

22        MR. MOSBY:  We don't know.

23        MS. PALUCH:  Your Honor, it has been provided in

24   discovery.  He has the call.

25        MR. MOSBY:  Listen, these calls are 20 minutes

1    long.  I can go to my office, start at 4:00 a.m., like I

2    do, I can listen all day, and you can only listen to so

3    many.  There are thousands of phone calls.  There are logs

4    for all of Pam Lucero's phone calls.  It is 28 pages.

5    Some of them are 10 on.  And you can't just listen to them

6    once, you have to get through all of the profanity and all

7    of the personal stuff, all right.

8            But, you know, the discovery in this case, there is

9    a lot.  There is a lot.  And they have given it all to me.

10   But what we are seeing here today is, we have met the

11   threshold requirement.  And, of course, there is always

12   going to be prosecutorial reasons.  But, here is what you

13   are hearing today.  I hope I get it right.

14           Well, after two more years of investigation, we

15   found more IRS returns and more checks.  But what happened

16   is, when Agent Romero talked to the white females, he told

17   them, as far as I'm concerned, your involvement is over

18   today.  All right.  He didn't wait to go through all of

19   the discovery.  He didn't wait to see if there were

20   additional returns.  He told them it was over.

21           And, I think, Your Honor, we have evidence from

22   which we should be able, at least -- and I'm going to

23   admit, you asked, and I have to answer about discovery, I

24   hadn't thought about.  I really hadn't thought about it,

25   because reading cases and going through and taking your

1    job serious, when you are going to come before a judge, I

2    just hadn't gone about the type of discovery I need.   I

3    want to take his deposition.

4         THE COURT:   In a criminal case?

5         MR. MOSBY:   Well, it's discovery.

6         THE COURT:   No.

7         MR. MOSBY:   No?

8         THE COURT:   No.

9         MR. MOSBY:   Okay.   Then I want to go and get the

10   depositions of these other three white women for this

11   motion.

12        THE COURT:   Let me be clear.   If you want to talk

13   to them, you can go talk to them.   So I'm not --

14        MR. MOSBY:   They are down in Delta, and I am

15   concerned about them being able to come up if we have a

16   hearing.

17        THE COURT:   Regardless, I'm not trying to resolve

18   discovery issues.

19        MR. MOSBY:   I hadn't thought about it before you

20   asked me the question.   I really hadn't thought about it.

21   I hadn't gotten that far.

22        THE COURT:   Okay.

23        MR. MOSBY:   But, Your Honor, I really think that

24   you can no longer say she was the only one that talked.

25   And, in their response, their response says it right

1    there, she was the only one that talked to Raul.  She was

2    not the only one to talk to Raul.  Tanya also talked to

3    Raul.

4          So if that was the difference, because they gave

5    you what factors were different in their motion, that

6    blows hole in that, and we are entitled to at least

7    discovery and to a hearing.

8          THE COURT:  Just on the Tanya conversation.  That

9    is all I am interested in.  Talk to me.

10         MS. PALUCH:  I have to respond, where he is saying

11   here is what the motion said, our response.  Then it is

12   not similarly situated to Steinhaus, Leff, or Barrett

13   because the Government cannot find any recorded DOC calls

14   and these women discussing the tax fraud scheme.

15         THE COURT:  I can read.

16         MS. PALUCH:  I know, I need to clarify that for the

17   record.  He is misstating what we have represented.  As to

18   the Tanya call, here is what we found in preparation of

19   the James log, was one call with a Tanya.  There is no

20   identifying information who it is.  Raul talked to her

21   about Lucero needing to get a job, and talked about Raul

22   wanting to cut a music track, a song with Barrett.  And we

23   can provide to defense counsel the date and time of that

24   call.  That is all we could find on Tanya.  Nothing to do

25   with the tax refund scheme.

