**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Action No. 15-cr-00149-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**6.  CRISTINA PORTILLOS,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT
(Sentencing Hearing)**

_____

        Proceedings before the HONORABLE RAYMOND P. MOORE, Judge, United States District Court, for the District of Colorado, commencing at 9:00 a.m. on the 1st day of August, 2016, Alfred A. Arraj United States Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
MARTHA A. PALUCH, Office of the United States Attorney, 1225 17th Street, Suite 700, Denver, CO 80202

**FOR THE DEFENDANT:**
JOHN E. MOSBY, Attorney at Law, 621 17th St., Suite 2445, Denver, CO 80293

1                    **AUGUST 1, 2016**

2         (Proceedings commence at 9:00 a.m.)

3         THE COURT:  Please be seated.

4         15-cr-149, United States of America v. Cristina

5   Portillos.

6         MS. PALUCH:  Good morning, Your Honor, Martha

7   Paluch and Bryan Fields on behalf of the United States.

8         MR. MOSBY:  Good morning, Your Honor, John Mosby on

9   behalf of Cristina Portillos.

10        THE COURT:  And good morning to you, as well as to

11  Ms. Portillos.

12        Okay.  We are here for sentencing.  And I suppose I

13  should lay this out now, simply because it is a little

14  unusual.  We are here for sentencing following a jury

15  trial and a conviction on multiple counts.  The jury

16  verdict was for Counts 1, 10, 12, 14 through 17, and 30.

17        Prior to the matter being submitted to the jury, I

18  took under advisement a motion to -- well, I took under

19  advisement in part, I denied in part, a motion to dismiss

20  or for judgment of acquittal with respect to the counts

21  based on statute of limitations grounds, and asked that

22  the matter be briefed.

23        Following the trial, the Government opted to

24  dismiss -- or moved to dismiss all counts other than 1,

25  17, and 30, those being the counts as to which I denied

1   the motion for statute of limitations defects.

2        The motion from the Government was basically

3   saying -- it was not on the grounds that were asserted

4   during trial, it was essentially it isn't going to affect

5   anything, it isn't going to affect the guidelines,

6   therefore, for the interest or in the interest of judicial

7   economy, they moved to dismiss, and I granted that motion.

8   And so it effectively mooted the limitations issue.

9        And I'm not going to comment on that issue, because

10  it is out of the case.  But that is the posture we are in.

11  Following a jury trial, we are here on three counts; 1,

12  17, and 30, and probation is going to have to keep me

13  honest with regard to that.

14       All right.  In any event, Mr. Mosby, have you

15  received a copy of the presentence report and had an

16  opportunity to review the matter as contained in the

17  report, both personally, as well as with Ms. Portillos?

18       MR. MOSBY:  Yes, Your Honor.

19       THE COURT:  And, Ms. Paluch, is that true of the

20  Government, as well?

21       MS. PALUCH:  It is, Your Honor.

22       THE COURT:  Now, there are various things that have

23  been filed.  The first thing that was -- well, let me

24  comment on some of these.  The Government filed a

25  sentencing statement, as the local rules require.  And

1    there has been some objections to some of the matters

2    included in the sentencing statement.

3           But, defendant, of course, had an opportunity to

4    file a sentencing statement after trial, as well, and did

5    not do so.

6           Probation, of course, incorporated the only

7    information available to them in the presentence report,

8    and I will get to the objections later, but I just want to

9    kind of deal with that.

10          Both sides responded to the PSR.  I don't believe

11   -- I don't believe that the Government's response

12   contained any objections, except to the extent that one

13   might construe a disagreement with the ultimate sentence

14   that probation recommends to be an objection.  Other than

15   that, I don't construe there to be any objections to the

16   factual findings or guideline calculations.

17          Am I correct; Ms. Paluch?

18          MS. PALUCH:  You are correct, Your Honor.

19          THE COURT:  All right.  With respect to the

20   defendant, there were objections to the PSR that were

21   filed.  I believe they were four in number, and I think,

22   ultimately, there are really only two of them that we have

23   to deal with.

24          The first one had to do with identifying data.  And

25   I assume that has been corrected; is that right,

1    Mr. Mosby?

2         MR. MOSBY:  Yes.

3         THE COURT:  All right.  The second one is one that,

4    to some extent, I suppose, I consider a bit of a tempest

5    in a teapot.  What I mean by that is this:  There is an

6    objection to the fact that the probation department's

7    presentence report incorporates the Government's

8    sentencing statement.  And in the Government's sentencing

9    statement, there is a contention that with respect to a

10   particular form, there is evidence, and I should find,

11   that Ms. Portillos filled out that form.

12        Mr. Mosby calls it a new allegation.  I don't agree

13   with the fact that it is a new allegation.  In fact, if I

14   remember correctly at trial -- and I don't remember

15   whether it was Ms. Paluch or Ms. Fields, but the

16   Government, at one point, went so far as to try to have

17   Agent Romero offer a lay opinion as to some handwriting,

18   and I wouldn't allow that in.  I don't mean by that to

19   suggest that there was anything improper there, it was an

20   evidentiary attempt and a ruling, and we go on from there.

21        But, it is indicative of the fact that this issue

22   has been floating around from at least the time of trial.

23   I honestly don't know, other than in some rough sense of

24   the flavor of the case, I really don't know that it means

25   anything.

1          MS. PALUCH:  Your Honor, that evidence suggests

2     that the defendant was -- took a more active role rather

3     than a passive one.  I don't think it is a passive role to

4     accept a refund check and turn it over to Pam Lucero, but

5     that evidence indicated she did more than that.

6          THE COURT:  All right.  Let me hear from you,

7     Mr. Mosby, on that.

8          MR. MOSBY:  Your Honor, you are correct.  It was

9     floated around at trial.  We did object to it.  You

10    sustained our objections when he tried to match the

11    handwriting with -- he indicated the handwriting, I think,

12    on her driver's license.

13         But, you know, Your Honor, the evidence also

14    contradicts what the Government says in their James

15    proffer, in the James proffer, itself.  When they

16    identified this as offered into evidence, they did not

17    indicate that she had filled out the form.  But, also in

18    the James proffer -- and that was on February 4, 2012, in

19    the James proffer.

20         But, then, if you go to February 9, 2012, Lucero is

21    telling Raul that she didn't do it.  All right.  That

22    Cristina freakin didn't get the form or didn't fill it

23    out, or something like that.

24         So, Your Honor, I don't think the evidence shows

25    conclusively that Ms. Portillos filled out any form.

1    Also, it should be noted that the form they are talking

2    about, that the return went to, I believe, Michelle

3    Steinhaus, I think it was to Delta, Colorado, for

4    Mr. Steele.  I think it was Apartment 20, the address we

5    have for Michelle Steinhaus.  It didn't go to

6    Ms. Portillos' address.

7              THE COURT:  I am not sure that is right.

8              MR. MOSBY:  Well, it is the last return on the

9    exhibit they indicate.

10             THE COURT:  There are a couple of things on the

11   return.  Look at line 26.  There is a William D. Steele,

12   going to 1044 Baltic.  There is also a later William D.

13   Steele, going to 1090 East 5th Avenue.  And so --

14             MR. MOSBY:  That is what I am talking about, Your

15   Honor.

16             THE COURT:  Okay.

17             MR. MOSBY:  And the one in 2012 you are talking

18   about, it goes to Delta.

19             THE COURT:  Okay.

20             MR. MOSBY:  That is the only point I am trying to

21   make; that she didn't have any -- and this was during a

22   period of time -- and I listened to the Court the other

23   day during the sentencing of Ms. Lucero.  And the Court

24   has a total understanding of this.  And this was in 2012,

25   when there was literally no checks or refund checks

```
1    received by Ms. Portillos at her house, Your Honor.

2              THE COURT:  All right.

3              MS. PALUCH:  I am not sure, did I hear his last

4    statement to be there was no refund check?

5              THE COURT:  I understand that.  In terms of the

6    last statement, I understand there were refund checks.  I

7    get that.

8              MS. PALUCH:  Okay.  As to Steele, it is on the

9    James log.  It is February 4, 2012, Lucero says, "And the

10   Steele.  I needed to get the 8 -- just the small -- the

11   EIC.  So it's already filled, but I had Cristina fill --

12   do the shit.  She was only able to do the 11.  That is all

13   they offered her.  I was like, yeah, so."  And then.  "She

14   was at work, and I told her to pull it up."

15             And then on the 9th, "Cristina, she got me like,

16   because I needed that extra 8, and she freakin didn't get

17   me the last form."

18             That doesn't mean she didn't provide what was

19   discussed in February.  Counsel mentioned that the Court

20   sustained the objection on the handwriting.  That is

21   correct.  But the calls were admitted.  These calls that

22   establish that Cristina was possibly pulling up forms at

23   work was submitted to the jury as proper evidence before

24   this Court to be considered.

25             THE COURT:  All right.  Look.  Here is the reality.
```

1    We have general verdict, so I don't know what the jury

2    decided with respect to that.  To be quite blunt about it,

3    I don't even know -- I don't recall there being much

4    discussion in closing about whether she filled out a form

5    or didn't fill out a form.  That really was not the thrust

6    of the Government's case.

7         I am not suggesting that this evidence wasn't

8    admitted, I am just saying the thrust of the Government's

9    case was elsewhere.

10        I also note that, unlike what Mr. Mosby tells me,

11   the issue is not whether there is conclusive evidence, the

12   issue is not even whether it is beyond a reasonable doubt,

13   it is whether the jury found it.  The issue is whether it

14   is by a preponderance of the evidence.  And, to be honest

15   with you, I am going to say that it is not.

16        I mean, again, I think this is much of a tempest in

17   a teapot.  I don't think that my concluding that I'm not

18   going to find that she filled out a form means that she

19   only had a passive role.

20        My difficulty is this:  I did go back and review

21   these calls and the audio of those tapes.  My recollection

22   -- my notes with respect to Exhibit 200E, which is the

23   first of the two calls that are referenced, is that the

24   critical lines are these:  "So it is already filled, but I

25   had Cristina fill -- do the shit."  Then a moment later,

1    "She was at work, and I told her to pull it up."

2            Honestly, I'm not sure what's going on there,

3    because it says it is already filled, then I had her "do

4    the shit."  Then there is a pause.  I am sorry, "I had her

5    fill --" pause "-- do the shit."  Does "do the shit" mean

6    fill?  If it does, I don't know how it relates to "it is

7    already filled."  "Pull it up at work" seems more like

8    pull it up the return to see -- there was evidence at

9    trial about people pulling these things up to see when the

10   checks were due.

11           Obviously, you don't -- "I told her to pull it up."

12   Maybe it is a blank form.  Maybe it is a completed form.

13   It is just not clear enough to me to say by a

14   preponderance that she filled it out.

15           I don't mean to skip over Exhibit 201, which I also

16   looked at.  The date of 2/9/12 was the conversation in

17   question, the critical line there being, "Yeah, Cristina,

18   she got me, like --" pause "-- I needed that extra 8, and

19   she freakin didn't get me the last form, you know, like

20   the third one."

21           Obviously there is some degree of involvement,

22   activity between Portillos and Lucero, but to say that

23   that activity is -- that Cristina Portillos filled out the

24   form, I can't do that on the record before me.  I am aware

25   of the fact that there is evidence to suggest that it

1    didn't appear to be -- at trial, it didn't appear to be

2    Sabrina Caraveo or Pamila Lucero, but that really doesn't

3    answer the question.  The fact that it is not X doesn't

4    mean that it is Y.

5         So, for whatever it is worth, I will sustain the

6    objection with respect to that.

7         Now, that leaves us with two issues, which are

8    issues that affect the guideline calculations, and that is

9    the loss calculation and a minor or minimal role.  One,

10   the burden is on the Government, the other, the burden is

11   on the defendant.

12        Ms. Paluch -- I suppose I should also say this by

13   way of a record.  This sentencing is occurring after

14   Pamila Lucero's sentencing.  In connection with Pam

15   Lucero's sentencing, the Government provided a

16   spreadsheet.  And I am not going to review everything,

17   because there is no mystery to the players in the room.

18   Counsel for the Government was here, and counsel for

19   Ms. Portillos was in the back of the room during all of

20   this.

21        Essentially, I asked the Government to send me a

22   more detailed spreadsheet that breaks out the various

23   things in the Pam Lucero case.  It is the various

24   categories or justifications for loss claims, and the

25   Government did that.

1            Thereafter, I asked sua sponte for the same type of
2    a spreadsheet to be given in connection with
3    Ms. Portillos.  And I have that spreadsheet.  I have
4    printed it out as Exhibit 1A.  I know it is in ECF.  I
5    don't have the ECF number at the tip of my fingers, but it
6    is not important.
7            With regard to the spreadsheet, Mr. Mosby, did you
8    have any objections or disagreements, not with the
9    conclusions the Government reaches, I know you do with
10   regard to those conclusions, but with regard to the
11   information that is contained in the spreadsheet?
12           MR. MOSBY:  No, Your Honor.
13           THE COURT:  All right.  And so I'm going to start
14   with the loss issue and see where we go from there.  The
15   spreadsheet is 533 in the ECF system.  It is, I believe --
16   no, that is not right.  Yes, it is right, it is 533-1.
17           All right.  So there is no quarrel with the details
18   of 533-1.  But, nonetheless, I turn to the Government and
19   say, do you want to call evidence?  Do you submit
20   evidence?  Do you want to proceed to argument?  How do you
21   wish to proceed, Ms. Paluch?
22           MS. PALUCH:  Thank you, Your Honor.  I believe we
23   could go about this two different ways.  One is, given
24   that the Government maintains its objection to the Court's
25   determination of intended loss, Agent Romero is prepared

1   to testify and explain the categories and the evidence

2   that we used in order for us to make a record on the loss.

3          At the same time, I can make a proffer as to what

4   Agent Romero would testify, similar to what occurred with

5   Ms. Lucero.  So I understand the Court's ruling.  I do

6   have a further record I would like to make on the intended

7   loss argument.  But I am asking the Court if you have a

8   preference on how I go about this, I will do that.

9          THE COURT:  I mean, we're all acting with informed

10  knowledge.  What I mean by that is, Ms. Paluch was here on

11  Friday when I ruled with regard to intended loss with

12  regard to Pam Lucero, and I believe that she is quite

13  correct in anticipating that my ruling today would tend to

14  follow my ruling then.

15         I think the facts line up somewhat differently.

16  But, notwithstanding that, I would be willing to accept

17  the proffer, assuming Mr. Mosby has no objection to that.