1          THE COURT:  All right.  Let me address this motion

2     in this way.  To some extent, this is compounded by the

3     fact that in the various arguments people are asking me to

4     draw inferences, which I have no intention of drawing,

5     because it is not my job necessarily to be drawing these

6     inferences.

7          For example, you know, Mr. Mosby says she is handed

8     the phone and she just wants to get off the phone and she

9     has a different meaning, interpretation of what does no

10    mean and things like that.  I am not going down that road.

11    That is not my job.  That is argument to the jury in terms

12    of what the conversation actually meant.

13         Similarly, you know, I hear from the Government at

14    various points in time, things about you know how many

15    calls and how many checks and, you know, what the amounts

16    are and things of that nature and what inferences to draw

17    from that.  I am not hear to draw all of the inferences

18    and decide who is guilty or not guilty.  That is not the

19    function.

20         Ultimately, who to prosecute is within the province

21    of the executive.  In this instance, that means the U.S.

22    Attorney's Office.

23         Now, counsel is correct that there has to be some

24    clear evidence that displaces the presumption of a lawful

25    decision having been made by the Government.  In this

1    instance, that evidence has to show that Ms. Portillos was

2    singled out, unlike other similarly situated.  And, two,

3    that the selection of her for prosecution was, I don't

4    know, in bad faith or based on impermissible consideration

5    of race.

6         Although there is some fuzziness here, and what I

7    mean by that is this; there could be such a claim made

8    with respect to a further investigation, or there could be

9    such a claim made with respect to the decision to

10   prosecute.

11        I am not aware of anything here that fairly

12   presents this as some kind of a prosecutorial or

13   investigative issue.  I see it as a prosecution issue.

14   Because it has been said to me these people were charged

15   and these people were not.  And frankly, I am not even

16   remotely -- it has not been remotely suggested to me that

17   further investigation of the white women or the Latina

18   women would have produced something that I should be

19   focusing on here.

20        In any event, I don't fault Ms. Portillos at all

21   for saying that in a circumstance where all of the named

22   defendants are minorities, and where the unindicted

23   co-conspirator is white, and the three persons that have

24   been identified to me; Steinhaus Barrett, and Leff, as

25   similarly situated to Ms. Portillos, are white and not

1    prosecuted.  There is something there from which one could

2    draw at least an inference of some kind of a racial

3    decision.

4           Having said that, what happens is that the

5    Government has come back and said that may be, but here is

6    the basis of our decision.  And our decision was on the

7    basis of a type of evidence that we had with respect to

8    Ms. Portillos that we did not have with respect to

9    Steinhaus, Barrett, or Leff.

10          That evidence is of two types, as it has been

11   explained to me.  And I will say this, all of this is laid

12   out in the Government's response.  And I firmly believe

13   that if there were some misstatement of what the call says

14   -- I understand there may be some other things discussed.

15   But, in terms of what is presented to me, there is no

16   challenge, no disagreement, no argument, no dispute as to

17   what the call says.

18          And, regardless of how you look at it, what I get

19   is -- and I am quoting the call as presented to me, that

20   Caraveo says to this defendant, "I finally get to say

21   what's up to one of the mother fucking integral parts of

22   the MOB."  He then thanks her a lot for everything she

23   agrees.  There is a later discussion or reference to --

24   that has been talked about here today about a bonus.

25          But that is a set of or piece of evidence, type of

1    evidence, that is said to me to be -- to distinguish

2    Ms. Portillos from others.  And I think that it is

3    correct.

4          Now, I am not going where people want me to go,

5    which is to sit down and say, well, you have to

6    understand, Ms. Portillos was in a car and this was handed

7    to her and you should interpret it this way, you should

8    interpret it that way.  The jury is going to interpret it.

9    From my perspective, the question is not whether I

10   interpret it differently from the Government, but whether

11   the Government could take that evidence as a

12   distinguishing feature.  They could be wrong about it.

13   They could be proven wrong by a jury about it.  But

14   whether or not it is a distinguishing feature that is an

15   appropriate basis upon which to rely for a prosecutorial

16   decision.  And my answer is, yes.