18         If he wants to cross-examine, then I will let him

19  do that.

20         MS. PALUCH:  Your Honor, in light of your comments,

21  and anticipating a possible appeal in this case, so that

22  the record is clear for the Tenth Circuit, I would like to

23  go ahead and call Agent Romero.

24         THE COURT:  That's fine.

25         MS. PALUCH:  Thank you.

1       THE COURT:  Come forward, sir.

2       COURTROOM DEPUTY:  Raise your right hand, please.

3                  **SPECIAL AGENT ANTHONY ROMERO**

4   having been first duly sworn, testified as follows:

5       THE WITNESS:  I do.

6       COURTROOM DEPUTY:  Please have a seat.

7       Good morning.  State your name, and spell your last

8   name for the court reporter.

9       THE WITNESS:  Anthony Romero.  R-O-M-E-R-O.

10      MS. PALUCH:  May I proceed, Your Honor?

11      THE COURT:  You may.

12                     **DIRECT EXAMINATION**

13  **BY MS. PALUCH:**

14  Q.   What did your investigation reveal as to the dates or

15  the length of time of this defendant's involvement in the

16  scheme?

17  A.   Yes.  Length of time was May of 2009 to November of

18  2012.

19  Q.   Can you state what happened in May of 2009?

20  A.   There was a conversation between Raul Caraveo and Pam

21  Lucero concerning using the defendant Portillos' address

22  for the scheme.

23  Q.   And was there a discussion about whether it was okay

24  to use that address?

25  A.   Yes.

1  Q.   Okay.  Let's go to November 2012.  And what was the

2  evidence indicating that this defendant was still involved

3  in November of 2012?

4  A.   Yes.  Two phone calls, one of November 2, 2012, and

5  also November 9, 2012.  The November 2nd phone call,

6  specifically between Caraveo and Lucero, indicated that

7  the IRS was contacting "Lucero's girls."  And basically

8  what she was doing was she was telling the girls to say,

9  "nada, nada, nada," which means, don't say anything.

10 Q.   Say "nada, nada" when?

11 A.   On November 2.

12 Q.   I am sorry, say "nada, nada" to whom?

13 A.   The "nada, nada" was in reference to what she told

14 her girls to say to the IRS concerning the investigation.

15 Q.   Okay.  Then was there a second call in November?

16 A.   There was.

17 Q.   And what was discussed?  This is November of 2012.

18 What was discussed in that call?

19 A.   Yes.  On November 9, 2012, there was a conversation

20 between Caraveo and Lucero, in which Caraveo suggests to

21 Lucero that they use the postal service as an excuse for

22 why mail is going to the Baltic Street address.

23 Q.   And did, in fact, the defendant tell you that she was

24 having issues with her mail when you interviewed her?

25 A.   Yes, she did.

1   Q.   And that interview occurred in December -- early

2   December of 2012; correct?

3   A.   Yes.

4   Q.   Okay.  And what was the nature of the defendant's

5   relationship with other participants in the conspiracy?

6   And, specifically, I will direct your attention to Pam

7   Lucero.

8   A.   She was a close personal friend of Pam Lucero.

9   Q.   What about Raul Caraveo?

10  A.   She knew Caraveo through -- from the phone calls I

11  listened to, developed somewhat of a personal friendly

12  relationship.

13  Q.   What did the calls reveal, if anything, about the

14  defendant's financial gain from this conspiracy?

15  A.   Well, the calls revealed that she was receiving

16  compensation from checks being sent to her house.  She, at

17  times, was disappointed when there was a refund issued but

18  not in the form of the check.  There was talk of her

19  receiving bonuses in some of the calls.

20  Q.   Were there phone calls in which she is asking about

21  being paid, according to Lucero?

22  A.   Yes.

23  Q.   Okay.  Now, did phone records introduced at trial

24  establish the approximate number or the volume of phone

25  calls that occurred between Pam Lucero and this defendant

 1   between the time period that you testified to?

 2   A.   Yes.

 3   Q.   And approximately how many phone calls were taking

 4   place between the two women during that time frame?

 5   A.   There were thousands of phone calls.

 6   Q.   Did you testify at trial that the defendant's Baltic

 7   Street address was used on false returns submitted to the

 8   IRS?

 9   A.   Yes.

10   Q.   How many returns were submitted using her address?

11   A.   Thirty-six.

12   Q.   And what are the dates that those false returns were

13   submitted, starting with the first return and the last?

14   A.   December 2009 through March of 2012.

15   Q.   Are those returns reflected on lines 1 and 36 of

16   Government's Exhibit 1A, attached to document 533?

17   A.   Yes.

18   Q.   And those 36 returns listing the defendant's address,

19   how does that number of 36 compare to other addresses used

20   in this conspiracy?

21   A.   Her address was used for most of the conspiracy.

22   Q.   Were refund checks mailed to the defendant's address?

23   A.   Yes.

24   Q.   And what happened to each refund check mailed to her

25   address?

1    A.    They were cashed by Pam Lucero.

2    Q.    As to the length of the time of this defendant's

3    involvement in the conspiracy, how does it compare to the

4    length of time that Carolina Aragon was involved?

5    A.    She was involved longer.

6    Q.    And how long --

7          THE COURT:  Hold on.  That is meaningless.  I know

8    what he means, but I am just saying, if you are making a

9    record, when you are talking about two women, and he says

10   "she was involved longer," which one is he talking about?

11   That is all I am pointing out.

12   Q.    (BY MS. PALUCH)  I am sorry.  Between Carolina Aragon

13   and this defendant.

14   A.    I am sorry, Portillos was involved longer.

15         THE COURT:  That is all I was trying to do.

16         MS. PALUCH:  Thank you, Your Honor.

17   Q.    (BY MS. PALUCH)  How many returns did Carolina submit

18   or was involved in the submission of?

19   A.    Approximately 25.

20   Q.    And that should read, the submission to the IRS.

21   A.    Yes.

22   Q.    All right.  What was the time period of Nancy

23   Guzman's and Conrad Archuleta's involvement in the

24   conspiracy?

25   A.    It was, I believe, February of 2010 through October

1    of 2010.  It was less than a year.

2    Q.   And how many returns were submitted using Nancy

3    Guzman's address?

4    A.   Approximately 14, 15 returns.

5    Q.   Okay.  Now, you testified that returns were submitted

6    using the defendant's address between December of 2009 and

7    March of 2012?

8    A.   Yes.

9    Q.   How many total returns were filed during that time

10   period for the course of the conspiracy?

11   A.   193 returns.

12   Q.   What was the intended loss from the false returns

13   submitted during that time period?

14   A.   Approximately $525,000.

15   Q.   Okay.  What was the actual loss from the refund

16   checks or offsets that were issued by the IRS during that

17   time frame?

18   A.   Approximately $275,000.

19   Q.   Were you asked to categorize those returns on the

20   spreadsheet, that is Exhibit 1A?

21   A.   Yes.

22   Q.   Do you have a copy of that spreadsheet before you?

23   A.   I do.

24   Q.   And let's start with the returns colored in blue.

25   Can you state for the record that category of returns?

1    A.    Yes.   The returns colored in blue are the returns

2    submitted and received by the IRS in which the defendant's

3    Baltic Street address was used.

4    Q.    The next section of returns on 1A are in yellow.   Can

5    you describe that category of returns?

6    A.    These are returns submitted to and received by the

7    IRS during the defendant's scope of activity.

8    Q.    We will come back to that category, but please first

9    explain the last return on Exhibit 1A, the one in the pink

10   color.

11   A.    Yes.   This is a Steele 2009 return.   And this

12   specifically was discussed by Lucero and Caraveo during

13   the phone call in February of 2012.

14   Q.    And those are the phone calls that the Court has

15   referenced earlier regarding whether or not the defendant

16   was involved in filling out a tax form; is that right?

17   A.    Yes.

18   Q.    All right.   Now let's go back to the returns in

19   yellow.   All of the individuals whose names appear on

20   those returns, did you determine that there was any

21   connection between those individuals, or what the

22   connection, if any, was between those individuals and this

23   conspiracy?

24   A.    Yes.   All of the individuals listed in the yellow

25   section were connected to this scheme.   Either they were

1    inmates in close proximity to Caraveo, or that the

2    returns, themselves, were prepared by Caraveo.

3    Q.   And during the course of the trial, were recorded

4    calls played in which the defendant is heard speaking to

5    Raul Caraveo?

6    A.   Yes.

7    Q.   During those recorded calls, were there discussions

8    between Pam Lucero and Raul Caraveo regarding this

9    defendant's involvement and knowledge of the conspiracy?

10   A.   Yes.

11   Q.   All right.  Were the returns submitted in yellow on

12   Exhibit 1A prepared and submitted in the same fashion as

13   those that were submitted listing the defendant's address?

14   A.   Yes.

15   Q.   Were each one of those returns submitted during her

16   -- the time period you have discussed?

17   A.   Yes.

18   Q.   Now, you testified about the thousands of phone calls

19   between the defendant and Pam Lucero during the time of

20   this conspiracy.  Did the defendant's actions, that you

21   have testified to here today, further the objective of the

22   conspiracy?

23   A.   Yes.

24   Q.   How so?

25   A.   Well, her allowing her address to be used allowed

1    more returns to be submit to the IRS, more refund checks

2    to be issued, more money to be made during the scheme.

3             MS. PALUCH:  Thank you, sir.

4             No further questions.

5             THE COURT:  Cross-examination?

6                      **CROSS-EXAMINATION**

7    **BY MR. MOSBY:**

8    Q.   Good morning, Agent Romero.

9    A.   Good morning.

10   Q.   In 2009, how many returns came to Ms. Portillos'

11   address?

12   A.   You mean how many returns were submitted using her

13   address, sir?

14   Q.   No, came to her address.

15   A.   How many returns came to her address?

16            THE COURT:  Let's assume the question is checks.

17            THE WITNESS:  Checks.  I don't have the exact

18   number with me.

19   Q.   (BY MR. MOSBY)  In 2010, do you know how many refund

20   checks came to her address?

21   A.   I don't, but I can look at my chart and give you an

22   estimate right now, if you would like.

23   Q.   Go ahead, sir.

24   A.   Okay.  Looks like in 2010 there were 15 refunds

25   issued using the defendant's address.

1   Q.   Now, some of those refunds that were issued, the IRS

2   actually applied the amount to what was owed or

3   outstanding for the individual; is that correct?

4   A.   Yes, sir.

5   Q.   And, therefore, no checks actually issued; isn't that

6   correct?

7   A.   Yes.

8   Q.   So how many checks were issued?

9   A.   Nine.

10   Q.   In 2011, how many checks were issued?

11   A.   Zero.

12   Q.   In fact, in 2011, were there any returns submitted

13   using Ms. Portillos' address?

14   A.   Again, I will refer to my chart real quickly, sir.

15   No.

16   Q.   In fact, in 2011, isn't it true that Raul, because he

17   was moved from one facility to another, that there were no

18   returns submitted that year?

19   A.   Well, concerning the defendant's address, there were

20   no returns submitted using her address.

21   Q.   Okay.  So she had no involvement at all in the year

22   2011?

23   A.   What I can say to that is there were no returns

24   submitted in 2011 using her address.

25   Q.   And are you aware of any phone calls in 2011 where

```
 1    her participation was discussed in any way?
 2    A.    No.
 3    Q.    Now, with respect to Carolina Aragon, what was the
 4    first contact that she made with Raul Caraveo?
 5    A.    There was a phone call in July of 2012.
 6    Q.    And what was the last phone call she made?
 7    A.    I believe there was one as late as August of 2014.
 8    Q.    So she was involved for 2 years in contacting or
 9    talking to Raul?
10    A.    Yes.
11    Q.    Now, with respect to Ms. Portillos, other than her
12    association with Pam Lucero and Raul, do you have any
13    evidence that she knew of any of the other
14    co-conspirators?
15    A.    Well, I knew that she worked with Jennifer Leff --
16    Q.    Okay.
17    A.    -- through Progressive Insurance.
18    Q.    So, other than Jennifer Leff, are you aware of any
19    other individuals involved in this case that she was aware
20    of?
21    A.    I would say again, Pam Lucero, Jennifer Leff, and
22    Tanya Barrett or the ones who come to mind.
23    Q.    Now, I don't think you stated the amounts that were
24    requested from the IRS tax forms that used Ms. Portillos'
25    address.  What was that amount?
```

1    A.    The intended amount was approximately a hundred

2    thousand dollars.

3    Q.    And what was the actual loss?

4    A.    Approximately $38,000.

5         MR. MOSBY:  Thank you.

6         MS. PALUCH:  Just one clarification.

7                      **REDIRECT EXAMINATION**

8    **BY MS. PALUCH:**

9    Q.    To clarify what you mentioned about Tanya Barrett and

10   Jennifer Leff, you indicated the defendant was involved

11   with them -- or what was your testimony about that?

12   A.    My testimony specifically is they worked at the same

13   insurance organization, Progressive.

14   Q.    Do you have any evidence that this defendant was

15   conspiring with Leff or Barrett?

16   A.    No.

17   Q.    And what information did you have about Leff and

18   Barrett tying them to this case?

19   A.    The information I had was that their address was

20   being used as part of the scheme.

21   Q.    Were you able to establish their knowledge; that they

22   were knowingly involved in this scheme?

23   A.    No.

24        MS. PALUCH:  Okay.  Thank you.  No further

25   questions.

```
 1            THE COURT:  All right.  May this witness step down?
 2            MS. PALUCH:  Yes, Your Honor.
 3            THE COURT:  You may step down, sir.  Thank you.
 4            Do you have any other witnesses?
 5            MS. PALUCH:  No other witnesses, Your Honor.
 6            THE COURT:  Mr. Mosby, I recognize that your issue
 7   is a different issue, but let me ask whether you have any
 8   witnesses?  I just assume we get rid of all of the
 9   evidence now, then we will go deal with the issues in
10   terms of argument and ruling at a later time.
11            MR. MOSBY:  No, Your Honor.
12            THE COURT:  All right.  Then let's talk about where
13   we are.  And I think it is important that we do so,
14   because there is a bit of a tendency to believe that this
15   is kind of the same issue as the Pam Lucero issue, and it
16   is not.  It is different.
17            What I mean by that is this:  The question is, what
18   is the specific offense characteristic loss amount that I
19   find?  And what is the adjustment under the guidelines
20   that corresponds to that?
21            What is interesting is if I use a figure from the
22   chart that the Government has provided me with -- and none
23   of those figures have been challenged -- then the
24   calculation would be that the actual loss was as the agent
25   testified, about $275,000.  It is actually $274,869.57.
```

1         And the intended loss, assuming that all of this

2    counts as intended loss, would be $524,963 even.  At least

3    that is the way I am extracting the numbers from this

4    spreadsheet.  Both of those are in the same range.  What I

5    mean is, the loss table in 2B1.1 assigns a plus 12 to any

6    amount greater than 250,000 up to 550,000.  So both of

7    these are within the same universe.