17         Even when we talk about the number of calls --

18   again, I am not sitting here and saying they're right or

19   wrong at the end of the day.  But when there are two or

20   three or four calls, that is different than the only other

21   call I have got is some reference to a single call from

22   Barrett -- between Barrett and Caraveo where there is some

23   reference to a job, it is devoid of these types of

24   statements, which could be argued as indicative of

25   involvement and awareness.  I am not saying it must be,

1    but it could be argued on that basis.

2         And, frankly, on some level, the numbers of

3    communications that one has with the people in the DOC

4    could be argued as some kind of an inference of knowledge

5    or familiarity with those people, and that three or four

6    calls starts looking materially different than a mere one

7    from Ms. Barrett, and an absolute zero for Steinhaus and

8    Leff.

9         Secondly, there is an argument that there was a

10   lie.  And, again, being told and asked to say, well, she

11   didn't know these people.  That is interpretation.  That

12   is not what I'm here to do today.  Ultimately, the

13   Government looks at that and says, that's a lie.  That lie

14   is evidence that we can use to show culpability.  The

15   defendant says no, it shows something else.  That is for

16   the jury to decide.

17        The question is, are there reasons and

18   justifications that militate against the presumption --

19   well, that militate against any inference of racial basis

20   for the prosecutorial decision, and there are.  Now, is it

21   that Government -- excuse me, that Mr. Mosby has to prove

22   by clear evidence?  No.  But there must be something below

23   clear evidence, which is still high, and I don't think

24   that racial distinctions alone are enough.

25        Now, I understand from the perspective of the

1    defendant there is something more than that; there is who

2    gets called and who gets visited, and we get into all this

3    preliminary stuff.  But, again, at the end of the day, the

4    prosecutorial decision is not based on who gets called and

5    who gets visited, it's based on what has been identified

6    to me as particular pieces of evidence, which nobody

7    denies exists, but which the defendant simply interprets

8    differently from the Government.

9           I respect that, but that is not my job to interpret

10   it differently and, therefore, say the prosecutorial

11   distinction is wrong.  The prosecutorial distinction, as

12   has been explained to me, is based on differences in the

13   evidence.  And those differences have been laid out in the

14   response.  And I find that that is sufficient to deny the

15   motion and deny further exploration through discovery

16   and/or a further evidentiary hearing in this matter.

17          Now, as it relates to the vindictive prosecution,

18   it's somewhat what tied together because, to some extent,

19   what we have got is a circumstance where someone was given

20   an opportunity to cooperate.  And the argument is that she

21   chose not to, and she has that absolute right to do so.

22   But that she was prosecuted for that reason.

23          There really is not evidence of a realistic

24   likelihood of vindictiveness which gives rise to some kind

25   of a presumption of vindictiveness that exists separate

1    and apart from the evidentiary pieces that have been

2    identified to me in the context of the selective

3    prosecution argument.

4          Standing alone, the fact that someone is given an

5    opportunity to cooperate, cooperate with us and you won't

6    get charged, assuming that was authorized, not authorized,

7    doesn't mean a whole lot to me.  At the end of the day, is

8    it proper to present defendants with those kinds of

9    options?  Absolutely.

10         Is it proper to prosecute someone simply because

11   they chose to exercise their right not to?  Well, that's a

12   different story.  But, at the end of the day, there is

13   nothing here that suggests that the prosecutorial decision

14   was driven by the mere fact that she chose not to

15   cooperate.

16         There are people who have been charged, who are

17   cooperating now, and their charges aren't being dismissed.

18   There are no immunities given.  There is nothing really to

19   suggest that there is some kind of a purpose or intention

20   that I should read into this, other than the fact that she

21   was given an opportunity, and she didn't.  That is fairly

22   standard stuff in a criminal prosecution.