8         Well, that is a poor way of saying it.  Both of

9    them fall within subsection (b)(1)(G); more than $250,000.

10   So, what does it mean?  Well, it kind of depends, because

11   there is -- there were two other things that have been

12   proffered to me, one of which I relatively quickly

13   disposed of.

14        In his written response, Mr. Mosby said that the

15   actual loss was $23,294 and the intended loss was $98,499,

16   because that is the amount that was expressed in the

17   Special Agent's report.

18        My calculations, my rulings, are not limited to a

19   document that is prepared pre-charge, pre-indictment.  I

20   mean, lots of things change.  Information gets understood

21   differently.  I discount any notion that the Special Agent

22   report either acts as a form of estoppel on the

23   Government's ability to request specific loss calculations

24   in excess of that, or that it is in any way evidence that

25   is, by virtue of the mere fact that it is contained within

1    the Special Agent's report, entitled to more weight than

2    all of the other evidence, particularly in a case that has

3    gone to trial, and I have seen and heard tons.

4         So, that part I take out.  But there is another

5    calculation, and that is this:  It is also possible that I

6    could conclude that the actual loss is $38,724.51, and the

7    intended loss is $98,499 even.

8         Where did that number come from?  It is from the

9    chart.  It is the blue section, and the blue section only.

10        So how does this work?  Well, if I found that the

11   actual amount of loss, the actual loss was the $38,000

12   number, then I would have to look at whether or not the

13   intended loss amount was either the 98,000 or the 524,000.

14   There is a big difference there.

15        So, depending upon how this works, what I find by

16   way of actual loss actually determines the relevance or

17   the need, if you would, to make a further determination as

18   to intended loss.  That is not correct.  To make a

19   specific determination.  Because, in both cases, if I were

20   to use the lower actual loss number, the intended loss

21   number is greater in both cases and would apply, but I

22   would have to decide, is it the 98,000 or the 524,000?

23        If I decide that the actual loss is 274,000, it

24   doesn't matter what the intended loss is, because the

25   actual loss, in and of itself, would trigger a plus 12.

1    So that is the way I am looking at it.  I do that so you

2    understand what I am thinking.

3         And now I turn it over to you to either tell me to

4    look at it another way, or to argue whatever it is you

5    wish to argue.

6         MS. PALUCH:  Thank you, Your Honor.  First of all,

7    I think what I need to do is address the Court's ruling on

8    intended loss.  So that this record is clear, perhaps we

9    need to just state that.  The Court has ruled that based

10   on --

11        THE COURT:  Let me do it.

12        MS. PALUCH:  Thank you.

13        THE COURT:  All right.  I will not incorporate it

14   -- I will not go through the whole thing, but I will

15   incorporate my analysis from Pam Lucero's sentencing last

16   Friday.

17        Essentially, what I concluded was that under 2B1.1,

18   intended loss is focused on and limited to the amount

19   purposefully intended by the defendant.  And that it did

20   not include amounts which were, if you would, relevant

21   conduct under 1B1.3.  It did not include all amounts that

22   were reasonably foreseeable to a member of the conspiracy

23   under the 1B1.3 rules.

24        I came to my conclusion based on four things --

25   well, actually five, but the fifth one was an evidentiary

1    issue.  The four legal issues were this:  One, I went to

2    the application note in 2B1.1 and based my decision on the

3    language used.

4          Second, I looked at the historical difference in

5    the language, noting that in earlier editions of the

6    guidelines, the definition of "intended loss" spoke to the

7    loss intended from "the offense."  And the offense is a

8    term of art in the guidelines that includes relevant

9    conduct.  And, stepping away from that, to "purposefully

10   intended by the defendant," had to have some meaning.

11         Number three, I looked at Amendment 792 and the

12   discussion within supplement C of the guideline manual,

13   the little black book, if you would, and noted that there,

14   the Commission was very clear that it was looking at a

15   subjective calculation, not an objective one.  And that it

16   was specifically adopting the Tenth Circuit's position in

17   United States v. Manatau.

18         And, fourth, I looked at Manatau, which is

19   different, in that it is not a conspiracy case.  But,

20   nonetheless, certain language in Manatau suggests a clear

21   indication from the Circuit that the concept of intended

22   loss was something distinct and different from the concept

23   of foreseeability.

24         I think each of those independently stands as a

25   basis for my ruling.  But, collectively, I looked at all

1    four of those in any event in reaching my decision.  So

2    that is the quick summary.

3         MS. PALUCH:  Yes, Your Honor.  I appreciate that so

4    that the record is clear.  And the Government objects to

5    the Court's determination for a number of reasons, one of

6    which is Amendment 792, there is no reference to

7    conspiracy.  It is specifically directed towards an

8    individual defendant's responsibility or liability.

9         And, as we have noted, the Manatau decision does

10   not involve a conspiracy or analysis of the principles

11   that apply to conspiracy.  What I have done is key cite

12   Manatau, and there are 35 opinions that cite to it.  And I

13   could not find a single case that applied to principles of

14   Manatau and its reading of 2B1.1 or 1.3 to a

15   conspiracy-type situation where you have that overlay of

16   conspirator liability.

17        What is interesting, and I know it would be a CF if

18   I were citing it to the Court, I did find one opinion that

19   came down last month, and it was authored by Judge

20   Gorsuch.  He does cite to the Manatau decision in that

21   case.

22        Now, in that case it was a conspiracy under 371.

23   And the case is United States v. Sing and Timmerman, found

24   at 2016 Westlaw 3569783.  And it was decided in June --

25   June 29th of this year.  And these were two defendants

1   that were convicted of a conspiracy regarding selling tax

2   shelters.  And, at trial, they were trying to determine

3   intended loss.

4          Now, the Court is looking to the ceiling because he

5   knows it is a different guideline provision that applies

6   here.

7          THE COURT:  No, that is not why I am looking at the

8   ceiling.

9          MS. PALUCH:  Okay.  All right.  So it did involve

10   the tax table at 2T.  But what is interesting in there is

11   Judge Gorsuch said, "the defendant concedes that the

12   government and the district court in this case have all

13   proceeded on the assumption that to qualify as the object

14   of the offense, the loss in question must have been

15   intended."  And he cited to <u>Manatau</u>.  And he said that

16   wasn't the correct standard.

17          He went on to say that this spreadsheet that the

18   Government had provided detailing the tax loss -- the

19   intended tax loss, was clearly applicable to the first

20   defendant because he said it is beyond reasonable dispute

21   as well that at least some of these amounts, some of the

22   amounts were known to the first defendant.

23          Then he gets to the second defendant, and he says,

24   "there is ample evidence for the district court to infer

25   that Ms. Sing knew about the information contained in her

1    co-defendant's files."  And he goes on to say, "we believe

2    a fact finder could reasonably infer that the defendants

3    intended, had their scheme succeeded, to shield their

4    clients from collection of the amounts they owed to the

5    IRS," and that that amount was attributable.

6            So this will be a matter to be determined at a

7    later date, but I want to make sure that the Government's

8    objection is lodged on that basis.  And I would also point

9    out that if that Application Note 3(A)(ii), which is

10   intended loss, and it talks about the pecuniary harm that

11   the defendant purposefully sought to inflict.  If the

12   ruling is that that means only what the defendant

13   purposely sought to inflict, there never would be intended

14   loss, it would always be the actual loss.  There would be

15   no meaning to intended loss if you are saying it has to

16   be --

17           THE COURT:  It simply is not true.

18           MS. PALUCH:  Well --

19           THE COURT:  I have already told you, if I limited

20   myself to the blue, the ones that use the Baltic Street

21   address, in this case, the intended loss would be the

22   $98,000 figure, not the $36,000 figure.

23           MS. PALUCH:  Certainly.

24           THE COURT:  So clearly intended loss would exceed

25   actual.

1          MS. PALUCH:  But, see, then that would be

2     inconsistent, because while it is pecuniary harm that she

3     sought to inflict by allowing her address to be used on

4     those 36 returns.  But what we're saying is that when you

5     agree to participate in the conspiracy and additional

6     returns that you have knowledge of, and we get back to the

7     conspiracy -- I don't want to belabor the point, I want to

8     preserve the objection.

9          THE COURT:  I understand, you are just making your

10    record, and I give you that.  What I will tell you is what

11    I think you need to make a record on, is the fact that you

12    treat the application notes to 2B1.1 as if it were some

13    monster that you want to avoid.  Normally, when one is

14    interpreting a statute or guideline, you go to the

15    language of the pertinent statute or guideline, itself.

16         And all of your discussion is pushing me into

17    chapter 1, and avoiding -- seemingly avoiding -- that may

18    be unfair, my characterization may be unfair, but

19    seemingly avoiding any kind of reasonable discussion of

20    the meaning of the words specifically used by the

21    Commission in the 2B1.1 application notes.

22         MS. PALUCH:  And the position of the Government is

23    the Commission could not have meant to completely ignore

24    co-conspirator liability.  So that is our argument on

25    intended loss.

```
 1            What I would like to turn the Court's attention to
 2    is an alternative argument, that is actual loss.  If we
 3    look at 3(A), the "general rule" is subject to the
 4    exclusions found in subdivision (D), which do not apply
 5    here.  Loss is the greater of actual loss or intended
 6    loss.  Then you go to (i), and it says "actual loss."
 7    "Actual loss means the reasonably foreseeable pecuniary
 8    harm that resulted from the offense."
 9            And so our alternative argument is if the Court
10    relies on 3(A)(i), and you look at the actual loss, the
11    Commission there incorporated the concept of reasonably
12    foreseeable.
13            THE COURT:  There is no question about that.
14            MS. PALUCH:  Absolutely.  Absolutely.
15            THE COURT:  And I took that position with
16    Ms. Lucero.  I take that position here.  With respect to
17    actual loss, it is the reasonably foreseeable loss flowing
18    from the offense.
19            MS. PALUCH:  Correct.
20            THE COURT:  And, in fact, as you argued to me on
21    Friday, what I have to conclude is that these additional
22    losses were within the scope of the jointly-undertaken
23    activity, in furtherance of that activity, and reasonably
24    foreseeable in connection with that activity.  I don't
25    disagree with that, either.
```

1          MS. PALUCH:  Right.  So if we look at the actual

2    loss that was reasonably foreseeable pecuniary harm that

3    resulted from the offense, the offense that we are talking

4    about, she has been convicted of conspiracy.  If you look

5    at the actual loss to the Government that occurred during

6    her involvement -- and, of course, we are looking at the

7    first return filed to the last return filed, the actual

8    loss is the 274-.

9          So we are asking the Court to find, given we

10   believe intended loss is the 524-, the amount we are

11   asking the Court, if you are not going to agree with the

12   Government on intended loss at 524-, at a minimum, you

13   should agree that the actual loss that resulted from the

14   returns submitted during the defendant's

15   jointly-undertaken criminal activity, which is the offense

16   referenced in 3(A)(i), the actual loss for this case is

17   the approximately $274,000 amount which, as the Court

18   noted in the loss table, that would be the same if the

19   Government prevailed on the 524- or if we prevailed on the

20   274-, it is the same enhancement, and we would ask that

21   you apply that as to the loss.

22         THE COURT.  Reasonably foreseeable to whom?

23         MS. PALUCH:  Reasonably foreseeable to the

24   conspirator.  And we have established -- to the defendant.

25         THE COURT:  To her.

1          MS. PALUCH:  To her.  We have established her

2    knowledge during this time frame, and what better evidence

3    than the thousands of phone calls between her and one of

4    the main participants.

5          THE COURT:  Well, except that is not what it was.

6    There were thousands of phone calls between her and Pam

7    Lucero, as reflected by the records of the phone company.

8          MS. PALUCH:  Correct, Your Honor.

9          THE COURT:  We have no idea what those

10   conversations were.

11         MS. PALUCH:  But I still think what those phone

12   calls establish is the nature of the relationship between

13   the two women.

14         THE COURT:  I don't doubt that.

15         MS. PALUCH:  And those aren't recorded.  So we

16   don't know what is discussed.  But I am saying, it is not

17   as if Pam Lucero is someone that she spoke to on nine

18   occasions when the nine checks came in.  She is talking to

19   her daily during this time period.

20         So that is the Government's argument on loss.  I am

21   prepared to argue at this point on the minor role

22   adjustment or, if you would have me sit down and come up

23   later.

24         THE COURT:  No.  Well, go ahead.  You are there.

25   Let's just do it all at once.

```
 1          MS. PALUCH:  Right.  So, all right.  The
 2   Government's position is the defendant has failed to meet
 3   her burden to establish that she is entitled to a minor
 4   role adjustment for these reasons:  Section 3B1.2 and the
 5   case law cited in our brief makes clear that this
 6   adjustment may be warranted for a defendant who plays a
 7   part in committing the offense that makes her
 8   substantially less culpable than the average -- the
 9   average participant in the criminal activity.
10          And the evidence establishes, and Agent Romero
11   testified, that the defendant's address was used in this
12   conspiracy more times than any other address.  Case law
13   cited in our brief states the adjustment is not warranted
14   for a defendant who played an integral role in the
15   conspiracy.  And that is the exact word that Raul Caraveo
16   used to describe this defendant.
17          "Finally get to say what's up to the one of the
18   integral parts of the MOB."  Now, more returns were
19   submitted using this defendant's address than were used by
20   Carolina Aragon, Nancy Guzman, Conrad Archuleta.  So, for
21   those reasons, she cannot show she was substantially less
22   involved or culpable than the average participant.
23          Also, as set forth in our brief is the Diaz-Rios
24   case.  And that case states that the Court is to consider
25   the defendant's role in the conspiracy as a whole; to
```

1    include the length of her involvement.  We have

2    established that.  Her relationship to the other

3    participants.  Agent Romero spoke to that element.  Her

4    potential for financial gain.  We have presented evidence

5    on that.  And her knowledge of the conspiracy, which was

6    made clear through the evidence presented at trial and the

7    jury's verdict.

8         Additionally, the evidence refutes her claim made

9    in her pleading that she was only involved in 2010.  Tax

10   returns were submitted in 2012.  Recorded calls indicate

11   she is talking to Pam Lucero.  She talks -- there is

12   discussion from Lucero about lying to the federal

13   investigators saying "nada, nada," and say that something

14   is up with the mail.