23         It only becomes, at least theoretically vindictive,

24   or at least has a patina of vindictiveness if I read into

25   this all of the other stuff from the selective

1    prosecution, and I don't, because, as I said, in the

2    context of that, I have already determined that the

3    Government has had a basis for its prosecutorial decision,

4    which is based on evidence.  And there is nothing about

5    that that suggests that the -- that that's just nonsense,

6    and that the real reason for prosecuting her, separate and

7    apart from race or national origin, is some purported

8    vindictiveness.

9        I understand that that is the allegation, but that

10   is all that is, is an allegation.  And so I deny the

11   motion with respect to prosecutorial -- excuse me, with

12   respect to the seeking of further discovery and an

13   evidentiary hearing with respect to the selective

14   prosecution and vindictive prosecution.  More

15   specifically, 201 is denied.

16       I believe that brings us to the end of the motions

17   pending at this time; am I correct?

18       MS. PALUCH:  For the Government, yes, Your Honor.

19       MR. MOSBY:  You are absolutely correct, Your Honor.

20   And I need to ask this Court's permission to file one more

21   motion.

22       THE COURT:  What is that?

23       MR. MOSBY:  Motion to suppress.  I didn't file it

24   because it is inconsistent with the argument of selective

25   prosecution and vindictive prosecution.  And it will not

1    be a long motion.

2            THE COURT:  All right.

3            MR. MOSBY:  But I would like to file it.

4            THE COURT:  I will give you 10 days to file.  What

5    I am going to do is, for now, I understand there are some

6    things that are under advisement and all, but, at the end

7    of the day, I think we are best served if I protect a

8    setting date for trial and trying to hold to that.  I am

9    looking at May 2.

10           MS. PALUCH:  Fine with the Government, Your Honor.

11           MR. MOSBY:  What date?

12           THE COURT:  May 2.

13           MR. MOSBY:  That is fine, Your Honor.

14           THE COURT:  All right.  As we get closer -- well,

15   maybe not as we get closer.  My judicial assistant will

16   set a trial prep conference.  And, if you want to, you can

17   both go back and talk to her, in terms of setting that

18   about a week or 10 days before the trial.

19           MR. MOSBY:  Ms. Moran says that date doesn't work

20   for her.

21           THE COURT:  Okay.  Let me be clear about a couple

22   of things.  You're appointed counsel, right?

23           MR. MOSBY:  That's right.

24           THE COURT:  She is not.

25           MR. MOSBY:  She is not.

 1          THE COURT:  So I'm not going to set my schedule on

 2    somebody who is not counsel.

 3          MR. MOSBY:  That's fine.

 4          THE COURT:  May 2.

 5          MR. MOSBY:  Got you.

 6          THE COURT:  All right.  So, in fact, why don't you

 7    just walk back afterwards and get with Deann and get a

 8    date for a pretrial conference.  I will get your motion

 9    within 10 days.  I assume you can respond within a week.

10          MS. PALUCH:  Thank you, Your Honor.

11          THE COURT:  Then let's set it.  And I will set it

12    in advance of the trial prep conference, and we'll see

13    what we've got by way of a motion to suppress.  All right.

14          MR. MOSBY:  Thank you, Your Honor.

15          THE COURT:  Anything else today?

16          MR. MOSBY:  No, Your Honor.

17          THE COURT:  Ms. Paluch?

18          MS. PALUCH:  I am sorry, no, Your Honor.

19          THE COURT:  All right.  We'll be in recess.

20          (Proceedings conclude at 11:21 a.m.)

21

22

23

24

25

# R E P O R T E R ' S   C E R T I F I C A T E

I, Darlene M. Martinez, Official Certified Shorthand Reporter for the United States District Court, District of Colorado, do hereby certify that the foregoing is a true and accurate transcript of the proceedings had as taken stenographically by me at the time and place aforementioned.

Dated this 11th day of October, 2016.


_____
s/Darlene M. Martinez
RMR, CRR