15        So, just to finish my argument, Your Honor, would

16   you like me to go on to anything else, or just leave it at

17   those two?

18        THE COURT:  What I would say is you can make

19   whatever record you want, but I am not moved, at least in

20   terms of what has been presented to me, that a minor role

21   adjustment applies or minimal role adjustment applies,

22   although I can be persuaded by Mr. Mosby.  So we will see

23   if that happens.

24        MS. PALUCH:  Certainly.  I think I presented my

25   argument on the loss and the minor role, and I save the

1    rest of my argument for later.

2             THE COURT:  All right.

3             MS. PALUCH:  Thank you, Your Honor.

4             THE COURT:  Mr. Mosby?

5             MR. MOSBY:  Your Honor was correct in terms of me

6    sitting through this Court's analysis and ruling for Pam

7    Lucero.  With respect to a minor role, it is like we have

8    said here today, that this individual was a friend.  There

9    were thousands of phone calls.  So the fact that the

10   Government can miraculously find that on a certain day

11   when a check came there was a phone call, Cristina

12   Portillos has known this person all her life.

13            And I think the Court remembers what Pam Lucero

14   said when she was here, "she is like family."

15            THE COURT:  I wouldn't endorse Pam Lucero as a

16   witness for anything.  But, if you want me to remember,

17   okay.

18            MR. MOSBY:  But we are endorsing her because we are

19   seeing that although --

20            THE COURT:  She called your client a liar.

21            MR. MOSBY:  Your Honor, that's going to be

22   addressed by my client.

23            THE COURT:  All right.

24            MR. MOSBY:  That is going to be addressed by my

25   client.  And, you know, to me, it is sort of like a Greek

1    tragedy.  I mean, you know, something was prophesied and

2    someone does all they can in life to make it not come

3    true, and it comes true.

4          And, you know, this is a case of the tangled web.

5    When Agent Romero came and started asking questions, at

6    that point certain things happened that will be addressed

7    also later on.  But, in terms of putting it in

8    perspective, in terms of the role that was played by

9    Sabrina, by Eugene Chavez, by Raul, by Pam, by Ms. Guzman,

10   by Archuleta, the fact that when Pam moved here, she used

11   her address, and they said 36 times.  Pam received 69

12   refund checks.

13         What we hear is nine of those checks came to the

14   Baltic Street address.  The Government has attempted --

15   and I don't want to get off into an area that is not an

16   issue here.  But they have attempted to try to

17   differentiate my client from individuals who were charged

18   with nothing and whose addresses were also used, who were

19   also friends, and there was no evidence.  So I would

20   venture to say, who probably Pam Lucero probably called

21   all of the time also.

22         Ms. Portillos got caught up in a situation that she

23   didn't know how to handle.  This was a friend of hers.

24   That cuts both ways.  It cuts that, you know, sometimes,

25   you know, that red flag when it is someone we know, when

1    it is someone we have associated with all our life, when

2    it is someone that our family knows, all right, sometimes

3    people go into denial of what they see and what they hear.

4         Unfortunately, the Government has the power to

5    bring any charge against anyone, and then they can

6    interpret the evidence, and because of that power, that

7    force, they can make it seem sometimes more dire than it

8    is.  There were mistakes made here.  And I am not going to

9    get into that.  My client will have to speak to that

10   herself.

11        But sometimes people are pulled into a world where

12   they are truly deceiving themselves.  The role she played

13   has to be put in perspective.  It has to be put in

14   proportion to the roles other people played in this case.

15        THE COURT:  So who do you say she is most like?

16        MR. MOSBY:  I would say most like -- I can't say

17   Carolina Aragon, because she actually was doing it.  I

18   mean, I would say, unfortunately, she is most like maybe

19   Guzman.  But, on the other hand, she is not most like, she

20   is like Pam Lucero's other friends.

21        THE COURT:  That is an argument that has no life

22   with me.  You want me to compare her to people who were

23   not charged, and say something, I don't know what.  They

24   were not charged.  And we have been down this road, and

25   this road is worn out.  I found that it is not on the

1    basis of some discriminatory motive.  It was not on the

2    basis of some racial motivation.

3         The reason for the charging decisions in this case

4    were as I found, and as I believe to this day, based on

5    the evidence.  They had evidence on her, your client, that

6    they did not have respect to others, the most damning of

7    which is, of course, a tape, where she is talking to Raul

8    Caraveo, and you can interpret it however you wish.

9         I think we can be fairly certain how the jury

10   interpreted it.  And she said, "I like bonuses."  That

11   puts her in the realm of consideration with respect to the

12   other co-conspirators.  I am not going to compare her to

13   people who aren't charged, who aren't defendants.  I am

14   not going to say they are not guilty so she is not guilty.

15   I am not going to do that.

16        MR. MOSBY:  I understand that.

17        THE COURT:  I can't.

18        MR. MOSBY:  I understand the logic.  And it makes

19   sense to me.  But you asked me a question.

20        THE COURT:  All right.

21        MR. MOSBY:  But, you know what, Your Honor, I am

22   struggling because she is almost in a category by herself.

23   She is almost in a separate category of that contact

24   between Pam Lucero, and Pam Lucero putting her on the

25   phone.  That is what we are talking about.  Here is the

1    phone.  "I finally get to talk to the mother fucking

2    integral part."  Here is the phone.  Raul says he's going

3    to give you a bonus.  "I like bonuses."

4         So it is so difficult for me when you ask who do I

5    compare her with, because she is almost in a category by

6    herself.

7         THE COURT:  Okay.

8         MR. MOSBY:  All right.  But, at the same time, we

9    are talking about, and what this Court is going to make a

10   judgment on is individual culpability.  And it is hard for

11   me to measure that against other people.  Do I compare her

12   with Sabrina?  No.  Do I compare her with Carolina Aragon?

13   No.  I mean, these people are actively talking to Raul.

14   Do I even compare her with Pam Lucero?  No.

15        But I understand we are at the sentencing portion

16   now.  And that is why I am careful.  I don't want to go

17   back to old arguments.  You have ruled.  And, of course,

18   that is the law of the case at this time.

19        But, you know, when you compare her and look at her

20   in her own -- and she was also, Your Honor -- not that she

21   was in a situation, but she was almost put in a situation.

22   When you listen to those tapes, and Raul is talking to Pam

23   Lucero, and Pam Lucero is telling him, I've got a friend.

24   I am going to move.  I am leaving here in November.  She

25   moved from Delta to Colorado Springs.  I have a friend.

1    They start talking about Cristina.

2           But she also is talking to Raul about Cristina; is

3    trying to hook those two up.  You know, Raul is asking her

4    about attributes of Cristina.  She is in a class by

5    herself, Your Honor.  It is difficult to say who is she

6    like.  Who she is closest to.  It is hard for me to say

7    that because it just doesn't fit with any other

8    individuals.

9           But I think you have to look at the fact that a lot

10   of this -- and we can't have it both way.  A lot of this

11   was Pam Lucero.  When I listen to these tapes and I hear

12   Raul saying to Pam Lucero, "we're Alpha," talking about

13   the Greek alphabet.  That we can get people to do what we

14   want them to do.  All right.  That we can manipulate

15   people.  That we know how to use people.  We know how to

16   pull people into our sphere of criminality.

17          You listen to the tapes where Pam Lucero and Raul

18   are talking, and their greatest wish in life is to be

19   "gangsters."  We are real gangsters.  And a gangster gotta

20   do what a gangster gotta do.  That is the way they talk.

21          This person is not part of that.  Now she's going

22   to be punished because there are red flags.  There are

23   things said.  There are things done that other people

24   would know, you just don't do that.  You don't say that.

25          But, also -- and I did not know it until I read the

1    probation report.  I was never told -- this is not to

2    convey any confidentiality -- that in 2010, this person

3    had a relationship from high school with one individual

4    and had known that individual all of her life.  That, as

5    things happened in 2010, she split up with that

6    individual, and the split up was so devastating that she

7    was prescribed to take Prozac.

8         Somebody says she was going through that during

9    this period of time.  What does she do?  What she does so

10   often; not listen to people who care about her.  She

11   didn't take the Prozac.  So she was going through things

12   in her life.  And during that period of time, she has this

13   other person sitting on her shoulder, Pam Lucero,

14   whispering in her ear, do this, ride to Delta with me.

15   Help me out.

16        You know, so I don't know who to compare her with.

17   I can only compare her with herself.  And I am just asking

18   the Court, in terms of the role she played, it was not the

19   role of people.  Raul, he was a friend, who as the Court

20   said on Friday --

21        THE COURT:  Let's be clear.  She is not Raul.  She

22   is not Ms. Chavez.  She is not Pam Lucero, and not Sabrina

23   Caraveo either.  So that doesn't answer the question of

24   whether or not she should get minor or minimal role.

25        MR. MOSBY:  Well, I think she should get a minor

1    role.  I mean, I think the role she played, Your Honor, is

2    minor.  Even Agent Romero, when he is talking to her, he's

3    telling her, we really don't know about you.  We really

4    don't know whether or not you are involved, because we

5    can't put you in a slot.

6         That is when he asked her -- so we could figure out

7    where to put you, he asked her -- and even the Government

8    couldn't put her -- she is in this unique position.  And I

9    think -- and this Court does know.  This Court has to

10   appreciate not the deviousness of Pam Lucero, not of Raul,

11   but of Pam Lucero.  I mean, how a person, unfortunately,

12   that you trust, can be so manipulative.  And there are

13   certain people subject to that manipulation.  And they are

14   also subject to that manipulation when they are at the

15   lowest point in their life.

16        So I just ask the Court to take it into

17   consideration.

18        THE COURT:  All right.  Let me rule on the role

19   first.  With respect to the role, I have considered it.  I

20   have considered the written objections and the response.

21   I have considered the evidence today.  I also am aware,

22   obviously, of the trial evidence, and I have considered

23   the argument.

24        I decline to give her a minor or minimal role.  The

25   arguments that have been presented today are almost -- not

1   quite, but almost require me to adopt the position that

2   she's the victim in this offense as a basis for giving her

3   a minimal role, or something along the lines of Pam Lucero

4   is responsible for her conduct, and I am not going there.

5           Look, what I know is this:  She had some

6   conversations with Raul Caraveo.  I grant you that

7   interpreting conversations can sometimes be tricky.  But

8   there is, in my view, and I have to believe in the view of

9   the jury, a belief that there was an understanding between

10  those two that she was working for money and that she was

11  going to get a bonus, and she got a bonus.

12          There is participation that is, however you want to

13  cut it, longer than one year.  What I mean by that is that

14  if you look at the returns on this exhibit, there are

15  returns that extend into the year 2012.

16          As I look at other co-defendants, it is a mixed

17  bag, but I perform the look anyway.  Aragon was around the

18  same time frame.  Aragon didn't get a role in the offense.

19  But Aragon cashed checks and Aragon filled out things.  So

20  she is a little different.  But Aragon only submitted --

21  there were only 25 returns submitted to her address.

22          In terms of Conrad Archuleta and Nancy Guzman, it

23  was a short period of time, much shorter than this

24  defendant's, and only 14 returns.

25          Ms. Portillos' returns number 36, and it is greater

1     than these other individuals that she might be compared

2     to.  And, there is the additional problem, which is that

3     as you is extend into 2012, towards the end of that time

4     frame -- I believe it is 2012, when the agent is

5     interviewing her, she is -- again, I am interpreting the

6     evidence in the way that is consistent with the verdict,

7     and that is also consistent with my interpretation of that

8     evidence, she is in no uncertain terms covering for Raul

9     Caraveo and seeking to protect the conspiracy.

10          That is not a minor role.  That is not a minimal

11    role.  I am required under the guidelines to look at a

12    number of factors, and I have looked at them.  I am

13    required to look at the degree to which she understood the

14    scope and structure.  And, at least in terms of her

15    involvement, I believe she did understand that scope and

16    structure.  And she was not only a friend of Pam Lucero,

17    but also getting paid for those checks that came to her

18    address.

19          Did she participate in the planning?  No.  Did she

20    participate in the decision making?  She didn't

21    participate in the overall decision making, but she had

22    decision making as to whether or not her address would be

23    used.

24          The nature and extent of her participation, that is

25    the trial.  She was involved in this through Pam Lucero

1    and with Pam Lucero over a period of time.  And there does

2    not, and I do not find there to be any reason that she had

3    some minor role to the extent of her particular

4    participation.

5         Did she stand to benefit, which is the final

6    factor?  Yes, she did.  Looking at all of the facts and

7    all of the circumstances, I find that the defendant has

8    not met her burden with respect to establishing a minor or

9    minimal role.  And, frankly, I find that the evidence, as

10   it exists before me, including the trial evidence, does

11   not support such a role.

12        Now, the loss is tricky.  First, as both sides

13   recognize, and as I have said, I am bringing forward my

14   ruling with respect to 2B1.1; loss calculation, intended

15   loss.  And, as a result of that, I conclude that the

16   intended loss was not the loss throughout the entire time

17   period of this defendant's involvement, for the reasons

18   that I have articulated, but I will also supplement those,

19   as I did with Pam Lucero, by saying that with respect to

20   all of those other losses, there is no evidence that has

21   been presented, nor do I believe there was any evidence

22   available, to suggest that this individual intended all of

23   those other losses.

24        Indeed, much of the evidence during the course of

25   the trial, and over the course of this case, is that she

1    doesn't even know these other people.  And so to assume

2    that she is aware of all of these other people cashing in

3    in the way that she is doing, requires a leap of faith of

4    one type or the other.

5         Type one is somehow she knew about Jennifer Leff

6    and Michelle Barrett -- excuse me, I am screwing up the

7    names, and I don't mean to do that.  Ms. Barrett,

8    Ms. Leff --

9         MR. MOSBY:  Steinhaus.

10        THE COURT:  -- Ms. Steinhaus.  And there was

11   another; Mary Gallegos.  And that somehow she knew about

12   that because she was friends with them.  Or, that she knew

13   about everything because she was friends with Pam.  And,

14   you know, that -- asking me to make that leap of faith is

15   a number of things, but it is not evidence.

16        So I conclude that the intended loss is not

17   $524,963.  I do conclude that the intended loss is

18   $98,499, because that is the loss on the returns that were

19   submitted using this defendant's address, and there has

20   been no challenge to that.

21        In fact, in his written pleadings, Mr. Mosby,

22   himself, has identified that as intended loss.  And

23   intended loss is relatively easy here.  You send in the

24   returns asking for a refund in a particular amount.  The

25   amounts claimed are the intended loss.

1          And I have no doubt that her discussions with Pam

2     Lucero, her providing checks to Pam Lucero, things of that

3     nature, is sufficient for me to say that she knew about

4     the extent to which her address was being used, and so

5     that is the intended loss.

6          The more interesting question is what is the actual

7     loss.  Because if, in fact, the actual loss is

8     $274,869.57, that being the actual loss during the period

9     of her involvement in the conspiracy, then that is the

10    number that governs.  That is the number that sets the

11    offense characteristic.

12         I do not find that to be the number, and I do so

13    for the following reason:  I don't disagree with the

14    Government at all in terms of the law.  The question

15    becomes, what evidence has been put before me to suggest

16    that that loss, all this other stuff that was going on was

17    foreseeable to this defendant?  Which is why I asked

18    Ms. Paluch, "foreseeable to whom?"  And the response I was

19    given was foreseeable to this defendant.

20         What I know from the trial evidence, what I know

21    from motions hearings and all of the other proceedings

22    that have gone on here is that most of the other people,

23    with the exception of Raul Caraveo and Pamila Lucero, they

24    don't know her at all.  Carolina Aragon, didn't know her.

25    Conrad Archuleta, didn't know her.  I don't believe that

1    Sabrina Caraveo knew her.  I have not heard from Nancy

2    Guzman.  But there is nothing that suggests that any of

3    them knew her at all.

4        I have no real reason to believe that she knew of

5    them.  In other words, that the information ran in the

6    other direction.  Again, I could make an inference, and I

7    am being asked to make an inference based on her close

8    association -- excuse me, association with Pam Lucero; her

9    friendship with Pam Lucero.

10       But, I don't have anything to suggest that Pam

11   Lucero was telling this defendant about what Carolina

12   Aragon was doing or what any of the other people whose

13   addresses were used was doing, and that includes Leff,

14   Steinhaus, Barrett, and Gallegos.

15       Again, because they're friends, I'm being asked to

16   draw the connection that she must have at least known of

17   that.  But what I have got is this mound of numbers.  And

18   I am being asked to just kind of make a logical leap and

19   say that Ms. Portillos knew about the returns and the

20   amounts of returns or the approximate amounts of returns

21   that were being submitted in other people's names at other

22   addresses, and I don't really have anything.

23       The argument makes, perhaps, more sense as to some

24   people, let's say by way of example, Barrett, than to

25   other people, by way of example, Aragon.  But I don't have

1    any kind of a breakdown that I can use to reach any kind

2    of a rational dollar figure, even if I were inclined to

3    follow that logical inference that I am being pointed at.

4          So, based on the evidence before me, I do not

5    disagree with the Government at all on the legal argument.

6    What I do disagree with the Government on is this:  That

7    the evidence that has been presented to me is sufficient

8    to demonstrate that this defendant, that it was

9    foreseeable to this defendant that $274,869.57 was the

10   harm of the conspiracy, that the activities of these other

11   people whose involvement, frankly, there is no evidence

12   that she even knows about them at all.  And with respect

13   to Barrett and Leff and the others, there is no evidence

14   that she knew that Pam was using their address during the

15   time of the conspiracy, I think it fails on an evidentiary

16   basis, not on a legal basis.

17         And so my ruling is distinct and different than

18   that for intended loss.  That puts me back to concluding

19   that the actual loss was $38,724.51, which means that the

20   intended loss -- the actual loss being the amount of loss

21   flowing from those checks using the Baltic Street, her

22   address.

23         Therefore, the intended loss is greater, therefore,

24   the intended loss governs.  The intended loss being

25   $98,499.  Again, going to the loss table, what I note is

1    that with respect to that figure, it is a plus 8 instead

2    of a plus 12.  And, therefore, the guideline calculation

3    is 6 plus 8 is 14.  And I pause, because now I have to get

4    to obstruction.

5         And let me just make a ruling, then I will let you

6    make your record.  The interesting thing about obstruction

7    is that the Government has asked for obstruction.

8    Probation has concluded obstruction is appropriate.  There

9    has been no objection to the obstruction calculation.  I

10   agree that obstruction is appropriate.

11        Now, but it is not that simple.  I just can't say,

12   well, I think she lied.  What I have to do is identify

13   particular statements so the Circuit can review my

14   conclusion.  The statements have to be material.  They

15   have to be ones that the jury necessarily found to be

16   untrue, and ones that I find to be untrue.

17        I identify the following two statements as the most

18   obvious examples:  On day 4, in the on morning session,

19   during the course of her testimony, Ms. Portillos was

20   asked:  "Have you ever given anyone permission to use your

21   address on an income tax return form?"  Her answer was

22   "Absolutely not."

23        Later, during the course of her testimony, she was

24   asked, "When is the first time that you heard anything

25   about Pam Lucero being involved in an IRS tax fraud

1    scheme?  "Answer:  When Mr. Romero came to my work.

2    "Question, and do you remember the date of that?  "Answer:

3    I believe December of 2012.  "Question:  Before that, did

4    you know anything about income tax return checks coming to

5    your house?  "Answer:  No."

6         There is a multitude of evidence that suggests and

7    convinces me that these statements were false.  First, it

8    is not possible that -- well, it is wholly incompatible

9    with the jury's verdict.  Frankly, there are a number of

10   calls where it is apparent, although they are calls

11   between Pam Lucero and Raul Caraveo, that this individual,

12   this defendant here, Ms. Portillos, knew about these

13   checks coming to her house, if not permitted it.

14        Government's Exhibit 186E is a recorded call where

15   Lucero is telling Caraveo that she, Lucero, just got off

16   the phone with Cristina, and there is nothing there today

17   either.  She is like "Oh, man," which means, in context,

18   that Portillos is looking to see what the status of the

19   return is, which she could not do and would not do had

20   there not been a return -- permission to use her address

21   and a return expected.

22        There is another conversation -- and I am just

23   simply giving some bits of evidence here.  Exhibit 195E

24   and Exhibit 117, in which Lucero is again talking to

25   Caraveo, and says "Cristina got another one of those

1    whatcha call it for that same other one."  Caraveo says

2    "For Will?  Lucero responds "Yeah, for the fucking --

3    they're taking that for CS, the whole thing."

4         And, in context, what that means is that the return

5    was being credited against child support payments.  And,

6    again, the conversation makes no sense unless

7    Ms. Portillos knows.  Frankly, Pam Lucero's ability to

8    cash the checks makes no sense unless Ms. Portillos is, at

9    the very least, allowing her to use her address, if not

10   actively participating in the conspiracy.  And I find that

11   she was participating in the conspiracy.

12        I know that there was some trial evidence that

13   attempted to explain how Lucero could have arguably come

14   into possession of these checks.  And they involve such

15   things as a hint or suggestion that she was hanging around

16   outside the house, stalking the mailbox.  I find that

17   occasion; that one or two times her being spotted outside

18   her home, means essentially nothing.

19        And, moreover, during the time period in question,

20   she was living in Delta, and during the significant

21   portions of 2010.  So the notion she is driving down from

22   Delta to Colorado Springs on a daily basis to hang out and

23   look at Ms. Portillos' mailbox and then run up there and

24   grab checks, it's ridiculous.  There is nothing more to

25   say about it than that.  It is ludicrous.  It is not

```
 1    convincing.  It is an attempt to give life to the lie.
 2    And it is for these reasons that I find that the
 3    obstruction of justice applies.
 4            Therefore, it is 6 plus 8 plus 2, I think.  Yes,
 5    for a total of 16.
 6            Now, Ms. Paluch, I will give you the opportunity to
 7    make your record with respect to any or all of the matters
 8    that I have now covered by way of guideline issues.
 9            MS. PALUCH:  Okay.  Your Honor, I think I have
10    preserved and, if not, I will preserve the Government's
11    objection to the loss calculation, both on intended and
12    actual.  Thank you.
13            THE COURT:  All right.  Mr. Mosby?
14            MR. MOSBY:  No, Your Honor, I have no record to
15    make, except I dispute the Court's statement that during
16    2010, that Pam Lucero was living in Delta.  Pam Lucero
17    left Delta in 2009.  Pam Lucero lived, from approximately
18    November of 2009, in Colorado Springs.
19            THE COURT:  All right.
20            MR. MOSBY:  But it doesn't really change the
21    ruling.
22            THE COURT:  What I was going to say is I accept
23    that if that is what the evidence shows and it is my
24    memory that fails me.  But, nonetheless, I still find the
25    notion that she is hanging outside the mailbox waiting for
```

1    the mail to be ludicrous and, frankly, completely

2    inconsistent with these other phone conversations where

3    she is talking about, you know, waiting for this and

4    finding out that that was being applied.

5         I withdraw that.  I will take you at your word,

6    counsel, but it doesn't change my ruling.

7         MR. MOSBY:  Absolutely.

8         THE COURT:  All right.  So, with all of that, where

9    are we?  We are at a 16-1 which is 21 to 27, in terms of

10   guideline numbers, and fine range of, Ms. Roberts?

11        PROBATION OFFICER:  Fine range is $5,000 to

12   $50,000.

13        THE COURT:  5- to 50-.  And supervised release

14   remains 1 to 3 years; correct?

15        PROBATION OFFICER:  That is correct.

16        THE COURT:  All right.  So, that's where we are,

17   which is a long way to get here, where we can now talk

18   about the ultimate sentence to be imposed.

19        To your knowledge, Ms. Paluch, are there any other

20   guideline issues that need to be resolved before we

21   address the issue or any other objections that needs to be

22   resolved before we address what is the appropriate

23   sentence?

24        MS. PALUCH:  No, Your Honor.  Thank you.

25        THE COURT:  Mr. Mosby?

1          MR. MOSBY:  No, Your Honor.

2          THE COURT:  All right.  Then what we are going to

3    do is we will take a break until 20 of so the court

4    reporter can get a break, then we will come back and

5    address what is the appropriate sentence.  I understand

6    that the defendant has filed a motion for variance; that

7    is ECF No. 529, or downward departure, and the Government

8    obviously opposes that.

9          I think that is all there is.  We are really down

10   to the core.

11         MR. MOSBY:  I would like to make one statement for

12   the record.  In the Judge's colloquy he indicated that

13   somehow that we were trying to portray Ms. Portillos as a

14   victim or being used by Pam Lucero.  She is not a victim.

15   And that was not the intent of my argument to portray her

16   that way.

17         THE COURT:  All right.  That's fair.  That's fair.

18   Well, I am not going to rehash that.  I am going to leave

19   that as it is.  What I will tell you, a curious feature

20   for me is this, and I want to be very direct:  The

21   Government interprets some of what was filed on the

22   defendant's behalf as a current admission of guilt.  I am

23   not saying it is right.  I am not saying it is wrong.  I

24   can understand why they can read it that way.  I don't

25   know how it is intended.

1           I also understand that it is difficult to walk a

2    sentencing line following a trial.  So I guess what I am

3    asking is, on some level, it will be helpful to understand

4    what her position is when I come back out in terms of

5    sentencing, because it is somewhat uncertain.  And I will

6    leave it at that.

7           All right.  We will be in recess.

8           (A break is taken from 10:29 a.m. to 10:40 a.m.)

9           THE COURT:  Please be seated.

10          And, before we begin, let me just, since we are all

11   in the record making business, note one thing that I noted

12   in Pam Lucero's sentencing but I haven't noted here, and I

13   want to be very clear about it.

14          In Ms. Lucero's sentence, I took issue with a

15   representation that is made in a pleading filed in this

16   case that the approach to actual loss; meaning the total

17   amount of loss that occurred during the time frame of a

18   defendant's involvement in the conspiracy, was the loss

19   approach used by the Government with respect to each

20   defendant.

21          It is the approach used with respect to Raul

22   Caraveo, Eugene Chavez, Pam Lucero.  Despite the

23   representation in a footnote, and I don't have the

24   document, I have concluded, in looking at the plea

25   agreements with respect to the other defendants, that it

1   is not the approach that was used with respect to Carolina

2   Aragon, Conrad Archuleta, or Nancy Guzman.

3         I want to be clear that although I have that

4   disagreement with the Government, that does not -- is not

5   the basis of my ruling in this case.

6         I would say that if my ruling were other than it

7   is, I would then be faced with trying to decide what it is

8   I wanted to do about that.  But I did not come to this

9   sentencing, nor do I now have any preconceived notion,

10   because I would need to talk to all of the parties about

11   their views and what they think about these things.

12         But, just for the sake of the record, there is

13   this, what I call difficult to understand inconsistency in

14   the loss approach among the various defendants.  It is

15   easier to understand why for Raul Caraveo, Conrad

16   Archuleta, Pam Lucero, it is the case.  It is also

17   understood by me that with respect to Sabrina Caraveo, the

18   answer is obvious.  She got checks -- she got money from

19   virtually every check, and counsel did not object.  And

20   the combination of those two things explains it.

21         But there is a clear change with respect to the

22   remaining defendants.  I am done with that.  I just want

23   to make it clear, because I don't want the Circuit to look

24   at a note that is in a document where it is said that it

25   was done this way for Carolina Aragon, "this way" being

1    all losses occurred due to the result of the conduct of

2    any co-defendant at any time of Ms. Aragon's involvement

3    in the conspiracy go unchallenged, because I do not

4    believe that to be the case.

5         All right.  Mr. Mosby -- well, six of one, half

6    dozen of another.  They are asking for a motion for

7    variance.  You are objecting.

8         Let me start with you, Ms. Paluch.  I think we all

9    know what is going on here.  Let me just say, you know,

10   there are some things that I just got to flow out.  The

11   fact that she has a criminal history score of zero, that

12   is not grounds for a variance or a departure in and of

13   itself.  If it were, everybody who scored zero, the

14   guideline floor would collapse.

15        By that comment, I do not mean to say the right

16   sentence is the guideline sentence.  I simply mean to say

17   that if you score zero, that does not, in and of itself,

18   mean that you should get a less-than-guideline sentence.

19   I do think that having a zero criminal history point,

20   coupled with age 36, is a factor worth discussing.  But

21   the mere factor that she has zero criminal history points

22   is not moving me, nor do I intend at all to get into this

23   discussion about other people who weren't prosecuted.  If

24   you want to talk about it, fine.  But I'm not going down

25   that road again.

 1          The other people -- look, I am not faulting you,

 2     Mr. Mosby, I am just saying, for purposes of where I --

 3     how I view some of this, that I am not moved by it.  And I

 4     am also not entirely moved by the comparison, in terms of

 5     what other people got in this case.

 6          What I mean by that is, I think it is something

 7     that I can and should look at.  But I think that there are

 8     very much differences between people in terms of who went

 9     to trial, who didn't, who got a 5K, who got obstruction,

10     and that all of these things kind of yield different

11     guideline numbers.

12          Now, there is no presumption that the guideline is

13     the right number to begin with.  But I am just simply

14     saying that in terms of the variance, those particular

15     points don't move me much.

16          So, Ms. Paluch?

17          MS. PALUCH:  Yes, Your Honor.  I am just looking at

18     the motion for variance.  As you noted, the first one was

19     the criminal history.

20          THE COURT:  The second one was family ties and

21     support will deter her.  And the third one is she has a

22     long-standing solid employment history.

23          MS. PALUCH:  We responded to both of those in our

24     pleading.  And I would rely on those responses.  As

25     discussed, to vary because of family ties, creates an

1    unwarranted sentencing disparity between those defendants

2    without family.

3         So I think while the Court is free to consider

4    everything under 3553(a), I don't believe that family ties

5    is a basis for a variance.

6         THE COURT:  Here is the way I look at it.  I have

7    got this guideline, and it is what it is.  Whether it is

8    -- well, I have ruled it is 21 to 27, and I can't remember

9    what it would have been had there been -- had the

10   Government prevailed.

11        MS. PALUCH:  The Government, I think, was a 33 to

12   41 something like.

13        THE COURT:  30 to 37, something like that.  Be that

14   as it may, I am not going to go through this like some

15   mathematical test.  What I mean by that is:  There is this

16   factor, and it cuts this way, and there is that factor,

17   and it cuts the other.  In sentencing, you looking at the

18   person, you are looking at the crime, you are looking at

19   these other factors, the guidelines, deterrence, all of

20   the rest of it, and you say, what is the right number?

21        So what I am asking you is not to get involved in

22   this kind of bop a gopher, he says X, you say Y.  You say

23   X, he says Y.  What do you think is the right number, and

24   why do you think it is the right number?

25        MS. PALUCH:  Certainly, Your Honor.  And the

1    Government says the right number is 27 months in prison.

2    And we say that for a number of reasons.  I was happy to

3    hear counsel say that the defendant is not coming to this

4    Court saying she is a victim.  Because I have heard a lot

5    of talk about manipulation that has occurred by -- you

6    seem confused.

7         I understood counsel to say that the defendant

8    would like the Court -- she is not asking the Court to

9    view her as a victim.  Isn't that what you said?

10        MR. MOSBY:  That is exactly right.

11        MS. PALUCH:  Right.  There has been much discussion

12   about manipulation by Pam Lucero and Raul Caraveo.  And

13   this defendant is not being sentenced based on whether or

14   not she is manipulated.  She is being sentenced based on

15   decisions she made; decisions she made that spanned

16   periods of years.

17        It wasn't one return, one time.  Why did I do that?

18   I got this envelope in my mailbox that tells me it is a

19   federal felony on the face of it.  This is the United

20   States Government, the Department of the Treasury, and

21   what am I doing with this mail?  This happened over and

22   over again, for a long period of time, and the phone calls

23   bore that out.

24        She is being sentenced for her decisions.  Everyone

25   in courtroom is responsible for their decisions that they

1    make on a daily basis.  We are all held accountable for

2    what we decide to do.  The Court said she is not a Raul,

3    Caraveo, She is not a Pam Lucero, going down the list of

4    the various defendants.  She is not, but she decided to

5    associate herself with these people.  She decided to

6    maintain this friendship.  She decided to be involved with

7    a guy who is in prison for a very long time for committing

8    another tax fraud scheme.

9         She is here for her own conduct, for her own

10   decisions.  As to any sort of unwarranted disparity of

11   sentences imposed by others, as the Court pointed out,

12   other defendants, all of them, we are talking nine,

13   because we have an unindicted co-conspirator, eight of

14   them --

15        THE COURT:  You are talking nine.  I am not talking

16   about unindicted co-conspirators, because I don't think

17   there is enough to even consider them co-conspirators.

18        MS. PALUCH:  Right.  Let's keep it to eight, then.

19   I am talking about Melanie Palumbo.

20        THE COURT:  That, I will accept.

21        MS. PALUCH:  So that is the nine that I am talking

22   about.  Eight of them came forward, agreed to -- eight of

23   them pled guilty.  Now, out of those eight, five

24   cooperated; four of the charged in this case, as well as

25   Melanie Palumbo.  They cooperated with the Government.

1    They met with the Government.  Three of them came to court

2    and testified.

3        So I don't believe you can compare this defendant's

4    sentence to those imposed on the others for those variety

5    of reasons.

6        Now, counsel can argue to you that this defendant

7    should not receive a trial tax.  We are not asking for a

8    trial tax.  She had every constitutional right to take

9    this case to trial, and she did.  That was her right to do

10   so.

11       But, as set forth in her brief, she didn't have the

12   right to commit perjury.  She didn't have the right to

13   come to a federal courtroom, take the stand, take an oath,

14   and lie to a federal judge and lie to a federal jury.

15       And that makes her case different than every other

16   defendant that has come before you.  When you look at the

17   length of the time of her involvement, lying to Agent

18   Romero during the investigation of this case, and lying

19   during the trial, a 27-month sentence is appropriate.  And

20   it is sufficient and not greater than necessary when you

21   consider all of the factors in 3553(a).  Thank you.

22       THE COURT:  Let me ask you a couple of things.

23   First, is it 27 months because the guideline says it is 27

24   months?  If the guideline say it was 10 to 16, would you

25   be asking me for 16?

1          MS. PALUCH:  It is 27 months because we believe the

2     guideline calculation should be 33 to 41.  And I know the

3     Court isn't going to sentence in that range.

4          THE COURT:  You could ask.

5          MS. PALUCH:  I certainly could.  I certainly could.

6     But I am asking for the 27 months.

7          THE COURT:  Let me ask you another question.  I

8     think this is right, but if I am wrong, it is due to

9     failure of memory, not other mischievous reasons.

10          I seem to remember Raul Caraveo, the Government

11     recommended the bottom of the range.  And I think I said

12     something along the lines of, what, are you kidding me?

13     And we had a discussion, and I ultimately went along with

14     it.

15          MS. PALUCH:  Yep.

16          THE COURT:  I believe the Government recommended

17     the bottom of the range for Eugene Chavez, as well.  Why

18     would you recommend the bottom of the range for those

19     people and the top of the range for her?

20          MS. PALUCH:  Certainly, Your Honor, I can answer

21     that question.  Raul came in early, very early.  He set

22     the tone for this case, as far as pleading guilty.  I

23     think, had Raul taken the stance of forget it, prove it,

24     Government, I am not accepting anything, we would have had

25     a different approach to his case.

1          As you recall, he came in with his plea days before

2     Carolina Aragon was set to be deposed, and he did not want

3     to be at the table.  He did not want to be sitting there

4     having Carolina Aragon have to testify about against him.

5     He didn't want to put her through that.  So there are a

6     lot of factors the Government took into consideration.

7          Primarily, if Raul admitted his guilt, it would set

8     the stage for the remaining defendants.

9          THE COURT:  Knock the dominos over.

10          MS. PALUCH:  Exactly right.  And so we felt that

11     because we made that offer, that we should extend that

12     same offer to the other defendants.  And Eugene Chavez'

13     attorney was unable to speak with Eugene prior to Carolina

14     Aragon's deposition.

15          He quickly soon after that accepted that deal.  It

16     took awhile to get the plea paperwork to the Court, but I

17     honored that agreement because I had honored it with Raul.

18          THE COURT:  Okay.

19          MS. PALUCH:  I wanted to point out one thing.  Your

20     Honor made reference to it's unclear as to whether or not

21     the defendant is now admitting her guilt through the

22     pleadings.  And there are references in the motion for

23     variance, but I would direct the Court's attention to the

24     defendant's objections, which are found at document 528.

25          THE COURT:  Hold on.  I have got them.  528.

1           MS. PALUCH:   528.  If you go to page 5, Your Honor,

2    the last paragraph, "defendant participated only through

3    Pam Lucero."  And then the last sentence is, "Defendant's

4    participation in the scheme was essentially limited to one

5    year; 2010."

6           Those are references in addition to statements that

7    were made in the variance.  And there I refer to page 4,

8    where it talks about the defendant's involvement in the

9    case.  Talks about the Government alleging the defendant

10   did anything more than agree to allow Pam Lucero to use

11   her address.

12          So I believe there was sufficient support between

13   both documents for the Government to say that it appears

14   she is now admitting her involvement.

15          THE COURT:  Don't misunderstand.  I am not

16   suggesting you were saying something that didn't have

17   support, I was simply going, it is a little unclear to me.

18   Even with you pointing those matters out, it still remains

19   unclear to me, because you could have a defendant who has

20   received a guilty verdict from a jury, be simply

21   commenting on the inferences of the evidence, without

22   necessarily accepting them as, yes, I participated in this

23   scheme.

24          You could say the evidence is that I was involved

25   in the scheme for this period of time.  And it is unclear

1    to me exactly what is being said.

2            MS. PALUCH:  It is unclear because it isn't said

3    that the evidence was presented.

4            THE COURT:  I understand.

5            MS. PALUCH:  It is not certain.

6            THE COURT:  Well, we will find out what it is.

7            MS. PALUCH:  Certainly.  Thank you, Your Honor.

8            THE COURT:  Mr. Mosby?

9            MR. MOSBY:  Your Honor, a couple of things.  I have

10   been asked by the parents, Ms. Portillos, to allow them to

11   make very brief statements to you, if you will so permit.

12           THE COURT:  They have no right, you understand

13   that, because they are not a victim, but I'll hear from

14   them.

15           MR. MOSBY:  Okay.

16           THE COURT:  All right.

17           MR. MOSBY:  I will answer the Court's questions

18   after that.

19           THE COURT:  Let's hear from whoever wants to be

20   first.

21           MS. R. PORTILLOS:  Your Honor, my name is Rosemary

22   Portillos.  I am Cristy's mom.  I want to thank you for

23   this opportunity to speak to you on behalf of my daughter.

24   And I asked Mr. Mosby, "well, can we ask for leniency?"

25   And he said "well, I will talk to the Judge and we'll see

1   if they will let you talk."

2         I am not from Colorado, I am from California, long

3   long, long time ago.  I was born and raised in small town

4   in California.  I was raised in a family where we were on

5   welfare for the majority of my lifetime.  There were seven

6   of us in the family.  And it was hard.  It was difficult

7   for my dad to be able to keep everybody fed and, at the

8   same time, have his weekend beers or whatever.

9         But, in my mind --

10        THE COURT:  If it helps, I know the taste of

11   government cheese personally.

12        MS. R. PORTILLOS:  In my mind, as I was growing up,

13   I wanted to become a teacher.  And I would always play

14   school with my other brothers and sisters, and I would be

15   the teacher.  So, I was lucky enough to have family that

16   was involved in the Catholic church.  We went to the

17   Catholic -- we went to Catholic school, all of us, all

18   seven.  We were the janitors.

19        And many a Friday night, the older ones would be

20   there cleaning the school because dad was out partying.

21   That is okay.  I went on, and I was able to get into

22   college in Los Angeles.  I went to Mount St. Mary College

23   and graduated with a BA in education.

24        And I was able to complete that, because the nuns

25   who taught me when I was in elementary and middle school,

1    also taught there at the college when I was that age.

2         Well, I left California and came to Colorado and

3    met my husband.  We got married.  And at the time, I

4    thought, well, I better get a job.  And I wanted to work

5    as a teacher.  I had taught for about 4 or 5 years in

6    California before I came out here.

7         So, the first few years that we were married, I was

8    working to get my Colorado license.  And when I got my

9    Colorado teaching degree, I started working.  As my

10   husband will tell, he worked nights, I worked days.  I was

11   determined then to, hey, I can do this, I can get my

12   master's.  So, I went back to school, worked, got my

13   master's degree in education, and finally retired after 26

14   years from Sierra High School in Colorado Springs.

15        Now I would like to share some information about

16   Cristy that you do not probably know quite well.  Cristy

17   has always been trying hard to be a good mother.  She is a

18   good person, basically.  She would never do anything to

19   bring pain or suffering to her children.

20        But, my husband and I, to be honest, were very

21   relieved when she finally recognized the man that is the

22   father of her first two children was not the kind of

23   father that she wanted for her children, nor the kind of

24   husband that she really wanted.

25        I share this with you because Cristy knew, Cristy

1    has always known that she needs to protect her children.

2    She needs to protect them from an environment and a system

3    that could take them down the wrong path.

4         There is no doubt in my mind that Cristy would not

5    have engaged in this crime with full knowledge.  But, then

6    again, I agree with you, people don't have to be

7    manipulated or forced.

8         Cristy is the oldest of four children, and we have

9    three girls and one boy.  He is the youngest.  In forming

10   our children's behavior, my husband and I stressed on the

11   importance of loving and caring for each other.  We taught

12   them right from wrong, and we helped them understand the

13   purpose of discipline and punishment.

14        When mistakes were made, we would explain to the

15   children that, hey, you ask forgiveness, and you try not

16   to repeat the same mistake.  And I give my examples from

17   the kids in my classroom, and my husband would give his

18   examples from young people trying to steal from the store

19   where he worked.

20        We gave our examples so they could change their

21   attitude and move forward in a positive way.  And as I sat

22   here today, feeling very hurt, very angry, I thought,

23   uh-uh, I am not going to let negativity overcome me, not

24   at my age.  There will be a positive thing happening

25   because of this.  I know there will.

1          Dan and I are both people of faith.  And we brought

2     up our children to honor to love their faith, love God,

3     their neighbor, to follow the rules of the household, and

4     to follow the rules of school and to follow the rules of

5     society.

6          Basically, to live the Ten Commandments.  We

7     trained our children to be good citizens.  We stressed

8     they needed to keep away from children who were

9     troublemakers; not to hang around with people that could

10    get them into trouble.  We harped on the idea that other

11    people will judge them by the friends and the people that

12    they hang out with.

13         Well, we expected our kids to be honest and to

14    treat others the way they wanted to be treated.  Well, we

15    still try and instill in our children and in our

16    grandchildren the importance of thinking before they do

17    anything.  There is consequences to your actions.  Making

18    good decisions are going to help them feel better about

19    themselves and strengthen their ability to make good

20    decisions.

21         My husband and I have felt blessed by our children.

22    They have made mistakes along the way, but so have all of

23    us.  Getting back to Cristy, she graduated from high

24    school.  She ended up getting pregnant with the guy that

25    she thought she was going to marry.  Five months later, he

1    ended up being sent to prison.

2         Well, she stayed and lived in a little apartment of

3    her grandparents.  We weren't too far away, so we were

4    there involved with helping her bring up the baby.  But,

5    no sooner than the fellow or the gentleman came out of

6    prison, she became pregnant with her second child.  And

7    they are both wonderful people.  They are sitting right

8    over there.  We love them very much.  Then he was sent

9    back to prison for some of the mistakes he was making and

10   the people he was hanging out with.

11        Your Honor, I do believe in the law.  And I

12   understand that she needs to be shown, by the severity of

13   whatever -- the whatchamacallit, the outcome of the wrongs

14   she has done.  But I really don't believe that she

15   actually made plans with Pam to steal from other people

16   and the Government.

17        She is married.  She recently married a very good

18   man.  He is a Christian.  They have a child.  He is 10

19   months old.  And so I am here this morning -- I don't know

20   really how much it holds, but I am here to request and to

21   plead with you to show her leniency.

22        She is a good person.  She has learned by her

23   mistakes.  She has been a hard worker.  Probably one of

24   the things that has bothered me is that she is too

25   friendly.  She is too open.  She is too gullible.  And

1    perhaps we have seen some of the results of that type of

2    behavior that was going on.  We didn't even know about it,

3    to be honest with you.  You would think we were so close

4    we would know something.

5         So, I have to end by saying, I don't really believe

6    that she actually knew what she was involved in.  One last

7    thing, it does deal with Pam.  Pamila, when she was out,

8    got pregnant.  And for some reason or another, I think it

9    is because she had really no family, she had lost all

10   contact with her biological family, so she latched onto

11   our daughter, Cristy.

12        But, anyway, Pam asked her to be present when her

13   little girl was born.  And I did wonder, why Cristy?

14   Well, one day Tanya and Jennifer called Cristy, and they

15   are very much concerned about the little girl; that Pam

16   was acting weird, and they were very scared for the child.

17        So Cristy called me, and I, in turn, told her you

18   have to call the Department of Social Services whenever

19   there is a child in danger.  Well, she felt an urgency to

20   help the child.  She got the child's aunt, Connie,

21   involved, and they both helped to make sure that the child

22   was removed to a safe place.

23        So, there is a lot of good in my daughter.  I want

24   to thank you, and I want to ask you to show mercy to her.

25   You know, that commercial on TV talks about "the strong

1    arm of the law."  Well, I kind of ask that, in your heart,

2    you find that -- in sentencing her, you are sentencing us,

3    because we love her very much.  And perhaps you can find

4    the softer arm of the law.  Thank you very much.

5          THE COURT:  All right.

6          MR. D. PORTILLOS:  Mine will be very short.

7          THE COURT:  Okay.

8          MR. D. PORTILLOS:  Thank you, Judge Moore, for --

9    thank you for allowing me to speak.  My name is Daniel

10   Portillos.  I am the father of Cristina.  I have been

11   asked to describe for you how we raised and placed in

12   Cristina the values we believe in.  But to do that, I have

13   to explain just a little bit how I was raised.

14         My father worked construction his whole life.  My

15   mom was a housemother.  In 1941, my father was in the

16   military service.  He was an MP.  30 years later, I went

17   into the Air Force.  I was an SP; security police.  After

18   I got out I went back to work at the grocery store, and I

19   worked for 29 years in the grocery store business.  I have

20   always worked nights during that time so that either my

21   wife or I would be with our kids.

22         Neither my dad or I entered law enforcement, but we

23   always had a respect for the law.  While our kids were

24   growing up, I volunteered at grade school where they

25   attended.  At one point at that time, I was volunteering

1    for about 18 hours a week plus working 40 hours at night.

2            I continued volunteering when my grand kids entered

3    the same grade school.  I still volunteer and work there

4    now.  I have also helped coach whenever their head coaches

5    needed help.  I soon became one of their head coaches.  I

6    had been a coach at one time or another for the Parks and

7    Rec, YMCA.

8            Being involved with my kids allowed me to help a

9    lot of players with problem they might have had, be it

10   home, school, or with other kids.  I would show my kids

11   how to help people by helping them push stuck cars out of

12   the snow whenever they needed help, or any place I could

13   help at.

14           My wife and I raised our kids to go to church,

15   respect the law, and to help others when you can.  They

16   have all been raised in the Catholic church and with

17   church beliefs.

18           Currently right now I am a member of the Knights of

19   Columbus.  I am an officer of the organization.  I have

20   always had good relationships with each of my children.

21   As I have worked nights in a grocery store, I would tell

22   them about the times when I apprehended shoplifters; how

23   it was important not to steal.  We taught our kids it was

24   important not to take anything that was not theirs and was

25   not earned by them.

1           Your Honor, as I talk about Cristy, I ask that you

2    be lenient with her sentence.  I know that my daughter,

3    Cristina, is a very good person.  She is the type of

4    friend that anyone would want to have.  I have seen her

5    drop everything she was doing to help a friend who had

6    flat tires, 7:30 at night on the highway, with a new born.

7           Ever since she had her kids, she has been -- they

8    have been number one in her life.  She would not put

9    anything in place that would separate her from her kids.

10   She now has a loving husband and a 10-month-old baby boy.

11   I truly believe that she did not knowingly do anything

12   against the law.

13          It did not surprise me that she had talked to

14   strangers, as I have always been caught by my kids talking

15   to strangers.  My kids would always ask who that was after

16   1 to 4 minutes of talking them.  I would tell them I

17   didn't know.  I told them it could be someone from either

18   my volunteering at school, church, work, or one of the

19   many sporting events that my kids were involved in.

20          I close with the hope that you will give her the

21   good grace of your leniency, and not separate my daughter

22   from her three kids and husband and her family and

23   friends.  Thank you.

24          THE COURT:  Thank you, sir.

25          Mr. Mosby?

 1          MR. MOSBY:  Your Honor, let me start on an unusual

 2    note.  I heard Ms. Paluch talk about her dealings with the

 3    other co-conspirators in this case.  Let me say that

 4    Ms. Paluch is a class act who has treated me and my client

 5    with the utmost respect.

 6          Now, you asked a question, are we now admitting

 7    that we -- the fact that it is unclear, I think answers

 8    that, under no circumstances.  But we are also paying

 9    respect to what the jury found.  And as I listen today,

10    when discussing obstruction, we are paying respect to what

11    the Court said.  Why make yourself ridiculous?  The facts

12    are the facts.

13          You know, I did my job in this case in terms of

14    communicating to my client things that I was supposed to

15    communicate with her.  But, you know, she is, has, and

16    will continue to say that she knew nothing about the

17    conspiracy.

18          But, you know, you asked a question that I can't

19    answer:  What sentence is appropriate?  We ask for a

20    below-guideline sentence, because I think that whatever

21    time you give my client is going to be heard so loudly in

22    her community, that the respect for the law will be known,

23    heard, and appreciated.

24          Unfortunately, the Court said this one day, and I

25    can't remember when you said it, that sometimes good

1    people find themselves just in bad situations.

2          And we have known that once you start that tangled

3    web, from telling a first untruth, and even my client

4    admits when Agent Romero walked in and asked a simple

5    question, and he did not ask the question that this Court

6    found:  Did you ever allow anyone to use your address to

7    receive IRS tax forms?  The question was:  Did you allow

8    anyone to use your address?  And those two are different.

9    And that is what my client said.  She told him no at that

10   time.  She did say at a later point in time she did allow

11   Pam to use her address for a friend.

12         Your Honor, basically, we're not talking about,

13   because what Raul did and Eugene, these folks are as close

14   to professional career criminals as I have ever seen.

15   They know how the game is played.  They know when to throw

16   in the towel.  They know how they are going to get the

17   best deal.

18         But what we have here is a person who basically has

19   made a decision that because her children's father was

20   sent to prison, that she was going to do everything within

21   her power to make sure that her children, and she,

22   herself, never were placed in that situation.

23         And that is what makes it a great tragedy, because

24   you do all of these things, and sometimes you don't

25   realize that you are being pulled into someone's web.

1    And, no, everybody is responsible for their actions.

2        I started out my profession, and what I was told is

3    that there will never be a right way to do the wrong

4    thing.  It is always going to come out.  And

5    Ms. Portillos, as she will tell you, she made some serious

6    errors in judgment and some serious mistakes.

7        But, Your Honor, she is not, and due respect to the

8    jury verdict, and due respect to what this Court has

9    found, she is not a criminal.  She will have a criminal

10   record after this is over, but she is, what you just saw

11   from those two folks, who did what we all do with our

12   children.  But sometimes people have to make their own

13   decisions.

14       And I ask the Court to consider the fact that a

15   message will be sent, and it does not have to be sent by

16   sentencing her in the guideline range.  And I will not say

17   what the sentence should be.  The Court has seen and

18   understands the dynamics and these issues much more than

19   I.  I just ask for leniency for my client.

20       THE COURT:  Let me ask that Ms. Portillos go to the

21   podium with you.

22       Ma'am, this is your opportunity to speak directly

23   to me.  If there is anything that you wish to say with

24   respect to yourself, this offense, anything at all, I will

25   be happy to listen to it and consider what you have to say

1    to me on your own behalf.

2          THE DEFENDANT:  Thank you, Your Honor, for the

3    opportunity to respond to these charges against me.  I

4    admit, I have made mistakes.  I've used poor judgment in

5    the past.  Sorry.

6          One of these mistakes was when Agent Romero

7    interviewed me at my work.  He asked me if I gave

8    permission for anyone to use my address.  Having an IRS

9    agent interviewing me at my work, I was distraught.  I

10   panicked.  I was unsure what was going on exactly.

11   Without even thinking, I responded with no.  I did not

12   allow anyone to use my address.

13         Once I really had time to sit and think about it, I

14   realized that I did give Pam Lucero permission to use my

15   address.  With her being my friend, when she asked, I did

16   not think that it would be for anything more than a

17   personal correspondence.

18         When Pamila Lucero started to have money to do more

19   activities, I should have seen that as a red flag.  In

20   2010, I was emotionally distressed, naive, and unaware of

21   everything happening around me, clearly.

22         I was going through a very hard time and seeing a

23   counselor regularly.  My counselor helped me to see I had

24   poor judgment.  I'm sorry that the Government was

25   defrauded.  I am also very sorry that I wasted the

1   Court's, DA's, and taxpayer's time and money for a trial,

2   but I simply could not stand in front of you and tell you

3   I knew about something I wholeheartedly did not know

4   about.  For that I apologize.

5          I should have recognized the wrongdoings.  I should

6   not have necessarily believed anything Pamila Lucero was

7   saying, especially when I asked her if things were

8   legitimate, if anything going on was illegal.  I should

9   have took everything going on in the whole picture and

10  realized something wasn't right.  That was a very, very

11  huge mistake on my part.

12         And I am asking Your Honor to please let me stay

13  with my family.  I do have respect for the law, and I

14  strive to be a good example for my children.  My oldest

15  son is a senior this year.  I am helping him strive for a

16  college scholarship, and doing all I can to help him get

17  there.  I need to be involved to help him make those

18  college decisions.

19         My daughter is 13; a very important time in a young

20  lady's life where she is finding who she is.  She needs

21  her mom.

22         I am still nursing my 10-month-old baby.  He needs

23  me.

24         These proceedings have taught me a lot.  I've

25  learned that no matter how long you have known someone or

 1    their family, it does not mean that you can trust them or

 2    believe them.  Definitely passing these lessons to my

 3    children.  I have learned to not take anyone's phone calls

 4    when a phone is handed to me.  I have educated my kids

 5    that their friends' actions can affect them, and to always

 6    be aware of what is going on around them.

 7         Your Honor, I am asking you to please be lenient

 8    and please allow me to continue raising my children.

 9    Thank you.

10         THE COURT:  All right.  In fashioning a sentence

11    here today, I have considered the presentence report, all

12    matters related to that report filed by the defendant and

13    the Government, statements and arguments of counsel for

14    the parties here today, and a statement of the defendant.

15         I am mindful of the fact that I am required by law

16    to impose a sentence that is sufficient, but not greater

17    than necessary, to achieve the purposes of sentencing, as

18    described in 18 U.S.C. Section 3553(a).

19         Fashioning such a sentence, I have considered both

20    individually and as a whole all of the 3553(a) factors,

21    which must be considered in determining a sentence,

22    specifically including those factors that have been

23    discussed and emphasized by counsel here today.

24         Ms. Portillos, what I do is I tell you, as you were

25    here on Friday, so you know --

1          THE DEFENDANT:  No, I was not here.

2          THE COURT:  -- what I do in terms of sentencing is

3    I tell you first what it is I am going to do, and I tell

4    you why it is I am going to do it, then I get to the

5    formal imposition using more stilted language that the law

6    requires.

7          I am going to start somewhere I probably shouldn't,

8    but I'm just going to.  It is very hard in every single

9    criminal case where there are parents who are involved in

10   their children's lives, to have to deal with the fact that

11   the person that they know, from the time that the person

12   was born, to today, is standing before a court convicted

13   of an offense.

14         And it is difficult on them as parents.  It is

15   difficult on them to, particularly in a case of a jury

16   verdict, to accept the jury verdict.  I'm not here trying

17   to do a strong arm.  I would note for the record, I know

18   the lawyer we are referring to, and it a civil lawyer,

19   talking about how tough he can be.  It has really nothing

20   to do with the Court.

21         But there is something that I just want you to

22   understand.  What I want you to understand is this:  The

23   system of justice in this country is that where there is a

24   dispute as to whether an individual commits a crime or

25   committed a crime or not, we have a trial.  And both sides

1    present all that they have to that jury, and that jury,

2    who has no dog in this hunt or no dog in this fight,

3    rather, goes back and weighs that and looks at it and they

4    decide what the facts are.

5         Once they have done that, unless there is some

6    strong disagreement that I have with regard to that, that

7    is the reality, at least in terms of the law.  So, in

8    terms of the law, did she do it?  Yeah, she did it.

9         And I understand that, as parents, you can come to

10   a different conclusion.  And I understand that you love

11   your daughter.  And I respect that, and I acknowledge

12   that, and I encourage you to do the same.  But, did she do

13   if?  The jury has spoken, and the answer is, yes, she did

14   it.

15        Now, Ms. Portillos, the broader question, of

16   course, is what is it that I am doing by way of a sentence

17   in this case?  And, you know, it's difficult.  And what I

18   mean by that is, what people say to me matters.  And at

19   the end of the day, you are telling me that you did not --

20   you were not involved in this, that it is Pam's fault, and

21   that's fine.

22        And you don't have to say anything.  But, I don't

23   know whether you intended it this way or not.  The

24   disturbing thing to me is not that you went to trial.

25   People have the right to go to trial.  The disturbing

1    thing is not that someone who is faced with possibly

2    having her life grossly disrupted, just wants to take a

3    shot at getting to go home.  That doesn't bother me at

4    all.

5         You sat in that box and you lied.  And what you are

6    saying today doesn't really line up very well with what

7    you said on the stand.  I mean, it was, no, you didn't

8    know anything about this, this was all whatever.  And now,

9    oddly, you are having conversations with Pam.  And, you

10   know, later on you realized what it was, and after you

11   thought about it, you realized that you did give her

12   permission.  Well, that is not really the testimony that I

13   heard.

14        You had conversations with her about whether this

15   was legal.  Why would you be having those kinds of

16   conversations if there was nothing going on and you were

17   as innocent as you say you were?  I am not trying to

18   resolve all of that.  All that I am trying to tell you is

19   what you are telling me today doesn't line up very well

20   with what you told me on the stand.  And, at the end of

21   the day, it doesn't line up with the truth.

22        It is awful to be where you are.  And it is awful

23   to have a stain on your life where you did something wrong

24   and it stays with you for the rest of your life.  And you

25   and your parents have spoken of what to do when the

1    children do wrong, because all children do wrong.  All

2    people do wrong.  How much wrong, I don't know.

3         But I don't know anybody who has never done

4    anything wrong, never had a wife or spouse or child or

5    somebody tell them that they did something wrong.  The

6    point is, when you stand up and say, all right, I did

7    wrong, I admit it, that means something.  And you are

8    saying everything but that.

9         Now, I don't expect you to stand here and admit

10   guilt when you have got an appeal going on.  I understand

11   that.  You have the right to stay silent and simply say,

12   look, I appreciate what the jury did, but blah blah.  But

13   that is not really what you are doing.

14        What you are doing is you are leaning out and

15   saying things that are inconsistent with guilt.  You are

16   leaning out and saying things that are inconsistent with

17   what the jury believes and what I believe.

18        Do I think that you were sitting there going oh,

19   baby, let's find some way to -- you know, no, I don't

20   think that is how things start.  That is not rational how

21   things start.  You find yourself in it.  Maybe you need a

22   little money for this or that.  Maybe it is a friendship

23   thing.  Maybe you find out, hey, what the hell did that

24   check come here for.

25        But, at some point, over the course of what is more

1     than a year, when these checks are coming and these

2     conversations are occurring, to sit down and say, well,

3     gee, I didn't read the flags.  You are going on that

4     mountain and you are talking to the people in the back of

5     that courtroom.  You are not talking to me.  You are

6     trying to get them to believe that you didn't do this, and

7     you did.

8          And I'm not looking to punish somebody because they

9     did.  People commit offenses.  People go ahead and deal

10    with the consequences.  But, I'm sorry, what you are

11    telling me today, what you are testifying to on the stand,

12    boy, those things don't go together very well, and it is

13    difficult -- extraordinarily difficult to deal with a

14    person who I don't think needs to be locked up to get a

15    message.

16         I think that at age 34, 36, this is the first time

17    that you are before a court.  You have no other record,

18    whether it be juvenile or not, other than this one

19    unscorable DUI or DWAI in which you got probation and

20    completed it successfully and terminated it in less than a

21    year.  Do I think you need some crippling sentence?  No.

22         But you have no idea how hard it is to ask a court

23    to give you all of this leniency when you keep blowing

24    smoke at me.  Frankly, it would be easier if you just

25    stood there and shut up.

1          But, no, you are going to make it -- you are trying

2     to fill in the gaps with what happened.  You didn't

3     realize, but you had these conversations about whether it

4     was legal.  You didn't realize you gave her permission

5     until after you talked to the agent.  That is not what you

6     testified to on the stand.

7          I understand that it is scary.  And I understand

8     that it is difficult.  And I don't think you need an

9     enormous amount of time, because I don't think that when I

10    look at you, notwithstanding all of this, do I think that

11    a person who is 36 years old, no record, stable employment

12    history, stable family life, children, that person needs a

13    particular number in order to get the message.

14         Well, it would be a whole lot easier to say you

15    don't need those numbers if I thought you got the message.

16    But I don't think you get the message, because I think you

17    are still trying to convince the universe of something

18    that the jury concluded and that I conclude is not true.

19         That testimony was a lie.  And that is something

20    that is difficult to overcome.  And it is more difficult

21    to overcome when you waffled and wiggled with it here

22    today.

23         I am going to give you 21 months.  And the reason

24    is that I think that it is an appropriate sentence given

25    your position in this matter and the position that you

1    have communicated to me.

2         I mean, at the end of the day, I am not asking that

3    someone fall on their sword.  But I am asking that someone

4    don't keep pushing in my face facts that just aren't

5    right.  That are just not right.

6         So, terms of supervised release will be 3 years.

7    There will be no fine.  There will be a $300 special

8    assessment, because I have to impose that by law.  All

9    terms of imprisonment will be concurrent.  That is what I

10   am going to do.

11        Ms. Paluch?

12        MS. PALUCH:  Nothing to add.

13        THE COURT:  Mr. Mosby?

14        MR. MOSBY:  Nothing.

15        MS. PALUCH:  I apologize.  I assume you are moving

16   into the more formal, and at that point we will address

17   restitution.

18        THE COURT:  Yep.  The restitution is obviously -- I

19   am required to do restitution; $38,724.51.  I believe that

20   is the number that is consistent with my prior ruling.

21        MS. PALUCH:  Yes, Judge.

22        THE COURT:  It will be joint and several with Raul,

23   Sabrina, Eugene, Pam Lucero.  I see no reason, given the

24   way that I have structured my ruling, to make it joint and

25   several with either Aragon, Guzman or Archuleta.

1          I will hear from you if you want.

2          MS. PALUCH:  I do not.

3          MR. MOSBY:  No, Your Honor.

4          THE COURT:  Okay.  All right.  Concerning the

5     guidelines, I have found that the loss that is used for

6     guideline purposes is the intended loss figure of $98,499.

7     Therefore, the base offense level of 6 is increased by --

8     I believe it is 8.  Yes, 8 pursuant to 2B1.1(b)(1)(E).  I

9     also deny a mitigating role adjustment.  I also grant the

10    obstruction of justice of 2 levels.

11         Having done these matters and made these

12    determinations, I conclude that total offense level is 16.

13    The Criminal History Category is I.  The guideline

14    imprisonment range is 21 to 27 months.  The fine range has

15    been said to me to be 5- to 50-.

16         PROBATION OFFICER:  Yes.

17         THE COURT:  $5,000 to $50,000.  Supervised release

18    range 1 to 3 years.

19         With respect to the other matters, I incorporate

20    the presentence report's factual determination, with the

21    exception of the determination that Ms. Portillos actually

22    completed a particular report as my finding of fact

23    concerning sentencing, and no other aspects of the report

24    have been challenged, either on a guideline basis or a

25    factual basis.

1        I find no reason to depart or vary from the

2   guideline range, and impose a sentence at the minimum of

3   that range, which does not exceed 24 months.

4        Pursuant to the Sentencing Reform Act of 1984, it

5   is the Judgment of the Court that the defendant, Cristina

6   Portillos, is hereby committed to the custody of the

7   Bureau of Prisons to be imprisoned for a term of 21 months

8   on each count, each sentence to be served concurrently.

9        Upon release from imprisonment, she shall be placed

10  on supervised release for a term of 3 years; a 3-year term

11  on each of Counts 1, 17, and 30, all to run concurrently

12  as required by law.

13       Within 72 hours of release from the custody of the

14  Bureau of Prisons, she shall report in person to the

15  probation office in the district to which she is released.

16  While on supervised release, the defendant shall not

17  commit another federal, state or local crime; shall not

18  possess a firearm, as defined in 18 U.S.C. Section 921;

19  and shall comply with the standard conditions that have

20  been adopted by this Court.

21       The Judgment will involve restitution as a

22  condition of supervision, with the defendant paying in

23  accordance with the schedule of payment sheet set forth in

24  the Judgment.

25       Defendant shall not unlawfully possess a controlled

1    substance.  She shall refrain from any unlawful use of a

2    controlled substance.  She shall submit to one drug test

3    within 15 days of placement on supervised release and two

4    periodic tests thereafter.  She shall cooperate in the

5    collection of DNA as directed by the probation officer.

6         I find that the following special conditions of

7    supervision are reasonably related to the factors

8    enumerated in 18 U.S.C. 3553 and 3563.  And, further,

9    based on the nature and circumstances of the offense, as

10   well as the history and characteristics of this particular

11   defendant, the following conditions do not constitute a

12   greater deprivation of liberty than reasonably necessary

13   to accomplish the goals of sentencing.

14        Therefore, I impose the following special

15   conditions of supervised release.  One, the defendant

16   shall not incur new credit charges or open additional

17   lines of credit without the approval of the probation

18   officer unless the defendant is in compliance with the

19   periodic payment obligation imposed pursuant to the

20   Court's judgment and sentence.

21        Two, the defendant shall participate in and

22   successfully complete a program of testing and or

23   treatment for substance abuse as approved by the probation

24   officer until such time as she is released from the

25   program by the probation officer.

1        She shall abstain from the use of alcohol or other

2   intoxicants during the course of the treatment.  Hold on.

3        All right.  Despite the fact that no one objected

4   to any of the conditions, I am going to delete special

5   condition two, because I am looking at the -- because I am

6   looking at the presentence report, and there is not much

7   by way of a drug history here, and I don't see the need.

8        Again, despite the objections, I have to look at

9   these things individually.  And as I am looking at this,

10  as I am reading it, I am realizing I don't believe that

11  this is necessary in this case.

12       Now, there is some history at various points in

13  time, there has been some mental health issues.  So I do

14  continue with what is denominated as number three, which I

15  will make number two.  The defendant shall participate in

16  and successfully complete a program of mental health

17  treatment as approved by the probation officer until such

18  time as she is released from the program by the probation

19  officer.  She shall pay for the cost of treatment as

20  directed by the probation officer.  Defendant shall remain

21  medication compliant and take all medication prescribed by

22  her treating psychiatrist.

23       Defendant shall cooperate with random blood tests

24  as required by the psychiatrist and/or supervising

25  probation officer to ensure that a therapeutic level of

1    prescribed medications is maintained.  That was the third

2    special condition.

3        The fourth is, as directed by the probation

4    officer, the defendant shall apply any moneys received

5    from any income tax refunds, lottery winnings,

6    inheritances, judgments, and any anticipated or unexpected

7    financial gains to the outstanding court-ordered financial

8    obligations in this case.

9        And, five, and finally, defendant has a financial

10   obligation that is outstanding.  The probation officer may

11   share any financial or employment documentation relevant

12   to the defendant with the Asset Recovery Division of the

13   United States Attorney's Office to assist in the

14   collection of the obligation.

15       The defendant shall make restitution to the victim

16   as identified in the presentence report, but which is the

17   Internal Revenue Service, in the amount of $38,724.51.

18   That amount of restitution is ordered to be joint and

19   several with Raul Caraveo, Pamila Lucero, Sabrina Caraveo,

20   and Eugene Chavez only.

21       Defendant shall pay a special assessment of $100

22   per count, for a total of $300, which is due and payable

23   immediately.  I find she does not have the ability for pay

24   a fine, so I waive the imposition of a fine in this case.

25   I also determine that she does not have the ability to pay

1    interest, and so it is ordered that the interest

2    requirement is waived for purposes of restitution.

3          The monetary obligation shall be paid immediately.

4    It is ordered that the monetary obligation shall, during

5    the period of supervision, be payable as follows:  Any

6    unpaid monetary obligation upon release from incarceration

7    shall be paid in monthly installments during the term of

8    supervised release.  The monthly installments will be

9    calculated as at least 10 percent of the defendant's gross

10   monthly income.

11         Defendant is advised of her right to appeal the

12   sentence.  If she desires to appeal, a Notice of Appeal

13   must be filed with the Clerk of the Court within 14 days

14   after entry of Judgment or the right to appeal will be

15   lost.  The Judgment, for Ms. Portillos' sake, is a

16   separate document that will be entered in the coming days.

17         If the defendant is unable to afford an attorney

18   for an appeal, the Court will appoint one to represent

19   her.  And if she so requests, the Clerk of the Court must

20   immediately prepare and file a Notice of Appeal on her

21   behalf.

22         Two matters.  One, I recommend to the Bureau of

23   Prisons that Ms. Portillos be designated to a facility

24   that is closest to the District of Colorado and consistent

25   with her security classification.

1          Bond?

2          MS. PALUCH:  No issue with her remaining on bond

3     until designation.

4          THE COURT:  I order the defendant's bond is

5     continued, and she shall self surrender.  Therefore, she

6     is ordered to surrender to the institution designated by

7     the Bureau of Prisons within 30 days from the date of

8     designation.

9          Anything further by way of record or comment on

10     behalf of the United States?

11          MS. PALUCH:  No, Your Honor.  Thank you.

12          THE COURT:  There is nothing to dismiss because it

13     was a trial; right?

14          MS. PALUCH:  That's correct.

15          THE COURT:  Mr. Mosby?

16          MR. MOSBY:  Nothing further.  I am sorry.

17          THE DEFENDANT:  I just was asking him if there was

18     any way to extend that while I wean my baby onto formula.

19          THE COURT:  No.

20          MR. MOSBY:  I told her we would ask in writing.

21          THE COURT:  No.  I am not going to extend it.

22     People wean their babies for all kinds of different

23     periods of time.

24          THE DEFENDANT:  Yeah.  It is difficult.  I have

25     been trying.

1        THE COURT:  No.

2        We will be in recess.

3        (Proceedings conclude at 11:44 a.m.)

4

5        **R E P O R T E R ' S    C E R T I F I C A T E**

6

7        I, Darlene M. Martinez, Official Certified

8    Shorthand Reporter for the United States District Court,

9    District of Colorado, do hereby certify that the foregoing

10   is a true and accurate transcript of the proceedings had

11   as taken stenographically by me at the time and place

12   aforementioned.

13

14       Dated this 23rd day of November, 2016.

15

16       _____

17       s/Darlene M. Martinez

18       RMR, CRR

19

20

21

22

23

24

25